**No. 2024-2174**

IN THE

# United States Court of Appeals
## FOR THE FEDERAL CIRCUIT

INTELLECTUAL PIXELS LIMITED,

*Appellant,*

*v.*

SONY INTERACTIVE ENTERTAINMENT, LLC,

*Appellee.*

APPEAL FROM THE U.S. PATENT OFFICE, PATENT TRIAL AND APPEAL BOARD
No. IPR2021-00237

## OPENING BRIEF FOR APPELLANT
## INTELLECTUAL PIXELS LIMITED

MICHELLE E. ARMOND
JOSEPHER LI
PATRICK MALONEY
**ARMOND WILSON LLP**
4685 MacArthur Court, Suite 390
Newport Beach, CA 92660
Tel: (949) 932-0778


November 25, 2024

DOUGLAS R. WILSON
**ARMOND WILSON LLP**
13785 Research Blvd., Suite 125
Austin, Texas 78750
Tel: (512) 267-1663


*Attorneys for Appellant*
*Intellectual Pixels Limited*

# PATENT CLAIMS AT ISSUE

Claims 1 and 8 of U.S. Patent No. 10,681,109:

    1.    A method of hosting an interactive software application comprising:

    running at a server the interactive software application;

    receiving at the server user input signals from a client device, wherein the user input signals are used to control updating of the state of the interactive software application;

    generating at least one updated image at the server in response to updating the state of the interactive software application; and

    ***compressing the at least one updated image*** and transmitting the compressed updated image to the client device, wherein the server transmits the updated image as a compressed frame that can be decompressed and displayed as an updated image at the client device.

    8.    An image display system, comprising:

    a server having a processor and memory configured to execute an interactive software application and further configured for:

    receiving at the server user input signals from a client device, wherein the user input signals are used to control updating the state of the interactive software application;

    generating at least one updated image at the server in response to updating the state of the interactive software application running on the server by the user input signals; and

    ***compressing the at least one updated image*** and transmitting the compressed updated image to the client device, wherein the server transmits the updated image as a frame and wherein the client device is configured for decompressing of the compressed updated image and displaying the updated image on a display coupled to the client device.

Appx152 (9:55–10:2, 10:27–45).

# CERTIFICATE OF INTEREST

Counsel for Appellant Intellectual Pixels Limited hereby certifies the following:

1.      The full name of every entity represented in the case by the counsel filing the certificate:

Intellectual Pixels Limited

2.      For each entity, the name of every real party in interest, if that entity is not the real party in interest:

Not Applicable

3.      For each entity, that entity's parent corporation(s) and every publicly held corporation that owns ten percent (10%) or more of its stock:

Not Applicable

4.      The names of all law firms and the partners or associates that have not entered an appearance in the appeal, and (a) appeared in the lower court tribunal; or (b) are expected to appear for the entity in this court:

Forrest M. McClellen

5.      Other than the originating case number(s), the title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

*Intellectual Pixels Ltd. v. Sony Interactive Entertainment LLC*, No. 8:20-cv-01422 (C.D. Cal. filed July 31, 2020)

6.      All information required by Federal Rule of Appellate Procedure 26.1(b) and (c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases:

Not Applicable

ARMOND WILSON LLP

Dated: November 25, 2024     By: /s/ *Douglas R. Wilson*
                                 Douglas R. Wilson

                             *Attorney for Appellant*
                             *Intellectual Pixels Limited*

# TABLE OF CONTENTS

**Page No.**

CERTIFICATE OF INTEREST ................................................................ i

STATEMENT OF RELATED CASES ........................................................1

JURISDICTIONAL STATEMENT....................................................................2

STATEMENT OF ISSUES ON APPEAL ..................................................3

I. INTRODUCTION.................................................................................4

II. STATEMENT OF THE CASE.............................................................6

    A. The Innovation Of The '109 Patent .......................................6

    B. Challenged Claims.................................................................9

    C. The Wiltshire Reference And The Petition's Allegations Of Obviousness Based On Wiltshire .............................................10

    D. The IPR Trial ........................................................................13

    E. The Board's First Final Written Decision Addressing "Generating" New Images And Compressing Them....................15

    F. Sony's Challenge To "Generating" In The First Appeal ..............16

    G. This Court's Prior Opinion And Mandate .................................17

    H. IPR Proceedings On Remand .......................................................18

    I. The Board's Second Final Written Decision Reversing Its Prior Findings On "Compressing"................................................20

III. SUMMARY OF ARGUMENT ..........................................................22

IV. ARGUMENT ......................................................................................23

**TABLE OF CONTENTS**
**(Cont'd)**

A. Standard Of Review ................................................................23

B. Law Of The Case And The Mandate Rule ..................................23

C. The Board Veered Outside This Court's Mandate And Improperly Reversed Its Undisturbed And Unchallenged Findings ...................................................................................26

    1. The Board Violated The Mandate From The First Appeal............................................................................27

    2. The Mandate Rule Barred The Board From Going Back In Time And Unraveling Its Undisturbed And Unchallenged Factual Findings .................................28

    3. The Board's Invocation Of Its Own Logic Does Not Excuse Compliance With The Mandate Rule..............31

    4. If Sony Wanted To Revisit On Remand The Board's Earlier Findings About Wiltshire's Alleged "Compressing," It Should Have Raised Them During The First Appeal .........................................33

D. Had the Board Stayed Within This Court's Mandate, It Could Not Have Found Wiltshire Disclosed "Compressing" Newly Generated Images ...................................36

    1. The Board Had It Right In The First Final Written Decision................................................................36

    2. Because Sony Never Appealed The Board's Original Findings, The Board Could Not Revisit Them On Remand..........................................................41

3.      The Board's Undisturbed And Unappealed Factual Findings Preclude The Board's About-Face On Obviousness ..................................................................43

E.      Even Disregarding This Court's Mandate, The Board's New Unpatentability Finding Is Unsupported By Substantial Evidence ................................................................46

1.      Wiltshire Itself Provides No Substantial Evidence Supporting The Board's Finding That Wiltshire "Teaches" Newly Generated Images ...................................47

2.      The Record Expert Testimony Provides No Substantial Evidence Supporting The Board's Finding ..............................................................................50

V.      CONCLUSION .................................................................55

# TABLE OF AUTHORITIES

**Page No(s).**

*Amado v. Microsoft Corp.*,
517 F.3d 1353 (Fed. Cir. 2008)......................................24, 28, 30, 34, 44

*ArcelorMittal France v. AK Steel*,
786 F.3d 885 (Fed. Cir. 2015)......................................31, 32

*Atlanta Gas Light v. Bennett Regulator Guards,*
33 F.4th 1348 (Fed. Cir. 2022)......................................25

*Banks v. United States*,
741 F.3d 1268 (Fed. Cir. 2014)......................................24, 31, 32

*Briggs v. Pa. R. Co.*,
334 U.S. 304 (1948)......................................23, 32

*Cardiac Pacemakers v. St. Jude Med.*,
576 F.3d 1348 (Fed. Cir. 2009)......................................23, 30

*Christianson v. Colt Indus. Operating Corp.*,
486 U.S. 800 (1988)......................................24

*Corephotonics v. Apple*,
84 F.4th 990 (Fed. Cir. 2023)......................................46

*cxLoyalty v. Maritz Holdings*,
986 F.3d 1367 (Fed. Cir. 2021)......................................45, 49

*Doe v. Chao*,
511 F.3d 461 (4th Cir. 2007)......................................24

*Doe v. United States*,
463 F.3d 1314 (Fed. Cir. 2006)......................................29

*Engel Indus. v. Lockformer Co.*,
166 F.3d 1379 (Fed. Cir. 1999)......................................24, 25, 28, 30, 44

**Page No(s).**

*Glass v. United States*,
63 F. App'x 486 (Fed. Cir. 2003)..............................................................42

*Hayward Indus. v. Pentair Water Pool & Spa*,
814 F. App'x 592 (Fed. Cir. 2020)........................................25, 26, 30, 54

*HPI/GSA-3C v. Perry*,
364 F.3d 1327 (Fed. Cir. 2004).........................................................31, 34

*In re Magnum Oil Tools Int'l*,
829 F.3d 1364 (Fed. Cir. 2016).........................................................43, 52

*Medtronic v. Teleflex Life Scis.*,
No. 2022-1605, 2024 WL 1208642 (Fed. Cir. Mar. 21, 2024).................52

*In re NTP*,
654 F.3d 1279 (Fed. Cir. 2011)................................................................48

*Pines v. McAllister*,
188 F.2d 388 (C.C.P.A. 1951) .................................................................42

*Polygroup v. Willis Elec. Co.*,
No. 2021-1401, 2022 WL 1183332 (Fed. Cir. Apr. 20, 2022) .................26

*Retractable Techs. v. Becton Dickinson*,
757 F.3d 1366 (Fed. Cir. 2014)........................................................ *passim*

*Robotic Vision Sys. v. View Eng'g*,
249 F.3d 1307 (Fed. Cir. 2001)................................................................31

*Samsung Elecs. v. Neonode Smartphone*,
No. 2023-1464, 2024 WL 3451828 (Fed. Cir. July 18, 2024).................41

*Scott v. Mason Coal Co.*,
289 F.3d 263 (4th Cir. 2002)....................................................................25

*SUFI Network Servs. v. United States*,
  817 F.3d 773 (Fed. Cir. 2016)..................................................................23

*Tronzo v. Biomet*,
  236 F.3d 1342 (Fed. Cir. 2001)................................................................42

*TQ Delta v. CISCO Sys.*,
  942 F.3d 1352 (Fed. Cir. 2019)..........................................................23, 45

*Williamsburg Wax Museum v. Historic Figures*,
  810 F.2d 243 (D.C. Cir. 1987) ...........................................................34, 35

*Xerox v. Bytemark*,
  IPR2022-00624, 2022 WL 3648989 (P.T.A.B. Aug. 24 2022) ...............49

**OTHER AUTHORITIES**

37 C.F.R. § 42.65 ......................................................................................45

8 U.S.C. § 1295 ...........................................................................................2

35 U.S.C. § 141 ...........................................................................................2

35 U.S.C. § 319 ...........................................................................................2

18B Charles Alan Wright et al., *Federal Practice and Procedure*
  § 4478.3 (3d ed. 2024) ......................................................24, 25, 30, 44

*All emphasis in this brief is added unless otherwise noted.*

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), Intellectual Pixels Limited states as follows:

1.      There has been one prior appeal from the same *inter partes* review proceeding challenging U.S. Patent No. 10,681,109: *Sony Interactive Entertainment LLC v. Intellectual Pixels Limited*, No. 2022-2118, 2023 WL 6773879 (Fed. Cir. Oct. 13, 2023) (Dyk, Prost, and Stoll, Circuit Judges).

2.      *Intellectual Pixels Ltd. v. Sony Interactive Entertainment LLC*, No. 8:20-cv-01422 (C.D. Cal. filed July 31, 2020), may be directly affected by the outcome in the pending appeal.

# JURISDICTIONAL STATEMENT

This appeal arises from an *inter partes* review proceeding in which the Patent Trial and Appeal Board issued its second Final Written Decision on June 5, 2024. Appx46. Intellectual Pixels Limited timely filed a notice of appeal on August 2, 2024. Appx913–917.

This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c) and 319.

## STATEMENT OF ISSUES ON APPEAL

1.      Whether the Board's unilateral decision on remand to reopen and reconsider unchallenged and undisturbed findings violated the mandate rule foreclosing the Board from further consideration of issues already decided.

2.      If the Board correctly disregarded this Court's mandate, whether substantial evidence supports the Board's contradictory finding on remand that the Wiltshire reference teaches the claimed requirement of "compressing" newly generated images when Wiltshire is completely silent and the uncontroverted expert testimony established Wiltshire included no such teaching.

## I. INTRODUCTION

This appeal returns following a remand to the Patent Trial and Appeal Board because Sony led the Board down the primrose path to reopen unappealed and undisturbed factual findings, plainly violating this Court's mandate. Although the Board has previously run afoul of the mandate rule, IPL is unaware of any precedential decision setting forth the rule when a final written decision is remanded to determine patentability on the merits and in which the Board did so.

The '109 Patent disclosed and claimed a foundational invention in the cloud-gaming and streaming graphics applications: dynamically and efficiently generating a realistic, 2D image corresponding to the player's current viewpoint of a 3D model of an imaginary gaming world. The patent claims require a series of interconnected steps including "generating at least one updated image," "compressing the at least one updated image," then "transmitting" it.

In the first appeal, Sony selectively challenged the Board's decision that the Wiltshire reference did not disclose the "generating" step. Sony repeatedly waved off appellate review of findings about Wiltshire's video MPEG stream adverse to its Petition, claiming they related to a "different" limitation—the "compressing" step.

This Court vacated the Board's judgment of patentability, holding that Wiltshire's Doom disclosure satisfied the "generating" step. The decision left

undisturbed the findings about Wiltshire's video MPEG stream that inevitably derailed Sony's challenge to the "compressing" step.

On remand, Sony urged the Board to disregard its prior, undisturbed and unchallenged findings about the video MPEG stream as "dicta" and reverse them. The Board followed along, ignoring the mandate and announcing that "the logical conclusion from the Federal Circuit's reasoning" was that its prior findings must be reversed. Appx93. It started over, issuing a second Final Written Decision that mushroomed to 93 pages and is now the subject of this appeal. This new decision expressly overturned its original findings that Wiltshire's alleged teachings about the MPEG stream did not show real-time "compressing" of newly generated images and reversed its prior findings rejecting Sony's expert testimony and finding it credible for the first time based on "the Court's guidance as to Wiltshire's disclosure." Appx93.

The Board's second Final Written Decision violates the mandate. The purpose of the mandate rule is to narrow future proceedings and prevent endless cycles of litigation and appeals. The Board's unappealed findings about Wiltshire's video MPEG stream were part of its judgment and were incorporated into the mandate. If Sony wished to revisit the Board's factual findings pertinent to the "compressing" step, it should have sought appellate review in the first

appeal, not waved this Court off.  Tactically waiting until remand to claim error in earlier findings is a clumsy end-run around the mandate rule.

The Board's latest decision should be reversed.

## II.  STATEMENT OF THE CASE

### A.  The Innovation Of The '109 Patent

The '109 Patent originated with a company called 3DLabs, a startup that went public on NASDAQ in 1996.  The 3DLabs founders and inventors (Osman Kent, David Baldwin, and Nicholas Murphy) were pioneers in computer graphics technology.  Mr. Kent still owns the '109 Patent through his current company, Appellant IPL.  Appx410–411.

When the inventors conceived of the '109 Patent inventions in 1999, computing power was limited, and computer graphics were relatively primitive. 3DLabs was the industry leader in bringing 3D computer graphics to PCs, a foundational development for the dynamic and immersive 3D graphics that dominate the video and computer game industries today.

In the mid-1990s, 3DLabs launched the Glint 300SX, the first single-chip, high-end 3D graphics device.  Its products won numerous awards, including "Editor's Choice-Best Products of 1997" by 3D Design Magazine and several "Best of Show" awards at the Comdex trade show, and were integrated into PCs

sold by leading manufacturers of the time, including Acer, Asus, Compaq, Dell, Fujitsu, Gateway 2000, Micron, Micro-Labs, and NEC.

The '109 Patent discloses an innovative, networked system where multiple client computers communicate with a remote visual server that dynamically delivers complex graphics to these clients more efficiently. Appx140 (Abstract); Appx149 (3:41–57); Appx3028–3029 (¶ 35). This invention was a marked improvement over existing techniques and was widely applicable to immersive, first-person video game graphics and digital television. Appx148–149 (1:58–3:37); Appx152 (9:4–22); Appx3028–3029 (¶¶ 35–36).

The '109 Patent discloses a client computer that collects inputs to control a game player's interaction with the image currently displayed at the client. Appx149 (3:58–61, 4:17–21). As shown in Figure 2 below, the client collects and transmits the user input to the server over a network (step 52). Appx149–151 (3:51–57, 4:17–32, 7:57–60); *see also* Appx3031–3033 (¶¶ 40–41). The server provides the user input to the game application to modify the existing state of the game (step 58), generates a modified or updated image based on those user inputs (step 62), and compresses the newly generated image and transmits it back to the client (steps 66, 68). Appx149–150 (3:51–57, 4:17–32, 6:38–43).



## Fig. 2B          Fig. 2D

Appx145–146 (Fig. 2, annotated).

The client decompresses the image data and displays the image frame.

Appx149 (3:67–4:3). This process is repeated many times per second to allow

the user to play a 3D video game, in real time, according to the target frame rate of the client.  Appx150–151 (6:23–28, 6:63–7:7); Appx3029 (¶ 36).

## B.    Challenged Claims

The Petition originally challenged all Claims 1-18 of the '109 Patent solely based on obviousness.  Appx170–171.[1]  The claims all require the following interconnected steps:

- "*receiving* at the server user input signals from a client device, wherein the user input signals are used to control updating of the state of the interactive software application,"

- "*generating at least one updated image* at the server in response to updating the state of the interactive software application,"

- "*compressing the at least one updated image*," and

- "*transmitting* the compressed updated image to the client device."

Appx152 (9:58–66, 10:31–40 ('109 Patent independent Claims 1, 8)).

Sony's first appeal solely addressed the "generating" limitation.  Appx40 ("The sole issue on appeal is whether the Board properly determined that Wiltshire does not teach the 'generating' limitation.").  This second appeal

---

[1] Claims 13-18 were disclaimed prior to institution.  *See* Appx2426.

addresses the following claimed step: "compressing the at least one updated image."

### C. The Wiltshire Reference And The Petition's Allegations Of Obviousness Based On Wiltshire

The Petition challenged all claims as obvious over Wiltshire (U.S. Patent No. 6,409,602) in combination with other references. Appx169–171; *see also* Appx1332–1358 (Wiltshire).

Wiltshire described a networked casino gaming system with "gaming stations" able to accept wagers, as shown below.



Fig. 1D

Appx1332 (Abstract); Appx1335 (Fig. 1D). Wiltshire taught that an image generated by a gaming program, located on the server, was transmitted to the

client over a network. Appx1355 (7:18–22). Examples of Wiltshire's casino

game images are shown below:



Fig. 5B

Fig. 6B

Fig. 7B

Fig. 9B

Appx1340–1351 (Wiltshire Figs. 5–9).

The Petition relied on Wiltshire alone to assert obviousness of the

"compressing the at least one updated image" limitation. The Petition's

obviousness theory solely asserted that Wiltshire "***discloses***" the claim limitation

based on two excerpts from Wiltshire's column 7:

> Wiltshire discloses that after an image is "update[d]" at stage 220 of
> Figure 2 (which is updated in response to the updated game state as
> described above for limitation 1[c]), the operation proceeds to stage
> 230, where the updated image "is sent from server/host computer 110

to client/terminal computer 120." Ex. 1004, 7:13-14. ***Wiltshire explains that to reduce bandwidth requirements, the server may compress the updated images as "a compressed video MPEG Stream."*** *Id*., 7:15-18; 7:62-64 (explaining that the "bandwidth requirement can be reduced *using data compression techniques*").

Appx194–195 (alteration and second emphasis in original) (citing Appx1355 (EX1004 at 7:13–18, 7:62–64) for obviousness of Claim 1[d] "compressing" limitation); Appx211–212 (Petition alleging obviousness of Claim 8's "compressing" limitation by cross-referencing to Claim 1[d]).

The Petition advanced no other theory of obviousness for satisfying the "compressing" limitation. Appx194–201.

The Petition first cited to Wiltshire's column 7:13–18, which describes stage 230 in Figure 2:

> In stage 230, an image is sent from server/host computer 110 to client/terminal computer 120. The image may include any type of graphical information including a bitmap, a JPEG file, a TIFF file or even an encoded audio/video stream such as ***a compressed video MPEG stream***. The image is generated by game computer program 112 and passed to server/host interface program 114. In turn, the image is transferred over communication pathways 130 to client/terminal computer 120 via the network services provided by server operating system 116.

Appx1355 (7:13–22). Wiltshire includes no other description of the "compressed video MPEG stream." *See generally* Appx1332–1358.

The Petition also cited to column 7:62–64, which explains that Wiltshire's "bandwidth requirement can be further reduced using data compression techniques to about 100 KB/sec." Appx1355 (7:62–64).

**D.    The IPR Trial**

During IPR proceedings below, the parties and expert witnesses hotly disputed whether Wiltshire's column 7 teachings satisfied the "compressing" limitation. Appx433–441; Appx504–510; Appx554–557.

IPL disagreed that Wiltshire taught "compressing" an updated image as required by the claims. Appx433–441. It pointed out that "Wiltshire's disclosure [is] completely silent as to the content or origin of that 'compressed video MPEG stream.'" Appx437. IPL explained that Wiltshire's column 7:15–18 never said that a generated image should be compressed. Appx439–440. Dr. Hart concurred, testifying that one of skill would have understood this passage to be referring to "a previously encoded video stream." Appx3044–3047 (EX2009 ¶¶ 64–68)). Using MPEG compression on live transmissions in an interactive game was hardly trivial, as explained by Sony's secondary reference Saha which required MPEG encoding to occur offline. Appx440 (citing Appx1366 (EX1005 at 2:60–61), Appx3047–3052 (EX2009 ¶¶ 69–79)). IPL pointed out that Wiltshire's teaching about reducing bandwidth to 100 KB/sec at column 7:62–64 did not explain how to reduce bandwidth using data compression and "in no way

disclosed or suggested that an updated image generated in step 220 might be compressed using MPEG." Appx440.

On reply, Sony argued that Wiltshire's column 7 "discloses the server updating the image and sending it as a compressed MPEG video stream to the client." Appx506 (citing Appx1355 (EX1004 at 7:15–18, 7:57–64)). Sony submitted a reply declaration from Dr. Fuchs. Appx508–510 (citing Appx2325–2329 (EX1033 ¶¶ 48–53)). Dr. Fuchs did not take issue with much of Dr. Hart's opinion. He did not disagree with Dr. Hart that Wiltshire's JPEG and TIFF files in the same clause as the MPEG stream could not be newly generated images because they are files. Appx2325 (¶ 48) ("The word 'file' is only used for JPEG and TIFF, and is specifically not used when describing the MPEG stream."). Dr. Fuchs also did not dispute Dr. Hart's opinion that Wiltshire's teaching of an encoded MPEG video stream referred to a preexisting MPEG stream. Appx3044–3055 (¶¶ 64–65); Appx2325–2328 (¶¶ 48–50). Dr. Fuchs' testimony that Wiltshire taught "dynamically generated" video streams because it disclosed "games like Doom" never said that Doom's "dynamically generated" images had to be compressed. Appx2326–2328 (¶¶ 49–50).

On sur-reply, IPL pointed out that "the reference to 'compressed video MPEG stream' says nothing about any image allegedly generated in step 220 being compressed to reduce bandwidth." Appx555. IPL also asserted that Sony

and Dr. Fuchs had no response to Dr. Hart's testimony that Wiltshire never taught or suggested "compress[ing]… a live stream of rendered images." Appx555–557.

### E. The Board's First Final Written Decision Addressing "Generating" New Images And Compressing Them

The Board issued its first Final Written Decision confirming patentability of Claims 1-12 on June 8, 2022. Appx1–36. The Board concluded that Sony "failed to meet [its] burden as to the 'generating' limitation of claims 1 and 8 of the '109 patent." Appx32. It held that "generating an updated image, as claimed, requires creation of a new image in response to updating the state of the interactive software application." Appx20. On that basis, it found that Wiltshire's disclosure of using preexisting images failed to teach "generating" new images in response to user input as required by the claims. Appx25; *see also* Appx19–31.

The Board made a number of other factual findings. It found that Wiltshire's disclosed embodiments described preloaded images, not images generated on the fly. Appx26. The Board rejected Sony's argument that Wiltshire's Figure 2 algorithm applied to games like Doom, finding that "Wiltshire does not teach using the operation disclosed in Figure 2 with Doom, and we find nothing in Wiltshire to suggest that a person of ordinary skill in the art would have understood that Wiltshire's system could possibly have supported that game in the manner proposed by Petitioner." Appx26–27.

It also rejected Sony's argument that Wiltshire's "video MPEG stream" taught "compressing" newly generated images. Appx30. It credited Dr. Hart's testimony about Wiltshire's reference to a "JPEG file" or "TIFF file" in column 7, finding "[t]he fact that Wiltshire specifically refers to the use of a *file* supports Dr. Hart's testimony that the updated image that Wiltshire refers to could simply be a pre-existing image file." Appx25 (emphasis in original) (citing Appx3043–3044 (EX2009 ¶¶ 62–63)). The Board found that "Wiltshire's disclosure [is] completely silent as to the content or origin of that 'compressed video MPEG stream'" and that Sony "imparts to Wiltshire something Wiltshire never discloses." Appx30 (alteration in original) (quoting Appx436–437).

On these bases, the Board entered judgment confirming patentability. Appx34–35. Sony then appealed.

## F. Sony's Challenge To "Generating" In The First Appeal

Sony's first appeal "sole[ly]" challenged the Board's determination that Wiltshire did not teach the "generating" limitation. Appx40. Sony challenged (1) the Board's construction of "generating," (2) the Board's findings that Wiltshire did not teach generating new images, and (3) the construction and findings regarding "generating" under the Administrative Procedure Act. Appx3492–3493; *see also* Appx3476–3546.

Sony never challenged the Board's findings about Wiltshire's video MPEG stream or compression. *See* Appx3476–3546. Instead, Sony urged this Court to ignore those findings, representing they were about "a ***different*** claim limitation ('compressing') and not the limitation at issue ('generating')." Appx3491 n.3; *see also* Appx3521–3522; Appx3542.

### G. This Court's Prior Opinion And Mandate

This Court's nonprecedential opinion addressed only one of Sony's three appellate arguments: "[t]he sole issue on appeal is whether the Board properly determined that Wiltshire does not teach the 'generating' limitation." Appx40. The decision expressly did not reach Sony's claim construction of "generating" or APA challenges regarding "generating." Appx45.

Citing its precedents holding that "[a] reference must be considered for everything that it teaches," the Court held that "[t]he Board erred when it narrowed the disclosure of Wiltshire to exclude Doom and only focused on the more detailed examples." Appx44–45 (citing *CRFD Rsch. v. Matal*, 876 F.3d 1330, 1349 (Fed. Cir. 2017)).

The Court discussed Wiltshire's teachings, Appx40–44, and found that "Wiltshire explicitly discloses that Figure 2 is to be applied to games like Doom," Appx44. The opinion quoted, but did not disturb, the Board's prior finding that Wiltshire did not disclose *how* to apply Figure 2 to Doom specifically:

> We find nothing in Wiltshire to suggest that a person of ordinary skill in the art would have understood that Wiltshire's system could possibly have supported that game in the manner proposed by petitioner.

Appx44 (cleaned up); *see also* Appx26–27. On that basis, the Court concluded that "[t]he Board's determination that Wiltshire does not disclose the 'generating' limitation under the Board's construction is not supported by substantial evidence." Appx45.

The opinion also left undisturbed the Board's findings that Wiltshire's video MPEG stream did not teach compressing newly generated images and that Wiltshire's disclosure was "completely silent as to the content or origin" of that video MPEG stream. *See generally* Appx37–45. The opinion did not task the Board with reopening its findings about Wiltshire's failure to teach "compressing the at least one updated image." *See* Appx45.

The Court "vacated and remanded" the first Final Written Decision "for further proceedings consistent with this opinion." Appx45. The Court subsequently issued its mandate. Appx841.

## H. IPR Proceedings On Remand

On remand, the PTAB changed its panel of judges. Appx842–843. It granted the parties' request for further briefing but denied their request for oral argument. Appx845–847.

Though this Court declined to address the Board's construction of "generating" in the first appeal, Appx45, Sony did not pursue its construction of "generating" on remand and instead argued under the Board's prior construction that "Wiltshire's disclosure of real-time compression of new, updated images is confirmed by Wiltshire's Figure 2 and 7:15–18, which teach transmitting a 'video *stream*' (step 230) that can be a '*compressed* video MPEG *stream*,' and Wiltshire's disclosure of a video game such as Doom, which would send such compressed video streams in real time."  Appx879 (emphases in original).

IPL explained on remand that all challenged claims require "a series of connected limitations, including: (1) 'generating at least one updated image,' (2) 'compressing the at least one updated image,' and (3) 'transmitting the compressed updated image.'"  Appx864 (quoting Appx152 (EX1001 at 9:62–66, 10:35–40)).  Because the claims require compressing *the* at least one updated image (i.e., a newly generated image), IPL argued "Wiltshire does not disclose compressing updated images as an MPEG stream, only that 'the image' sent to the client 'may include… a JPEG file, a TIFF file or even an encoded audio/video stream such as a compressed video MPEG stream.'"  Appx865 (quoting Appx1355 (EX1004 at 7:12–18)); *see also* Appx436–441.

IPL pointed out that the "Petition's only argument that Wiltshire *discloses* 'compressing' the updated image" was based on Wiltshire's teachings of "a

compressed video MPEG Stream." Appx865 (citing Appx194–195, Appx1355 (EX1004 at 7:15–18, 7:62–64)). It explained that the Board's finding that Wiltshire's disclosure was "completely silent as to the content or origin" of that video MPEG stream was undisturbed and now "binding" under the mandate rule. Appx865–866.

Sony argued on remand that "the Federal Circuit's opinion confirms that Wiltshire discloses 'compressing the at least one updated image….'" Appx880; *see also* Appx876–880. Labeling the Board's prior factual findings as "dicta," it asserted that "the Board is not bound to its prior dicta that Wiltshire is completely silent as to the content or origin of that compressed video MPEG stream." Appx895 (internal quotation marks omitted). Sony argued the mandate rule did not apply and warned the Board that "clinging to" its prior finding "would run counter to the Federal Circuit opinion." Appx895–896.

## I. The Board's Second Final Written Decision Reversing Its Prior Findings On "Compressing"

The Board's second Final Written Decision did an about-face and cancelled Claims 1-12 of the '109 Patent as obvious over Wiltshire. Appx46–138. The Board started over, issuing a second, 93-page Final Written Decision. *See id.* It not only applied the Court's mandate to find Wiltshire taught "generating," but

went further and reversed its earlier factual findings about Wiltshire's alleged "compressing" of newly generated images. *See id*.

The Board found "that Petitioner has shown that Wiltshire teaches compressing the updated image and transmitting the updated image as a compressed frame." Appx91. The Board addressed its finding in the first Final Written Decision that "Wiltshire is silent as to the content of that compressed MPEG stream." Appx93. It concluded that the Federal Circuit found it "improper" for the Board to focus "on embodiments in Wiltshire where images are preloaded." Appx92–93. The Board determined that the only

> ***logical conclusion*** from the Federal Circuit's reasoning is that our finding that Wiltshire is silent as to the content of that compressed MPEG stream has now been rejected. We must "credit[] Wiltshire's disclosure of applying its system to video games like Doom, which require 'generating' new images."

Appx93 (alteration in original) (quoting Appx45).

The Board reversed its earlier findings, deciding instead that Wiltshire's Figure 2, stage 230 shows "compress[ing] the updated images in the form of 'a compressed video MPEG stream.'" Appx91 (quoting Appx1355 (EX1004 at 7:13–18, 7:62–64)). It credited Dr. Fuchs' rejected testimony that Wiltshire's "video stream must be dynamically generated" as "consistent with the Court's guidance as to Wiltshire's disclosure," Appx93 (citing Appx2326–2327 (EX1033 ¶ 49)), and concluded "an ordinarily skilled artisan" would have known "*how* to

use MPEG for live, real-time interactive games disclosed in Wiltshire," Appx93–94 (emphasis in original).

The Board never addressed the mandate rule on remand. *See generally* Appx46–138. This appeal followed. Appx913–915.

## III. SUMMARY OF ARGUMENT

Stemming from judicial hierarchy and law of the case principles, the mandate rule precludes relitigation of already resolved issues and is designed to efficiently bring disputes to a close. Here the Board violated the mandate rule when it reversed its prior undisturbed and unchallenged findings on remand. The Board's first Final Written Decision correctly found that Wiltshire was "completely silent" as to the content or origin of its compressed video MPEG stream. Appx30. Despite these findings precluding Sony from prevailing on its sole theory that Wiltshire disclosed the claimed "compressing" step, Sony never appealed these findings and systematically discouraged appellate review during its first appeal. Had the Board remained within this Court's mandate, the Board's initial undisturbed findings precluded Sony from meeting its burden to show unpatentability.

Even setting aside the mandate issue, the Board's reversal of its earlier findings lacks substantial evidence. Nothing in Wiltshire, nor Dr. Fuchs'

conclusory and repudiated testimony, supports the Board's finding that Wiltshire taught real-time "compressing" of newly generated images.

## IV. ARGUMENT

### A. Standard Of Review

The Court reviews *de novo* both the Board's interpretation of this Court's mandate and whether the Board violated that mandate. *Retractable Techs. v. Becton Dickinson*, 757 F.3d 1366, 1369 (Fed. Cir. 2014); *SUFI Network Servs. v. United States*, 817 F.3d 773, 779 (Fed. Cir. 2016) (citing *Cardiac Pacemakers v. St. Jude Med.*, 576 F.3d 1348, 1355 (Fed. Cir. 2009)).

Obviousness is a question of law based on underlying facts. *TQ Delta v. CISCO Sys.*, 942 F.3d 1352, 1357 (Fed. Cir. 2019). The Board's legal conclusion of obviousness is reviewed *de novo* and its underlying factual findings for substantial evidence. *Id.* This Court has "repeatedly recognized that conclusory expert testimony is inadequate to support an obviousness determination on substantial evidence review." *Id.* at 1358–59.

### B. Law Of The Case And The Mandate Rule

From "its earliest days [the Supreme] Court consistently held that an inferior court has no power or authority to deviate from the mandate issued by an appellate court." *Briggs v. Pa. R. Co.*, 334 U.S. 304, 306 (1948). "The principle that a district court may not violate the mandate of a circuit court of appeals and

may not alter the law of the case so established is basic." *Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007) (citation omitted).

"The mandate rule provides that 'issues actually decided on appeal—those within the scope of the judgment appealed from, minus those explicitly reserved or remanded by the court—are foreclosed from further consideration.'" *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1360 (Fed. Cir. 2008) (cleaned up) (quoting *Engel Indus. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999)).

The mandate rule is a corollary of the doctrine of law of the case. *Banks v. United States*, 741 F.3d 1268, 1276 (Fed. Cir. 2014). Law of the case "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16 (1988) (citation omitted). "The rule encourages both finality and efficiency in the judicial process by preventing relitigation of already-settled issues" and is designed "to prevent the possibility of endless litigation." *Banks*, 741 F.3d at 1276.

"[I]llustrations abound of cases in which disobedient district judges are corrected for failure to honor the mandate as the law of the case on remand." 18B Charles Alan Wright et al., *Federal Practice and Procedure* § 4478.3 (3d ed. 2024). Such "disobedience" includes the "sin of carrying the court of appeals

ruling further than the court of appeals intended" or "misinterpreting the opinion and mandate." *Id.*

The mandate rule's objective of streamlining and narrowing litigation in remanded proceedings requires "the appellant [to] fully set forth its attack on the judgment below" for consideration by the appellate court. *Engel*, 166 F.3d at 1383. Prior decisions explain how this plays out in appellate practice:

> An issue that falls within the scope of the judgment appealed from but is not raised by the appellant in its opening brief on appeal is necessarily waived. Unless remanded by this court, all issues within the scope of the appealed judgment are deemed incorporated within the mandate and thus are precluded from further adjudication.

*Id.*; *see also Retractable Techs.*, 757 F.3d at 1371.

Like district courts, "[t]he Board is bound by the terms of a mandate issued by an appellate court." *Hayward Indus. v. Pentair Water Pool & Spa*, 814 F. App'x 592, 597 (Fed. Cir. 2020); *Atlanta Gas Light v. Bennett Regulator Guards*, 33 F.4th 1348, 1355 (Fed. Cir. 2022) (noting that "the unpatentability issues were locked in on remand [to the Board] by the mandate rule"); *Scott v. Mason Coal Co.*, 289 F.3d 263, 267–68 (4th Cir. 2002) (The mandate rule "applies with equal authority and weight to the Board and to the ALJ as administrative agencies."); *Fed. Practice and Procedure* § 4478.3 ("An administrative agency is bound by the mandate of a reviewing court….").

Although the Board has run afoul of the mandate rule in the past, IPL is unaware of any precedential decision setting forth the mandate rule in a subsequent appeal from a post-grant proceeding previously remanded to the Board to complete its patentability analysis and in which the Board did so. *See, e.g., Hayward*, 814 F. App'x at 598 ("[T]he Board exceeded the scope of our mandate" in the first appeal.); *Polygroup v. Willis Elec. Co.*, No. 2021-1401, 2022 WL 1183332, at \*1 (Fed. Cir. Apr. 20, 2022) (unpublished) ("[T]he Board exceeded the scope of our remand….").

### C. The Board Veered Outside This Court's Mandate And Improperly Reversed Its Undisturbed And Unchallenged Findings

This Court's prior opinion (1) reversed the Board's finding that Wiltshire did not satisfy the "generating" claim limitation and (2) vacated and remanded the Board's first Final Written Decision for "further proceedings consistent with this opinion." Appx45. Instead of complying, the Board ignored this Court's mandate and improperly invoked its own logic to undo prior factual findings that dictated confirming the '109 Patent claims again on a different claim limitation. Appx91–95. The second Final Written Decision violated the mandate rule and should be reversed.

### 1. The Board Violated The Mandate From The First Appeal

The mandate from the first appeal was straightforward. During the prior appeal, "[t]he sole issue [raised by Sony] on appeal [was] whether the Board properly determined that Wiltshire does not teach the 'generating' limitation." Appx40. The Court found that the Board legally erred by not considering Wiltshire "for everything that it teaches" and "narrow[ing] the disclosure of Wiltshire to exclude Doom." Appx44–45. It reversed the Board's decision that Wiltshire did not satisfy the "generating" limitation, finding it was "not supported by substantial evidence." Appx45. The opinion accordingly vacated and remanded to the Board "for further proceedings consistent with this opinion." *Id.*

On remand, the Board decided to wipe the slate clean and start over. It decreed the only "logical conclusion from the Federal Circuit's reasoning" was to overturn *all* of its prior findings about Wiltshire, including findings acknowledged by the Federal Circuit's decision and not challenged by Sony. Appx93. Its original 35-page Final Written Decision mushroomed into a second, 93-page Final Written Decision. *Compare* Appx1–35, *with* Appx46–138. The Board's second decision reversed both its prior findings about Wiltshire and its earlier judgment, finding the '109 Patent claims unpatentable. Appx137.

If the Board had stayed within this Court's mandate and adhered to its prior findings about Wiltshire's video MPEG stream, it could not have found that

Wiltshire disclosed the '109 Patent's "compressing" limitations or that the challenged claims would have been obvious. The Board's second Final Written Decision violated the mandate rule.

### 2. The Mandate Rule Barred The Board From Going Back In Time And Unraveling Its Undisturbed And Unchallenged Factual Findings

The mandate rule precluded the Board from starting over on its own initiative and revisiting undisturbed and unchallenged factual findings. *Amado*, 517 F.3d at 1360. "Unless remanded by [the appellate] court, all issues within the scope of the appealed judgment are deemed incorporated within the mandate and thus are precluded from further adjudication." *Engel*, 166 F.3d at 1383.

The Board's first Final Written Decision made two key findings about Wiltshire's disclosure pertinent to the "compressing" claim limitation that Sony never challenged in the first appeal and this Court's opinion did not disturb:

1. The Board found that "Wiltshire's disclosure [is] completely silent as to the content or origin of that 'compressed video MPEG stream.'" Appx30 (alteration in original) (quoting Appx437). Sony never appealed this finding, Appx3476–3546, Appx3655–3688, and this Court's opinion did not disturb it, *see* Appx37–45.

2. The Board also found "nothing in Wiltshire to suggest that a person of ordinary skill in the art would have understood that Wiltshire's system could

possibly have supported [Doom] in the manner proposed by Petitioner." Appx27.

Sony also declined to appeal this finding. Appx3476–3546; Appx3655–3688.

The Court's opinion quoted this finding, expressly acknowledging that the Board

determined "that a person of ordinary skill in the art would not be enabled to

practice Wiltshire with a game like Doom." Appx44 (quoting Appx27). Rather

than setting it aside, the Court instructed that the Board should nevertheless

consider Wiltshire for what it does disclose even if that disclosure is not enabled.

Appx44–45.

The Board's findings about Wiltshire's teachings are plainly within the

scope of its first Final Written Decision confirming patentability of the '109

Patent over Wiltshire and should not have been disturbed. *Doe v. United States*,

463 F.3d 1314, 1327 (Fed. Cir. 2006) ("Because they did not [raise an issue now

argued on appeal in a prior appeal], the issue was waived.") (citing *United States

v. Husband*, 312 F.3d 247, 250-51 (7th Cir. 2002) ("There are two major

limitations on the scope of a remand. First, any issue that could have been but

was not raised on appeal is waived and thus not remanded.")); *see also Retractable

Techs.*, 757 F.3d at 1371 (The Board is not "free to disturb matters that were

within the mandate.").

Instead of following the mandate, the Board defied it by reversing itself and

now finding:

1. "***Wiltshire teaches*** that to reduce bandwidth requirements, the server may compress the updated images in the form of '***a compressed video MPEG stream.***'" Appx91 (citation omitted).

2. "[T]he logical conclusion from the Federal Circuit's reasoning is that ***our finding that Wiltshire is silent as to the content of that compressed MPEG stream has now been rejected***. We must 'credit Wiltshire's disclosure of applying its system to video games like Doom, which require "generating" new images.'" Appx93 (cleaned up) (quoting Appx45).

The Board may not "reconsider its own rulings made before appeal and not raised on appeal." *Fed. Practice and Procedure* § 4478.3. The mandate rule bars disturbing the Board's prior unchallenged factual findings. *See, e.g.*, *Retractable Techs.*, 757 F.3d at 1373; *Amado*, 517 F.3d at 1360; *Engel*, 166 F.3d at 1383; *Cardiac Pacemakers*, 576 F.3d at 1356–57 (finding violation of the Court's mandate); *Hayward*, 814 F. App'x at 598 (determining "the Board exceeded the scope of our mandate" where "[i]n addition to making factual findings that Discenzo does not disclose the 'optimize energy consumption' limitation, the Board also made factual findings regarding whether Discenzo teaches switching between the master/slave mode and the independent mode" which "revisit[ed] the [already-decided] question of whether Discenzo teaches the two modes").

Here, the Court did not mandate new factual findings for the "compressing" limitations on remand. Appx45. Instead, it "remand[ed] for further proceedings consistent with [its] opinion." *Id.* Left undisturbed by the Court, the Board should have applied its previous findings that precluded Sony's unpatentability theory for the "compressing" limitations. *HPI/GSA-3C v. Perry*, 364 F.3d 1327, 1333–34 (Fed. Cir. 2004) (The "conclusion by the Board remains undisturbed on remand."); *Robotic Vision Sys. v. View Eng'g*, 249 F.3d 1307, 1311 (Fed. Cir. 2001) ("Because that finding was undisturbed by this court in the first appeal, the district court, on remand, properly concluded that Robotic's invention was the subject of a commercial offer for sale before the critical date." (internal citation omitted)).

The Board plainly exceeded the mandate.

### 3. The Board's Invocation Of Its Own Logic Does Not Excuse Compliance With The Mandate Rule

The mandate rule is an imperative. It applies absent "exceptional circumstances." *Banks*, 741 F.3d at 1276; *see also ArcelorMittal France v. AK Steel*, 786 F.3d 885, 889 (Fed. Cir. 2015). The Board never found that any exception justified its departure from the Court's mandate for reconsideration of its prior factual findings about Wiltshire's alleged teachings of compressing. *E.g.*, Appx91–95. Indeed, no intervening substantial change to the law or evidence

condones the Board's new findings on remand.  *See Banks*, 741 F.3d at 1276; *ArcelorMittal*, 786 F.3d at 889.

The Court's earlier opinion vacating the Board's initial Final Written Decision and remanding is the only intervening change and plainly does not trigger an exception to the mandate rule.  *See Retractable Techs.*, 757 F.3d at 1372 (rejecting argument "that a decision of this court can be considered a change in the 'evidence' sufficient to create an exception to the mandate of that same decision").

On remand, the Board substituted its "logical conclusion" for its adherence to this Court's mandate.  *See* Appx93.  The Board may not disobey this Court's mandate on its own initiative.  *Briggs*, 334 U.S. at 306 ("[A]n inferior court has no power or authority to deviate from the mandate issued by an appellate court.").

Similar assertions that a lower court was required to depart from the mandate have been summarily rejected.  In *Retractable Technologies v. Becton Dickinson*, this Court rejected an effort to skirt around the mandate.  757 F.3d at 1369–73.  There, the defendant won a reversal-in-part of the district court's infringement decision for one accused product but never appealed the damages determination based on all products.  *Id.* at 1369.  The Federal Circuit disagreed that its mandate "actually *requires* the district court to conduct further proceedings on damages to determine the effect of the reversal on any damages award."  *Id.* at

1370 (emphasis in original). It found the proposition that the appellate reversal of infringement made "the damages award… inconsistent with the mandate, puts the cart before the horse." *Id.* Plainly, "the mandate rule foreclose[d]" revisiting it. *Id.* at 1373.

### 4. If Sony Wanted To Revisit On Remand The Board's Earlier Findings About Wiltshire's Alleged "Compressing," It Should Have Raised Them During The First Appeal

Sony led the Board down the path of reversing the earlier findings unfavorable to Sony's Petition. It inaccurately told the Board its earlier findings were mere "dicta." Appx895. Sony told the Board it was required to reopen its undisturbed findings for "compressing" on remand, warning that doing otherwise "would run counter to the Federal Circuit opinion." *Id.*

Sony's threat was an empty one. Sony assured the Board that this Court's opinion "confirmed that 'Wiltshire discloses generation of a new image' and a compressed MPEG video stream is a type of newly generated image." Appx895 (internal citation omitted) (quoting Appx42). Sony offered no citation to this Court's opinion or Wiltshire for its claim that a "compressed MPEG video stream is a type of newly generated image." Appx895.

Nor could it. At Sony's urging, the Court never addressed Wiltshire's compression during the first appeal. Appx3491 n.3; Appx3521–3522; Appx3542.

And neither the opinion nor Wiltshire addresses the source of Wiltshire's "compressed video MPEG stream," let alone that this MPEG stream is a newly generated image that Wiltshire compresses in real-time for transmission. *See generally* Appx40–45; Appx1332–1358. The Court held that Wiltshire satisfied the "generating" claim limitation because "both parties agree[d] the game Doom requires creating new images." Appx43. The parties **never agreed** that Doom requires **compression**. As explained in the following Section IV.D.3, there is no evidence in the record from either party that Doom requires compression. *See* Appx907–908.

If Sony wanted the Board to reconsider its prior findings, it should have raised them during the first appeal. It did not. *See generally* Appx3476–3546; Appx3655–3688. Because it chose not to, the mandate rule now applies. *See, e.g.*, *Retractable Techs.*, 757 F.3d at 1370 (The mandate rule applied because defendant's "current substantive argument… could have and should have been raised in the previous appeal."); *Amado*, 517 F.3d at 1360 ("Microsoft and Amado both appealed from the amended judgment… which expressly noted that a permanent injunction and stay had been entered…. Because Microsoft failed to challenge that grant, it became a part of our mandate."); *HPI/GSA-3C*, 364 F.3d at 1333-34 (The "conclusion by the Board remains undisturbed on remand" because "neither party disputed" it.); *see also Williamsburg Wax Museum v.*

*Historic Figures*, 810 F.2d 243, 250 (D.C. Cir. 1987) ("[A] legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation….").

Instead, Sony took a different and improper course: it "not only made no effort to raise the issue, it arguably made an effort to avoid raising the issue" in the first appeal. *Retractable Techs.*, 757 F.3d at 1371. Sony systematically discouraged appellate review, distinguishing its appellate arguments about "generating" from the Board's findings that Wiltshire never disclosed the "compressing" limitation. *E.g.*, Appx3491 n.3 ("[T]he FWD places undue emphasis on two paragraphs from the declaration of IPL's declarant, Dr. John C. Hart, … about a ***different*** claim limitation ('compressing') and not the limitation at issue ('generating')." (emphasis in original)); Appx3521–3522 ("[T]he FWD relies on Dr. Hart's testimony for a ***different*** limitation: 'compressing' the updated image after it has been generated." (emphasis in original)); Appx3542 ("[T]he only treatment the FWD gives to Wiltshire's image generation statement is an ambiguous reference to Dr. Hart's testimony regarding a ***different*** limitation ('compressing')…." (emphasis in original)).

Because Sony did not challenge the "compressing" findings in its first appeal, they were "precluded from further adjudication" on remand, and the Board's reconsideration was error. *Retractable Techs.*, 757 F.3d at 1371.

### D. Had the Board Stayed Within This Court's Mandate, It Could Not Have Found Wiltshire Disclosed "Compressing" Newly Generated Images

Had the Board stayed within its mandate, its prior undisturbed findings precluded finding that Wiltshire taught the "compressing" limitation as alleged in the Petition. Absent Wiltshire disclosing that the "compressed video MPEG stream" was made with newly generated images as Sony contends, there was no basis to find that Wiltshire disclosed the compressing limitation. After a careful analysis, the Board correctly found that Wiltshire was "completely silent" about the content of its compressed video MPEG stream. Appx30. That finding was not disturbed on appeal. *See* Appx37–45. The Board's latest judgment that Wiltshire taught this limitation merits reversal. *See* Appx91 ("Wiltshire teaches that to reduce bandwidth requirements, the server may compress the updated images in the form of 'a compressed video MPEG stream.'").

#### 1. The Board Had It Right In The First Final Written Decision

The Petition's sole obviousness theory asserted that Wiltshire "discloses" the "compressing" requirement of all claims. Appx194. Sony selectively quoted

two passages from Wiltshire's column 7 about a "compressed video MPEG stream" and reducing bandwidth to support its theory. Appx194–195 (citing Appx1355 (EX1004 at 7:13–18, 7:62–64)). However, neither passage identifies the predicates necessary to show unpatentability of "compressing the at least one updated image" required by all claims at issue, namely: (1) what is being compressed (i.e., preexisting images or newly generated images), or (2) when the compression occurred. That showing is required because the challenged claims require generating an updated image in response to user input and compressing *the* updated image. Appx152 (EX1001 at 9:58–65 (Claim 1), 10:31–39 (Claim 8)).

Relying on Wiltshire's Figure 2, the Petition asserted that, at stage 230, "the updated image 'is sent from server/host computer 110 to client/terminal computer 120'" and that "to reduce bandwidth requirements, the server may compress the updated images as 'a compressed video MPEG Stream.'" Appx194–195 (quoting Appx1355 (EX1004 at 7:13–18, 7:62–64)). The first Final Written Decision rejected the Petition's contentions, correctly finding that Wiltshire did not disclose compressing updated images to form a compressed video MPEG stream. Appx30.

Sony's cropped and altered quotations originating from the following two passages from Wiltshire do not teach "compressing" as Sony claimed:

- Wiltshire's column 7:13–18: "The image may include any type of graphical information including a bitmap, a JPEG file, a TIFF file or even an encoded audio/video stream such as a compressed video MPEG stream."  Appx1355 (7:15–18), *quoted by* Appx194–195.

- Wiltshire's column 7:62–64: "This bandwidth requirement can be further reduced using data compression techniques to about 100 KB/sec."  Appx1355 (7:62–64), *quoted by* Appx194–195.

Neither passage refers to what data is being compressed or when. Appx1355 (7:15–18, 7:62–64).

**<u>Wiltshire's column 7:13–18</u>** does not describe the system "compressing" anything, let alone a newly generated image.  It states in full:

> In stage 230, an image is sent from server/host computer 110 to client/terminal computer 120.  ***The image may include any type of graphical information including a bitmap, a JPEG file, a TIFF file or even an encoded audio/video stream such as a compressed video MPEG stream***.  The image is generated by game computer program 112 and passed to server/host interface program 114.

Appx1355 (7:13–20).  Wiltshire does not teach that the "JPEG file," "TIFF file," or "compressed video MPEG stream" constitute the image, but rather are items that may be "***include[d]***" in "[t]he image."  Appx1355 (7:13–18); Appx3043–3044 (¶ 62).

The plain language of column 7:13–18 only confirms that Wiltshire was not referring to newly generated images. It specifically contemplates preexisting images: it describes both JPEG and TIFF *files*, which are stored in memory, not newly generated for transmission to a client. Appx1355 (7:13–18); Appx3044 (¶ 63) ("[A] POSITA would not have understood Wiltshire to disclose on-the-fly compression of the image generated by the game computer program, because Wiltshire specifically refers to a *file*." (emphasis in original)). As the Board correctly found: "The fact that Wiltshire specifically refers to the use of a *file* supports Dr. Hart's testimony that the updated image that Wiltshire refers to could simply be a pre-existing image file." Appx25 (bold added).

Wiltshire's reference to "an encoded audio/video stream such as a compressed video MPEG stream" in the same sentence also does not teach compressing newly generated images. Appx1355 (7:13–18). Like the JPEG and TIFF files, Wiltshire also describes this "*encoded*" stream in the past tense, indicating it is not generated dynamically. *See* Appx1355 (7:13–18); Appx3044 (¶¶ 64–65) ("[A] POSITA would have understood Wiltshire's reference to 'or even an encoded audio/video stream such as a compressed video MPEG stream' (7:16–18) to mean a pre-stored encoded audio/video stream, such as an MPEG file…. A POSITA would have understood 'encoded' here to mean a previously encoded video stream.").

The Board correctly found that "Wiltshire's disclosure [is] completely silent as to the content or origin of that 'compressed video MPEG stream,'" and criticized the Petition for "impart[ing] to Wiltshire something Wiltshire never discloses." Appx30 (first alteration in original); Appx3044–3045 (¶¶ 64–65). The Board originally found Dr. Hart's testimony that Wiltshire taught "us[ing]… pre-encoded files is persuasive." Appx30 (citing Appx3042–3047 (EX2009 ¶¶ 60–68)).

**Wiltshire at column 7:62–64** discusses bandwidth reduction and fares no better than Sony's first column 7 excerpt:

> the communication network bandwidth required for efficient operation of computer gaming system 100 is in the order of 10 MB/s. This bandwidth requirement can be further reduced using data compression techniques to about 100 KB/sec.

Appx1355 (7:60–64). Like Wiltshire's column 7:13–18 passage, this description of using "compression techniques" to reduce bandwidth is silent about what is being compressed or when. Nothing here "teaches" compressing newly generated images in real time. Wiltshire explained in the next four sentences that using "cached" or "preloaded" images also reduces bandwidth, a clear reference to preexisting images. Appx1355 (7:65–8:14); Appx3042–3043 (¶ 61). Cached or preloaded images are not newly generated images, and the Petition certainly presented no evidence showing they are. Appx191–195. Wiltshire's express

reliance on preexisting images meant that Sony needed to show that Wiltshire's disclosure of "compression techniques" meant compressing newly generated images, as required by the claims, as opposed to previously generated and compressed images. Nowhere does Wiltshire's column 7:62–64 passage describe generating a new image and compressing it for transmission. *See* Appx1355 (7:60–64); Appx3042–3044 (¶¶ 61–62).

### 2. Because Sony Never Appealed The Board's Original Findings, The Board Could Not Revisit Them On Remand

In sum, after a detailed review of Wiltshire and the expert testimony, the first Final Written Decision correctly concluded that Wilshire never taught compressing newly generated images. Appx25–30. The Board found that Wiltshire's silence about the origin of its "compressed video MPEG Stream" made it just as likely that Wiltshire referred to a preexisting MPEG stream. Appx30. Because the Petition relied on exactly that teaching in Wiltshire to allege obviousness of the "compressing" limitation, the Board's undisturbed finding precluded Sony from meeting its burden to show disclosure of "compressing." *See, e.g.*, *Samsung Elecs. v. Neonode Smartphone*, No. 2023-1464, 2024 WL 3451828, at *3 (Fed. Cir. July 18, 2024) (unpublished) (affirming patentability judgment where "the evidence supporting [petitioner's] obviousness position was in rough equipoise with the evidence weighing against that position, such that"

petitioner had not met its burden); *Pines v. McAllister*, 188 F.2d 388, 392 (C.C.P.A. 1951) ("preponderance of the evidence" standard not met where "the record also contains evidence which could as easily support the opposite conclusion").

As discussed in Section IV.C.4, Sony never appealed those findings, and they became part of the Court's mandate precluding review on remand. Appx40 ("generating" limitation is the "sole issue" in the first appeal); *Retractable Techs.*, 757 F.3d at 1371 (Board findings within the scope of prior appeal of a patentability judgment "are deemed incorporated within the mandate and thus are precluded from further adjudication" (citation omitted)); *Tronzo v. Biomet*, 236 F.3d 1342, 1347 (Fed. Cir. 2001) ("We agree that by failing to appeal the award of punitive damages in *Tronzo I*, Biomet waived this issue and was barred from raising it on remand."); *Glass v. United States*, 63 F. App'x 486, 488–89 (Fed. Cir. 2003) (determining "issue was within the scope of our mandate, and further review is foreclosed on the remand" even where lower court "did not explicitly say that it was granting summary judgment" on the issue).

The Board erred when it expressly rejected and reversed these findings on remand.

### 3. The Board's Undisturbed And Unappealed Factual Findings Preclude The Board's About-Face On Obviousness

On remand, it remained Sony's burden to prove that Wiltshire disclosed compressing newly generated images. *In re Magnum Oil Tools Int'l*, 829 F.3d 1364, 1375 (Fed. Cir. 2016) ("In an *inter partes* review, the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' 35 U.S.C. § 316(e), and that burden never shifts to the patentee." (quoting *Dynamic Drinkware v. Nat'l Graphics*, 800 F.3d 1375, 1378 (Fed. Cir. 2015))). Sony could not carry that burden with the Board's rejection of the Petition's evidence and argument. The Petition's only argument for the compressing limitation was that Wiltshire disclosed it; Sony never asserted the limitation would have been obvious. *See* Appx194–195 (asserting "Wiltshire discloses" the limitation). Thus, the Board's finding that Sony's evidence did not show disclosure of compressing newly generated images precluded a determination that Wiltshire disclosed the "compressing" limitation for all challenged claims. Had the Board adhered to this Court's mandate, it could not have found the challenged claims obvious.

The first appeal did not change the fact that Wiltshire's disclosure was "completely silent" about the content of the "compressed video MPEG stream" referenced in column 7. Appx30. This Court did not disturb that finding on

appeal.  *See generally* Appx37–45.  The Board plainly violated the mandate rule by revisiting and overturning its earlier findings to now find that Wiltshire "teaches… compress[ing] the updated images."  Appx91; *Retractable Techs.*, 757 F.3d at 1373 ("[T]he mandate rule precluded the district court from revisiting the issue."); *Amado*, 517 F.3d at 1360; *Engel*, 166 F.3d at 1383; *Fed. Practice and Procedure* § 4478.3 (The Board may not "reconsider its own rulings made before appeal and not raised on appeal.").  The second Final Written Decision should be reversed on this basis.

Sony's resort to Doom on remand does not remedy its Petition.  Although Doom generates images, there is no evidence that its images require compression.  Sony's briefing on remand cites to Dr. Fuchs' reply declaration at paragraphs 42–43 and 49–50 as support for Doom "requir[ing] real-time compression when used in Wiltshire's Figure 2."  Appx878 (citing Appx2319–2322 (EX1033 ¶¶ 42–43), Appx2326–2328 (EX1033 ¶¶ 49–50)); *see also* Appx895 (same).  But Dr. Fuchs only mentions "compressing" a few times in those four paragraphs in conclusory, unsupported assertions and never even asserts, much less shows, that Doom *requires* compression.  Appx2321–2322 (¶ 43) ("That is why in Wiltshire, the game running on the server generates the image based on the game state, compresses the image (using MPEG), and transmits the image to the server."); Appx2326–2327 (¶ 49) ("As explained above, Figure 2 and the accompanying

descriptions teach dynamically generating updated images based on game states that are in turn affected by user inputs, and sending those images to the client as a compressed video stream.").

Even if Dr. Fuchs had asserted that Doom *requires* compression (and he did not), his unsupported and conclusory testimony regarding compression is entitled to no weight. *cxLoyalty v. Maritz Holdings*, 986 F.3d 1367, 1378 (Fed. Cir. 2021) ("We do not accord weight to conclusory expert testimony." (citing *TQ Delta*, 942 F.3d at 1359 n.5, 1360)); 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight.").

Additionally, the Board previously found that "we find nothing in Wiltshire to suggest that a person of ordinary skill in the art would have understood that Wiltshire's system could possibly have supported [Doom] in the manner proposed by Petitioner." Appx27. This Court expressly acknowledged this finding on appeal. Appx44. Thus, it was also binding on the Board and precluded Sony's theory that Figure 2 as applied to Doom teaches compressing newly generated images. *Retractable Techs.*, 757 F.3d at 1371 ("Unless remanded by this court, all issues within the scope of the appealed judgment are deemed incorporated within the mandate and thus are precluded from further adjudication." (citation omitted)). If Wiltshire did not disclose how the Figure 2 embodiment could have

supported Wiltshire's system in the manner proposed by Sony, it certainly did not disclose compressing Doom's newly generated images to create a compressed video MPEG stream as Sony alleged.

### E.     Even Disregarding This Court's Mandate, The Board's New Unpatentability Finding Is Unsupported By Substantial Evidence

Even if the Court finds that the Board did not violate the mandate, no substantial evidence supports the Board's reversal of its prior findings and decision on remand that Wiltshire instead taught "compressing the at least one updated image." The Board was required to consider the evidence of record and determine, based on that evidence, whether the Petition carried its burden. *Corephotonics v. Apple*, 84 F.4th 990, 1003 (Fed. Cir. 2023) ("In evaluating whether the petitioner has met its burden, the Board must consider all evidence and argument properly submitted….").

In the first Final Written Decision, the Board credited Dr. Hart's testimony and found that Sony failed to show that Wiltshire's "compressed video MPEG stream" included newly generated images. Appx25; Appx30. On remand, the Board rejected its prior findings and Dr. Hart's credited testimony, believing that "[t]he Federal Circuit concluded that was improper." Appx92–93. It considered that the only "logical conclusion from the Federal Circuit's reasoning is that our finding that Wiltshire is silent as to the content of that compressed MPEG stream

has now been rejected." Appx93. The second Final Written Decision's reliance on its own "logic," rather than Wiltshire's actual teachings, lacks substantial evidence. *See* Appx92–93.

### 1. Wiltshire Itself Provides No Substantial Evidence Supporting The Board's Finding That Wiltshire "Teaches" Newly Generated Images

The Board cited Wiltshire's column 7 passages to find that

> Wiltshire teaches that to reduce bandwidth requirements, the server may compress the updated images in the form of "a compressed video MPEG stream."

Appx91 (citing Appx1355 (EX1004 at 7:13–18, 7:62–64)). These are the same two column 7 passages Sony cited in its Petition. *Compare id., with* Appx194–195 (citing same). As discussed in Section IV.D.1, neither Wiltshire's column 7:13–18 nor 7:62–64 taught "compress[ing of] updated images." Appx91.

Wiltshire's column 7:13–18. Wiltshire's disclosure of a "JPEG file," "TIFF file," and "compressed video MPEG stream" in column 7:13–18 does not teach the limitation. *See* § IV.D.1. These passing descriptions do not describe Wiltshire's system compressing anything in real time, let alone a newly generated image. *Id.*; *see also* Appx1355 (7:13–18); Appx30.

Even applying Wiltshire's Figure 2 to Doom, Sony and its expert never asserted that Wiltshire's JPEG or TIFF "*file*" included newly generated images. Appx504–510; Appx2324–2326 (¶¶ 47–48). Indeed, the experts did not dispute

that a "file" is stored in memory and is by definition preexisting. *E.g.*, Appx3043–3044 (¶ 62) ("A POSITA would have understood Wiltshire to disclose that the 'image [] generated by the game computer program' could include the contents of a pre-existing compressed image file." (alteration in original)); Appx2324–2326 (¶¶ 47–48) (acknowledging Dr. Hart's testimony and asserting that "[t]he word 'file' is only used for JPEG and TIFF").

The same is true for Wiltshire's past-tense description of "an ***encoded*** audio/video stream." Appx1355 (7:13–18). The undisputed evidence is that one of skill "understood Wiltshire's reference to 'or even an encoded audio/video stream such as a compressed video MPEG stream' (7:16-18) to mean a pre-stored encoded audio/video stream, such as an MPEG file." Appx3044 (¶ 64) (Dr. Hart); *see also* Appx3045 (¶ 65) (Wiltshire's "encoded audio/video stream" was "a previously encoded video stream," not a stream of "updated images"); Appx30 (crediting Dr. Hart's testimony); Appx3042–3047 (¶¶ 60–68). Sony's expert never acknowledged or responded to Dr. Hart's testimony, leaving it undisputed. Appx2325–2329 (¶¶ 48–53) (failing to address Dr. Hart's ¶ 64 opinion).

The Board's original plain reading of Wiltshire is the only correct interpretation of this language, and substantial evidence does not support a contrary interpretation. Appx30; *In re NTP*, 654 F.3d 1279, 1302 (Fed. Cir. 2011)

("Telenor is silent about the removal of information; thus, substantial evidence does not support the Board's fact-finding….").

Wiltshire's column 7:62–64 provides nothing to support the Board's new finding that Wiltshire "teaches" compressing updated images. Appx91 (citing Appx1355 (EX1004 at 7:13–18, 7:62–64)). As explained, Wiltshire's mere reference to reducing bandwidth is also silent about what exactly is compressed and when. *See* § IV.D.1; Appx1355 (7:62–64). Reference to cached or preloaded images are certainly not newly generated. *See* § IV.D.1.

This passage makes no mention of compressing streaming video, or "applying MPEG compression" for an image dynamically generated by the game program. Appx3042–3044 (¶¶ 61–62). Dr. Fuchs' only discussion of this passage in his opening declaration in support of the Petition's argument for "compressing" is a verbatim repetition of the single sentence in the Petition (except for one letter). *Compare* Appx1055–1056 (EX1002 ¶ 81), *with* Appx194–195. The Board by its own rule accords such verbatim and conclusory expert testimony "little weight." *Xerox v. Bytemark*, IPR2022-00624, 2022 WL 3648989, at *6 (P.T.A.B. Aug. 24 2022) (precedential) (Expert testimony that "merely repeats, *verbatim*, the conclusory assertion for which it is offered to support" is "entitled to little weight." (emphasis in original)); *see also cxLoyalty*, 986 F.3d at 1378 ("We do not accord weight to conclusory expert testimony.").

In his reply declaration, Dr. Fuchs cites this passage three times but never explains how this passage discloses what is being compressed or when, much less that MPEG is being used to do it. Appx2322 (¶ 44); Appx2324–2325 (¶ 47); Appx2325–2326 (¶ 48). Indeed, he comes closest to accurately characterizing the passage when he states, "Wiltshire then reiterates that the use of compression in this system can reduce the required bandwidth." Appx2324–2325 (¶ 47). Although this is the first and only mention of use of compression to reduce bandwidth in Wiltshire, *see generally* Appx1332–1358, his description here is otherwise accurate. His description confirms what is plain from the quoted language—i.e., that there is no description of what is being compressed or when, and there definitely is no mention of using MPEG to do it.

### 2. The Record Expert Testimony Provides No Substantial Evidence Supporting The Board's Finding

The Board accepted Dr. Hart's testimony and rejected Dr. Fuchs' testimony in its first Final Written Decision. *E.g.*, Appx25 (Board: "[W]e find persuasive Dr. Hart's testimony…."). It changed course on remand, now crediting Dr. Fuchs' repudiated testimony and finding it "consistent with the Court's guidance as to Wiltshire's disclosure." *See* Appx91–93. The Board's citations to Dr. Fuchs does not supply the required substantial evidence to support its contradictory findings

on remand that Wiltshire taught "compressing." *See id.* The expert testimony confirms that Wiltshire did not teach compressing newly generated images.

Dr. Hart considered Wiltshire's column 7 passages cited in the Petition and explained that "nowhere in the entirety of Wiltshire does it disclose the application of MPEG compression, or any streaming video compression, to the image generated by the game program running on the server/host computer." Appx3043 (¶ 62). He explained that the reference to the TIFF and JPEG "file[s]" in column 7, coupled with Wiltshire's other descriptions of caching or preloading images for use on the client, led Dr. Hart to conclude that "a POSITA would not have understood Wiltshire to disclose on-the-fly compression of the image generated by the game computer program, because Wiltshire specifically refers to a ***file***." Appx3044 (¶ 63) (emphasis in original); Appx25 (crediting this testimony). Further, Wiltshire's use of the past-tense of "an ***encoded*** audio/video stream" "mean[t] a previously encoded video stream." Appx3044–3045 (¶¶ 64–65).

Dr. Fuchs did not dispute Dr. Hart's opinion on the use of "file" in this passage. Appx2325–2326 (¶ 48). Dr. Fuchs' limited response was that "[t]he word 'file' is only used for JPEG and TIFF and is specifically ***not*** used when describing the MPEG stream." *Id.* (emphasis in original). He never addressed Dr. Hart's testimony that the past-tense reference to "encoded audio/video

stream" would lead a POSITA to understand the stream was preexisting rather than generated on-the-fly. *See generally* Appx2325–2328 (¶¶ 48–50). Dr. Fuchs' testimony was simply that "[t]he video stream must be dynamically generated because Wiltshire system [sic] must be capable of playing real-time interactive games like Doom." Appx2326–2327 (¶ 49). Even if accepted at face value, Dr. Fuchs' opinion that the images must be "dynamically generated" to accommodate Doom never explained why the Doom video stream was also a ***compressed*** video MPEG stream.

On remand, the Board found Dr. Fuchs' testimony that "real-time image compression" was known "credible given the disclosure of Saha and the Levoy article." Appx91–92. But resorting to other art to support Dr. Fuchs' opinion does not establish obviousness based on Wiltshire's "disclosure"—the Petition's sole unpatentability theory for the "compressing" limitation. Appx194–195; *Medtronic v. Teleflex Life Scis.*, No. 2022-1605, 2024 WL 1208642, at *8 (Fed. Cir. Mar. 21, 2024) (unpublished) (The Board correctly "evaluated the obviousness arguments [the petition] presented over Kontos alone, which were based on the express teachings of Kontos," and not "the broader teachings of Kontos and a skilled artisan's creativity and common sense."). The Board may not "adopt arguments on behalf of petitioners that could have been, but were not, raised by the petitioner during an IPR." *Magnum Oil Tools*, 829 F.3d at 1381.

After invoking its own "logic" to repudiate its earlier contrary findings, the remainder of the Board's analysis relies on Dr. Fuchs' testimony. Appx93–94. The Board found Dr. Fuchs' testimony that Wiltshire discloses sending video streams to clients "persuasive and consistent with the Court's guidance as to Wiltshire's disclosure." Appx93. Although it concludes that "Petitioner persuasively shows that the combination of Wiltshire and Saha teaches compressing those new images," the Board's discussion of Dr. Fuchs' supporting testimony does not mention "compressing" even once. *See* Appx93 (quoting Appx2323–2324 (EX1033 ¶ 46), Appx2326–2327 (EX1033 ¶ 49)). That does not appear inadvertent. Of the two paragraphs from Dr. Fuchs that the Board cites, paragraph 46 never mentions "compressing," Appx2323–2324 (¶ 46), and paragraph 49 provides only a conclusory statement without any supporting citation, Appx2326–2327 (¶ 49) (Dr. Fuchs: "As explained above, Figure 2 and the accompanying descriptions teach dynamically generating updated images based on game states that are in turn affected by user inputs, and sending those images to the client as a compressed video stream.").

Dr. Fuchs' paragraph 49 also refers to his earlier testimony presumably in paragraph 47. Appx2326–2327 (¶ 49) ("As explained above…."). But even that earlier paragraph does not provide the required substantial evidence to support the Board's new finding that Wiltshire teaches "compressing." Dr. Fuchs' opinion is

a transparent attempt to redraft Wilshire's disclosure. *See* Appx2324–2325

(¶ 47). He quotes Wiltshire at column 7:13–18, then states:

> Sending a "compressed video MPEG stream" corresponds exactly with step 230 shown in ***Figure 2, which is labeled, "Send video stream to client."*** A POSITA would thus understand that the term "compressed video MPEG stream" is compressing the "video stream" being sent to the client, of which the updated image is a part.

Appx2324–2325 (¶ 47) (internal citation omitted). First, Wiltshire does not

disclose "[s]ending a 'compressed video MPEG stream,'" undermining Dr.

Fuchs' analysis from the outset. Second, Dr. Fuchs opines that Wiltshire's step

230 means "Sending a '***compressed*** video MPEG stream'" even though step 230

is actually labeled "Send video stream to client." *Compare* Appx1336 (Fig. 2,

step 230), *with* Appx2324–2325 (¶ 47) (Dr. Fuchs). Dr. Fuchs' conclusory single

sentence provides no explanation or support for this assertion. Blatantly masking

the actual disclosure of Wiltshire certainly does not provide substantial evidence.

*Hayward*, 814 F. App'x at 597 (Board's finding unsupported by substantial

evidence where it "ignore[s] the explicit disclosures" of the reference).

Dr. Fuchs does the same thing with Wiltshire's column 7:13–18.

Appx2324–2325 (¶ 47). He claims that Wiltshire taught "compressing the 'video

stream' being sent to the client" such that "the server may send to the client each

updated image." *Id.* But, as discussed above, Wiltshire simply referenced the

fact that an "image may include … an encoded audio/video stream such as a

compressed video MPEG stream," not **compressing** newly generated images in real time. Appx1355 (7:13–18); *supra* § IV.E.1. Dr. Fuchs again provides no reasoning or analysis to support his revisions of Wiltshire. *See* Appx2324–2325 (¶ 47). Redrafting Wiltshire by fiat does not provide an actual "teaching" necessary to support the Petition's obviousness theory.

Even if the Court's mandate were set aside, nothing in Wiltshire supports the Board flipping its prior factual findings on remand. The Board's decision that Wiltshire "teaches compressing the updated image" lacks substantial evidence and should be reversed. *See* Appx91. Absent that teaching of the compressing limitation, there is no basis for a conclusion that the challenged claims requiring compressing newly generated images would have been obvious, such that the Board's obviousness conclusion for all challenged claims should be reversed.

## V. CONCLUSION

For these reasons, the Board's conclusion that '109 Patent Claims 1-12 would have been obvious should be reversed.

Respectfully submitted,

ARMOND WILSON LLP

Dated: November 25, 2024

By: /s/ *Douglas R. Wilson*
Douglas R. Wilson

*Attorney for Appellant*
*Intellectual Pixels Limited*

-55-

# ADDENDUM

# INDEX TO ADDENDUM

1.     Judgment and Final Written Decision Determining No
       Challenged Claims Unpatentable and Granting In Part
       Patent Owner's Motion to Exclude (June 8, 2022)..................... Appx1-36

2.     Opinion, *Sony Interactive Entm't v. Intellectual Pixels*,
       Case No. 2022-2118 (Fed. Cir. Oct. 13, 2023) ......................... Appx37-45

3.     Judgment and Final Written Decision on Remand
       Determining All Challenged Claims Unpatentable
       (June 5, 2024) ....................................................... Appx46-139

4.     U.S. Patent No. 10,681,109.................................... Appx140-153

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

SONY INTERACTIVE ENTERTAINMENT LLC,
Petitioner,

v.

INTELLECTUAL PIXELS LIMITED,
Patent Owner.

IPR2021-00237
Patent 10,681,109 B2

Before JENNIFER MEYER CHAGNON, STACY B. MARGOLIES, and
IFTIKHAR AHMED, *Administrative Patent Judges.*

AHMED, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
Granting In Part Patent Owner's Motion to Exclude
*35 U.S.C. § 318(a)*

**Appx1**

## I.   INTRODUCTION

Sony Interactive Entertainment LLC ("Petitioner") requested an *inter partes* review of claims 1–18 of U.S. Patent No. 10,681,109 B2 (Ex. 1001, "the '109 patent").  Paper 3 ("Petition" or "Pet.").  Intellectual Pixels Limited ("Patent Owner") filed a Preliminary Response.  Paper 11.  In its Preliminary Response, Patent Owner informed us that it had disclaimed claims 13–18.  *Id.* at 5 (citing Ex. 2001 (Notice of Filing a Statutory Disclaimer of Claims in a Patent under 37 C.F.R. § 1.321(a))).  Applying the standard set forth in 35 U.S.C. § 314(a), we instituted an *inter partes* review of claims 1–12 (the "Challenged Claims")[1] of the '109 patent.  Paper 13 ("Inst. Dec.").

After institution, Patent Owner filed a Patent Owner Response (Paper 17, "PO Resp."), Petitioner filed a Reply to Patent Owner's Response (Paper 22, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 26, "PO Sur-reply").  An oral hearing was held on March 10, 2022, and a copy of the transcript was entered in the record.  Paper 37 ("Tr.").

We have jurisdiction pursuant to 35 U.S.C. § 6.  This Decision is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of the claims on which we instituted trial.  Petitioner bears the burden of proving unpatentability of the Challenged Claims, and the burden of persuasion never shifts to Patent Owner.  *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).  To

---

[1] Because Patent Owner filed a statutory disclaimer of claims 13–18 of the '109 patent (*see* Ex. 2001) prior to our institution decision, no *inter partes* review was instituted as to those claims.  Inst. Dec. 6–7; *see also* 37 C.F.R. § 42.107(e) ("No *inter partes* review will be instituted based on disclaimed claims.").

prevail, Petitioner must prove unpatentability by a preponderance of the evidence. *See* 35 U.S.C. § 316(e) (2018); 37 C.F.R. § 42.1(d) (2020). Having reviewed the arguments and the supporting evidence, we determine that Petitioner has not shown, by a preponderance of the evidence, that claims 1–12 of the '109 patent are unpatentable.

## II. BACKGROUND

### A. Related Proceedings

The '109 patent is asserted in *Intellectual Pixels Ltd. v. Sony Interactive Entertainment LLC*, No. 8:20-cv-01422-JVS-KES (C.D. Cal). Pet. 1; Paper 5, 1. That proceeding has been stayed pending resolution of this *inter partes* review. Paper 7, 2.

### B. The '109 Patent (Ex. 1001)

The '109 patent, titled "Image Display System with Visual Server," was filed on June 29, 2017, and claims priority to a provisional application filed on January 24, 2001. Ex. 1001, codes (22), (54), (60), (63). The '109 patent issued on June 9, 2020.[2] *Id.* at code (45). The '109 patent "relates to computer graphics and a graphical image display system that use a visual server to generate and transmit images to a client." *Id.* at 1:30–33.

---

[2] In our decision to institute *inter partes* review, we determined that the '109 patent has an effective filing of at least November 15, 2011, and was therefore eligible for *inter partes* review on December 4, 2020, the filing date of the Petition. Inst. Dec. 8–9.

Figure 1 of the '109 patent is reproduced below.



Figure 1 shows image display system 10 including visual server 12 and associated components in communication with a plurality of clients (i.e., set-top box 22, personal digital assistant ("PDA") 18, and cellular telephone 20). Ex. 1001, 5:36–54. The '109 patent notes that "for reasons of cost, size, and power consumption, sophisticated three dimensional graphics are not available on common consumer client devices such as personal digital assistants (PDAs) mobile telephones and set-top boxes." Ex. 1001, 3:26–30; *id.* at 5:51–52 (listing Palm Pilot and Handspring Visor as examples of PDAs).

The '109 patent describes displaying such graphics on these clients "through the use of the resources of a remote visual server." Ex. 1001, 3:41–43. The server has image data processing capabilities, receives image-modifying data corresponding to a generated image from a client, generates

a modified image based on that image-modifying data, and transmits the modified image as compressed data back to the client. *Id.* at 3:51–57.

Figures 2B and 2D of the '109 patent are reproduced below.



Fig. 2B                    Fig. 2D

5

Figures 2B and 2D show a flowchart of the process on the server in receiving image-modifying data from the client, and then generating and transmitting a modified client image to the client. Ex. 1001, 5:24–29.

"In generating the image-modifying data at the client and processing the image-modifying data at the visual server, the typical data processing segment is a frame," and "compressed data comprising a frame" is transmitted to the client. Ex. 1001, 4:10–12, 4:48–55, 6:63–7:1. The '109 patent teaches use of "a protocol such as MPEG4" for compressing and transmitting an image to a client. *Id.* at 9:26–28. According to the patent, "[t]he use of an industry standard image compression protocol such as MPEG allows . . . use of facilities that are already present in most clients." *Id.* at 9:32–34. The clients include "processing ability to uncompress the compressed image data . . . and display the image defined by the decompressed data on the client image display." *Id.* at 3:67–4:3.

Figure 3 of the '109 patent is reproduced below.

6

Figure 3 is a schematic of data and procedural flow in an embodiment of the '109 patent. Ex. 1001, 5:30–31. The'109 patent describes that image data is compressed at the server and transmitted to the client, where it is decompressed and displayed to the user. *See id.* at 8:1–22; *see also id.* at Figs. 2A–2D (a flowchart illustrating the processes executed on the server as well as the client to facilitate image generation).

## C. Challenged Claims

We instituted review on independent claims 1 and 8, and dependent claims 2–7 and 9–12. Claim 1 is reproduced below.

> 1. A method of hosting an interactive software application comprising:
> running at a server the interactive software application;
> receiving at the server user input signals from a client device, wherein the user input signals are used to control updating of the state of the interactive software application;
> generating at least one updated image at the server in response to updating the state of the interactive software application; and
> compressing the at least one updated image and transmitting the compressed updated image to the client device, wherein the server transmits the updated image as a compressed frame that can be decompressed and displayed as an updated image at the client device.

Ex. 1001, 9:55–10:2.

## D. The Instituted Grounds of Unpatentability and Declaration Evidence

As against the Challenged Claims, Petitioner asserts the following grounds of unpatentability, relying on the declaration testimony of Dr. Henry Fuchs (Exs. 1002, 1033). Pet. 3–4, 19–73.

| Claim(s) Challenged | 35 U.S.C. §[3] | References |
|---|---|---|
| 1, 3–12 | 103(a) | Wiltshire[4], Saha[5] |
| 2 | 103(a) | Wiltshire, Saha, Chen[6] |
| 6, 11, 12 | 103(a) | Wiltshire, Saha, PC Magazine[7] |

Patent Owner supports its arguments with a Declaration by John C. Hart, Ph.D. (Ex. 2016).

## III. ANALYSIS

### A. Principles of Law

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware*, 800 F.3d at 1378 (discussing the burden of proof in *inter partes* review).

---

[3] Because the Challenged Claims of the '109 patent have an effective filing date before March 16, 2013 (*see supra* n.2), patentability is governed by the pre-AIA version of 35 U.S.C. § 103.
[4] U.S. Patent No. 6,409,602 B1, filed Nov. 24, 1998, issued June 25, 2002 (Ex. 1004, "Wiltshire").
[5] U.S. Patent No. 6,404,817 B1, filed Nov. 20, 1997, issued June 11, 2002 (Ex. 1005, "Saha").
[6] Walter Y. Chen, The Development and Standardization of Asymmetrical Digital Subscriber Line, IEEE COMMUNICATIONS MAGAZINE, Vol. 37, No. 5, 68–72 (May 1999) (Ex. 1006, "Chen").
[7] PC MAGAZINE, Vol. 18:16, Sept. 21, 1999 (Ex. 1007, "PC Magazine").

As set forth in 35 U.S.C. § 103(a),

> [a] patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). An obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). However, Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016). Instead, Petitioner must articulate a reason why a person of ordinary skill in the art would have combined the prior art references. *In re NuVasive*, 842 F.3d 1376, 1382 (Fed. Cir. 2016).

### B. Level of Ordinary Skill in the Art

We review Petitioner's asserted obviousness grounds in view of the understanding of a person of ordinary skill in the art at the time of the invention. *Graham*, 383 U.S. at 17. Petitioner contends that a person of ordinary skill in the art "would have had at least (1) an undergraduate degree in computer science, electrical engineering, or an equivalent subject, together with two years of post-graduate experience in computer graphics; or

(2) a master's degree in computer science, electrical engineering, or equivalent subject, together with one year of postgraduate experience in computer graphics." Pet. 14 (citing Ex. 1002 ¶ 23). Patent Owner agrees. *See* PO Resp. 10 (citing Ex. 2009 ¶¶ 24–25).

We determine that the parties' agreed level of ordinary skill is consistent with the '109 patent and the asserted prior art. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995); *In re Oelrich*, 579 F.2d 86, 91 (CCPA 1978). We adopt that level of ordinary skill in determining the patentability of the Challenged Claims.

## C. Claim Construction

In this *inter partes* review, claims are construed using the same claim construction standard that would be used to construe the claims in a civil action under 35 U.S.C. § 282(b). *See* 37 C.F.R. § 42.100(b). The claim construction standard includes construing claims in accordance with the ordinary and customary meaning of such claims as understood by one of ordinary skill in the art at the time of the invention. *See id.*; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–14 (Fed. Cir. 2005) (en banc). In construing claims in accordance with their ordinary and customary meaning, we take into account the specification and prosecution history. *Phillips*, 415 F.3d at 1315–17. Additionally, only terms that are in controversy need to be construed, and these need be construed only to the extent necessary to resolve the controversy. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (holding that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy"); *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor*

*Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (citing *Vivid Techs.* in the context of an *inter partes* review).

Petitioner initially asserts that it "does not believe the claim terms need to be construed to resolve the issues presented in this Petition." Pet. 18–19. Patent Owner proposes two claim terms for construction: "frame" and "mobile device." PO Resp. 10–21. In its Reply, Petitioner disagrees with Patent Owner's proposed constructions for both of those terms. Pet. Reply 1–12. We do not find it necessary, however, to resolve the parties' claim construction dispute to decide the issues in this proceeding.

### D. Overview of the Asserted Prior Art

#### 1. Wiltshire (Ex. 1004)

Wiltshire discloses a "slim terminal gaming system" that claims to "drastically reduce[] the cost and substantially increase[] the tamper resistance of individual gaming stations" by "allow[ing] concurrent access to multiple computer gaming programs from individual gaming stations by a patron." Ex. 1004, code (54), 2:21–28.

Figure 1D of Wiltshire is reproduced below.



Figure 1D shows an overview of Wiltshire's system, with "server/host computer 110 connected to a plurality of remote client/terminal computers 120." Ex. 1004, 3:62–66. The client computers may have minimal storage, memory, and processing power because "the overwhelming majority of the gaming related and regulated processing is performed on the server/host computer." *Id.* at 5:17–23. The game program running on the server determines which images are to be displayed on the display connected to each client computer (e.g., display devices 140) and also processes any input commands detected by the client computer. *Id.* at 5:50–65.

Figure 2 of Wiltshire is reproduced below.



Figure 2 is a flow diagram showing the operation of Wiltshire's system.
Ex. 1004, 7:7–8. Wiltshire explains that "an image is sent from server/host
computer 110 to client/terminal computer 120," where the "image may
include any type of graphical information including a bitmap, a JPEG file, a
TIFF file or even an encoded audio/video stream such as a compressed video
MPEG stream." *Id.* at 7:11–18. The image transmitted to the client/terminal
computer 120, where "program 122 then causes the image to be displayed on
a screen of client/terminal computer 120 in stage 240." *Id.* at 7:18–27. If an
input command, such as a keystroke or a mouse click, is detected at stage

250, that command is transmitted back to the server at stage 260. *Id.* at 7:27–38.

2. *Saha (Ex. 1005)*

Saha "relates to the field of video compression, and in particular to a video decoder which provides robust error detection and concealment." Ex. 1005, 1:6–8, 5:66–67. Saha describes that in contrast to intraframe or still image compression techniques, "video compression algorithms for motion video use a concept referred to as interframe compression to remove temporal redundancies between frames." *Id.* at 1:24–28, 1:44–47. Saha discloses that the "compression standard referred to as MPEG (Moving Pictures Experts Group) compression is a set of methods for compression and decompression of full motion video images[,] which uses the interframe and intraframe compression techniques." *Id.* at 1:64–2:1. Saha explains

> Interframe compression methods such as MPEG are based on the fact that, in most video sequences, the background remains relatively stable while action takes place in the foreground. The background may move, but large portions of successive frames in a video sequence are redundant. MPEG compression uses this inherent redundancy to encode or compress frames in the sequence.
>
> An MPEG stream includes three types of pictures, referred to as the Intra (I) frame, the Predicted (P) frame, and the Bi-directional Interpolated (B) frame. The I (intra) frames contain the video data for the entire frame of video and are typically placed every 10 to 15 frames . . . and are generally only moderately compressed. Predicted frames are encoded with reference to a past frame, i.e., a prior Intraframe or Predicted frame. Thus P frames only include changes relative to prior I or P frames [and] receive a fairly high amount of compression.

*Id.* at 2:14–30.

14

### 3. Chen (Ex. 1006)

Chen discusses the development and standardization of asymmetrical digital subscriber line ("ADSL"), one of a variety of digital subscriber line ("DSL") systems built upon the existing twisted-pair telephone technology. Ex. 1006, Abstract, 68.[8]  Chen discusses that ADSL can provide higher speed download bandwidth to a user along with lower speed upload bandwidth from the user, making it "well suited to the concept of a video-on-demand service." *Id.* at 69.  The video, audio channel, and associated overhead can be transmitted within a 1.5 Mb/s downstream channel, sufficient to receive on-demand MPEG video. *Id.*  An upstream channel of 16–64 kb/s is provided to send back control signals for interactive commands such as pause, play, and so forth. *Id.*

### 4. PC Magazine (Ex. 1007)

PC Magazine is a magazine article that provides details about Apple's then newly-announced iBook portable computer.  Ex. 1007, 9.  The article describes the iBook as weighing 6.6 pounds, with a 12.1 inch display, a 300 MHz G3 processor, and a battery life of over six hours. *Id.*  According to the article, iBook users can roam up to 150 feet from base stations using Apple's AirPort wireless technology that supports data-transfer rate of 11 Mbps. *Id.*

### E. Obviousness of Claims 1 and 3–12 over Wiltshire and Saha

Petitioner contends that claims 1 and 3–12 are unpatentable as obvious over the combination of Wiltshire and Saha.  Pet. 13–58.  For the reasons that follow, we are not persuaded that Petitioner has established by a

---

[8] Page numbers cited in this Decision are the underlying page numbers of the references themselves.

preponderance of the evidence that these claims are unpatentable under § 103(a) in view of Wiltshire and Saha.

### 1. Independent Claims 1 and 8

Patent Owner argues that the combination of Wiltshire and Saha fails to teach or suggest the "generating at least one updated image" limitation of independent claims 1 and 8. PO Resp. 24–32. Specifically, Patent Owner contends that claims 1 and 8 each include distinct limitations directed to "generating," "compressing," and "transmitting," and also require that the three steps be performed or be configured to be performed in that order. *Id.* at 24–26 (citing Ex. 1001, 6:33–38, 8:4–6, 8:10–14, 9:62–66, 10:39–40, Figs. 2B, 2D; Ex. 2009 ¶¶ 41–42). Patent Owner argues that Wiltshire, the reference that Petitioner primarily relies upon as teaching those limitations, "never describe[s] 'generating at least one updated image,' 'compressing the at least one updated image,' and then 'transmitting the compressed updated image.'" *Id.* at 28; *see id.* at 27–32. We focus our analysis below on the "generating" limitation.

### a) Petitioner's Contentions

Petitioner contends that Wiltshire teaches the "generating" limitation because Wiltshire discloses that at stage 270 of Wiltshire's method, the game program processes the input command and updates the state of the game accordingly. Pet. 24–25 (citing Ex. 1004, 7:41–45, Fig. 2; Ex. 1002 ¶¶ 73–74). Petitioner further contends that at stage 220 of Wiltshire's method, the determination of whether an image is to be displayed includes deciding whether to update the image on the client in response to updates to the game state. *Id.* at 26 (citing Ex. 1004, 8:61–63). According to Petitioner, a person of ordinary skill in the art would have understood that the game program at the server would determine whether to generate an

updated image in response to the updated game state. *Id.* (citing Ex. 1002 ¶ 76). Petitioner contends that it is the server that generates the updated image in Wiltshire. *Id.* (citing Ex. 1004, 2:35–39, 2:45–46, 5:44–46, 7:8–9, 7:18–20; Ex. 1002 ¶¶ 77–78).

> b) *Patent Owner's Arguments*

Patent Owner argues that Wiltshire does not disclose generating an updated image in response to user input, as required by the claims. *See* PO Resp. 24–32. Patent Owner argues that although Wiltshire discloses sending an image from the server to a client and that the image may include "a compressed video MPEG stream," Wiltshire is entirely silent as to the content or origin of that compressed video MPEG stream, and therefore does not disclose generating an updated image, compressing that updated image, and then transmitting the compressed updated image. *Id.* at 27–28 (citing Ex. 1004, 7:13–18). According to Patent Owner, Wiltshire's failure to teach the generating step is confirmed by Wiltshire's disclosure that "in some embodiments, images for use by computer gaming system 100 are preloaded into a memory of client/terminal computers 120 to further reduce the amount of communication network bandwidth required." *Id.* (quoting Ex. 1004, 8:8–11). Patent Owner argues images that are preloaded onto the client are preexisting images and are not "generated" in response to "updating the state of the interactive software application" as required by claims 1 and 8. *Id.* at 28–29 (citing Ex. 2009 ¶¶ 61–63).

Patent Owner also faults Petitioner's characterization of step 220 shown in Figure 2 of Wiltshire, arguing that Petitioner simply assumes the single word "update" in Figure 2 means that Wiltshire would generate an "updated image" in response to updated software state when it could simply mean update the display by choosing a different preexisting image to

display, possibly an image that is already resident on the client.
PO Resp. 29–30 (citing Ex. 1004, 7:9–12, 8:8–11, Fig. 2); *see also*
Tr. 42:3–14, 42:25–43:17. Patent Owner further asserts that aside from the use of "update" in Figure 2, Wiltshire does not disclose compressing any updated image, but instead describes "moving straight from determining whether an image was to be displayed at the client (step 220) to sending the image (step 230)." PO Resp. 30 (citing Ex. 1004, 7:9–15).

c) *Petitioner's Reply*

In its Reply, Petitioner responds that "Wiltshire disclos[es] the 'update image' step 220 in Figure 2 and 'modifying' an image based on the game state on the server." Pet. Reply 12 (citing Pet. 24–27; Ex. 1004, 8:61–63, Fig. 2). Petitioner contends that "Wiltshire discloses that the decision to 'update' or 'modify' an image at the server is in response to the updated game state running on the server, meaning that the server will update or modify the image in response to the updated game state when the answer to step 220 is yes." *Id.* (citing Pet. 26; Ex. 1033 ¶ 41). According to Petitioner, Wiltshire describing "preloading images onto the client" is only for "some embodiments," whereas "[t]he main embodiment described in Figure 2 relies on transmitting an updated image 'from the server/host computer 110 to client/terminal computer 120,' or as shown in the flow chart of Figure 2, 'Send[ing] video stream to client' 230 following the step 220 of 'update image.'" *Id.* at 12–13 (citing Ex. 1004, 7:13–15, Fig. 2); *see also* Tr. 85:21–86:25. Petitioner asserts that "[p]re-loaded images would also make no sense for interactive video games like 'Doom,' which generate updated images in response to user inputs in real time." Pet. Reply 13 (citing Ex. 1025, 52:16–23, 53:19–54:9; Ex. 1004, 1:26–43; Ex. 1033 ¶¶ 42–43).

18

*d) Analysis*

We agree with Patent Owner that Petitioner has failed to show by a preponderance of the evidence that the combination of Wiltshire and Saha teaches "generating at least one updated image at the server in response to updating the state of the interactive software application," as recited in claim 1. We also agree with Patent Owner that Petitioner has failed to show by a preponderance of the evidence that the combination of Wiltshire and Saha teaches a server configured for "generating at least one updated image at the server in response to updating the state of the interactive software application," as recited in claim 8. Petitioner relies on Wiltshire's Figure 2 and Wiltshire's description of that figure as teaching the "generating" limitation. *See* Pet. 24–27; Pet. Reply 12–18. Specifically, Petitioner argues that the "determination of whether an image is to be displayed at stage 220 includes deciding whether to 'update' the image," and "stage 220 will 'display/update [the] image' in response to updates to the game state." Pet. 26 (citing Ex. 1004, 8:61–63, Fig. 2) (alteration in original). According to Petitioner, a person of ordinary skill in the art would have understood that "the game program at the server will determine whether to *generate an updated image* in response to the updated game state." *Id.* (citing Ex. 1002 ¶ 76) (emphasis added).

For the reasons discussed below, we find that Wiltshire fails to include express disclosure of generating an updated image at the server, as claimed. The parties disagree as to how a person of ordinary skill in the art would have understood Wiltshire's gaming system to operate, based on the limited disclosure in Wiltshire on this point. We are not persuaded, by a preponderance of the evidence, that an ordinarily skilled artisan would have understood Wiltshire's system to necessarily operate as Petitioner proposes,

19

but rather find Patent Owner's proposal just as likely to have been understood by such an artisan.

As an initial matter, Patent Owner argues that the claimed steps reflect the invention described in the specification in which the server *generates* a modified image based upon the image-modifying data received from the client. PO Resp. 24–25 (citing Ex. 1001, 8:4–6, Figs. 2B, 2D; Ex. 2009 ¶¶ 40–43). Patent Owner distinguishes the claimed "generating" step from mere selection of pre-existing images, which Patent Owner contends Wiltshire discloses. *Id.* at 27–31. We agree with Patent Owner that generating an updated image, as claimed, requires creation of a new image in response to updating the state of the interactive software application.

Figures 2A and 2B from the '109 patent are reproduced below.



Fig. 2A          Fig. 2B

Figure 2A shows a flowchart of the process on the client in communication with the server to facilitate image generation. Ex. 1001, 5:21–23. Figure 2B shows a flowchart of the process on the server in receiving image-modifying data from the client, and then generating and transmitting a modified client image to the client. *Id.* at 5:24–27. As evident from Figures 2A and 2B, the

21

generating step involves generating the "corresponding image for the image-modifying data" received from the client, i.e., creating a new image based on data received from the client. *See also id.* at 8:4–6 ("The virtual server 12 otherwise determines the graphic API, as shown at step 60, based upon the image-modifying data receiving, and then generates the corresponding modified image based upon the image-modifying data received from the client 16, 18, 20, as shown at step 62."). The claimed steps track this disclosure, requiring receiving user input signals from the client, using those signals to update the state of the interactive software application, and generating an updated image in response to updating the state of the interactive software application. *See, e.g.*, *id.* at 9:58–64; *see also* Ex. 2009 ¶ 40 ("The second 'generating' step generates an updated image in response to these user input signals (specifically to reflect the new state of the interactive software application updated according to the user input signals)."). We therefore agree with Patent Owner that modifying what is displayed on the client device merely by selecting a pre-existing image does not meet the "generating" limitation. In view of this determination, we are not persuaded, by a preponderance of the evidence, that Wiltshire discloses the "generating" limitation.

To start with, step 220 of Wiltshire's Figure 2 does not disclose *generating* an updated image in response to the updated game state. Instead, it merely states "display/update image?" Ex. 1004, Fig. 2. The description accompanying Figure 2 of Wiltshire does not explain what "display/update image?" means. *See* Ex. 1001, 7:6–44. Rather, the cited disclosure in Figure 2 is located only within a decision symbol—a symbol used to indicate a *question* in the flow diagram, not the steps that occur after the decision. In describing step 220, Wiltshire discloses that "[s]tage 220 then

22

determines *whether an image is to be displayed* on the screen of client/ terminal computer 120, in which case operation 200 proceeds to stage 230." *Id.* at 7:9–12 (emphasis added); PO Resp. 29. That is, even though the flowchart at step 220 shows "display/update image?" it does not disclose actually updating the image; it merely discloses asking the question, and discloses "determining whether an image is to be displayed." According to Wiltshire:

> In stage 230, an image is sent from server/host computer 110 to client/terminal computer 120. The image may include any type of graphical information including a bitmap, a JPEG file, a TIFF file or even an encoded audio/video stream such as a compressed video MPEG stream.

Ex. 1004, 7:12–16. Step 230, in response to the "display/update image?" decisional step, discloses *sending* the image to the client computer. It does not disclose how that image is obtained at the server.

We agree with Petitioner that Wiltshire separately discloses that "Game program 112 . . . responds to input command 112 by updating the state of the game and *possibly modifying the image displayed* on screen 140," and that disclosure teaches that the displayed image is possibly modified, but, beyond that, Wiltshire does not disclose *how* the displayed image is modified. Ex. 1004, 8:61–63 (emphasis added). When read in context of Wiltshire's preceding discussion of Figure 2 and Wiltshire's disclosure of preloaded images, Petitioner has not persuasively shown that modifying the image displayed involves generating an updated image. Rather, we are persuaded that modifying the display refers to selecting an already available image to display on the client. *See, e.g.*, Ex. 1004, 7:9–14 ("Stage 220 then determines *whether an image is to be displayed* on the screen of client/terminal computer" (emphasis added)). Moreover,

Wiltshire's disclosure of possibly modifying the image displayed on the screen relates to user interactions where a user selects one of the games displayed in the casino floor image shown in Figure 4B, where the screen is modified to display the image shown in Figure 5A. *See id.* at 8:42–67. As discussed in further detail below, Petitioner has not persuasively shown that each of these "updated" or "modified" casino floor and game displays are generated as opposed to selected from pre-existing images.

> In support of Petitioner's contentions, Dr. Fuchs testifies that
>
> Wiltshire discloses that the decision to "update" or "modify" an image at the server is in response to the updated game state running on the server, meaning that *the server will, at times, update or modify the image in response to the updated game state*. . . . For example, if the decision at step 220 of Figure 2 is to "update [the] image," Wiltshire's server will do so, as Wiltshire explicitly describes, including at column 8, lines 61–63.

Ex. 1033 ¶ 41 (citing Ex. 1002 ¶¶ 71–79) (emphasis added). We do not find Dr. Fuchs's testimony persuasive because Wiltshire's disclosure does not support that "updating" or "modifying" the image displayed on the client necessarily requires *generating* an updated image in response to the updated game state instead of simply selecting a pre-existing image to display, as argued by Patent Owner. *See* PO Resp. 24–25 (arguing that the claimed steps reflect the invention described in the specification in which the server generates a modified image) (citing Ex. 1001, 8:4–6, Figs. 2B, 2D; Ex. 2009 ¶¶ 40–43); Ex. 2009 ¶ 40 ("The second 'generating' step generates an updated image in response to these user input signals (specifically to reflect the new state of the interactive software application updated according to the user input signals)."). As discussed above, the cited portion of Wiltshire merely discloses "*possibly modifying the image displayed* on screen,"

without explaining how the displayed image may be modified. As Patent Owner points out, Petitioner does not argue that Wiltshire renders the "generating" limitation obvious or that a person of ordinary skill in the art would have found it obvious to modify Wiltshire's system to implement the generating step. *See* Pet. 24–27 ("Wiltshire discloses this limitation."); Ex. 1002 ¶¶ 71–79; Ex. 1033 ¶ 41; *see also* PO Resp. 31–32 (arguing that Petitioner does not argue that Wiltshire renders the "generating" limitation obvious). Wiltshire's silence on how images displayed at the client are updated or modified renders Petitioner's contentions deficient.

Instead, we find persuasive Dr. Hart's testimony that a person of ordinary skill in the art would have understood Wiltshire's disclosure "that the 'image [] generated by the game computer program' could include the contents of a pre-existing compressed image file," rather than requiring the image be updated. Ex. 2009 ¶ 62 (emphasis added); *id.* ¶ 63 (testifying that a person of ordinary skill in the art would have understood at least two ways to include contents of a pre-existing image file in view of Wiltshire's disclosure). Dr. Hart bases his testimony on the fact that Wiltshire's disclosure regarding its step 230 states that that image "may include any type of graphical information" and that graphical information could include "a JPEG file" or "a TIFF file." *Id.* ¶ 62 (citing Ex. 1004, 7:18–19). The fact that Wiltshire specifically refers to the use of a *file* supports Dr. Hart's testimony that the updated image that Wiltshire refers to could simply be a pre-existing image file. *See id.* ¶ 63; *see also* PO Resp. 28 (providing a potential scenario that need not "involve the creation of a new image or compression because the video clip may come from a file held on the server just for that purpose").

Wiltshire further discloses that "in some embodiments, images for use by computer gaming system 100 are preloaded into a memory of client/ terminal computers 120 to further reduce the amount of communication network bandwidth required." Ex. 1004, 8:8–11. Petitioner does not argue these preloaded images are generated in response to "updating the state of the interactive software application" as required by the claims. *See* PO Resp. 29; *see generally* Pet. Reply. Petitioner instead argues that preloading images is only for "some embodiments" of Wiltshire's system, and not the "main embodiment." Pet. Reply 12–13. That argument misses the point. Wiltshire's discussion here is directed to reducing the amount of network bandwidth required rather than how the images themselves are obtained. Wiltshire's reference to "some embodiments" therefore distinguishes the location where those pre-existing images are stored, not the very use of preexisting images. *See* Ex. 1004, 8:8–11; *see also* 7:65–8:2 (explaining how caching the transmitted images can also reduce the amount of bandwidth required); Tr. 46:17–47:5.

Petitioner contends "[p]re-loaded images would also make no sense for interactive video games like 'Doom,' which generate updated images in response to user inputs in real time." Pet. Reply 13 (citing Ex. 1004, 1:26–43). Dr. Fuchs testifies, with an example of gameplay from Doom, that the Doom player's perspective changes dynamically based on what the user is doing in real time, and that "[e]ach image is updated to reflect the current state of the player within the game world." Ex. 1033 ¶¶ 42–43 (citing https://www.youtube.com/watch?v=8mEP4cflrd4). Dr. Fuchs explains that "[p]re-loading an image [in Wiltshire] would not work in this type of game because the client would not know what action the player would take at every instant in time." *Id.* ¶ 43. But Wiltshire does not teach

using the operation disclosed in Figure 2 with Doom, and we find nothing in Wiltshire to suggest that a person of ordinary skill in the art would have understood that Wiltshire's system could possibly have supported that game in the manner proposed by Petitioner. In fact, the *only* mention of Doom in Wiltshire appears in a lengthy list of games that Wiltshire states as included in the definition of the term "game" or "gaming"—provided in the "Related Art" section of Wiltshire. *See* Ex. 1004, 1:26–44. Given Wiltshire's use solely of casino gaming stations for its description of the invention (as discussed below), we are not persuaded that a person of ordinary skill in the art would have understood that every video game mentioned on the list in the background section could also be implemented using the operation disclosed in Wiltshire's Figure 2. *See, e.g.*, *id.* at 1:15–25 (describing computer gaming systems in the related art), 2:20–3:3 (summary of Wiltshire's invention); PO Sur-reply 12–13; Ex. 1025, 45:10–19, 48:11–49:2.

On the other hand, Wiltshire's disclosure only provides details as to how its system is used to implement casino games such as Bertha, Blackjack, Video Poker, Slots, and Keno. *See* Ex. 1004, 8:37–11:53; *id.* at 8:42–9:2 (discussing the virtual casino floor that allows a user to select one of many casino games supported by the gaming system). Figures 4A–9D illustrate the images displayed on the client computer's screen during operation of Wiltshire's gaming system. *Id.* at 8:38–41. For example, Wiltshire's Figure 4A, reproduced below, shows an "attract mode" image displayed on the client screen. *Id.* at 8:42–44.

**Appx27**



Fig. 4A

400

Figure 4A is an image displayed on the screen of a client computer in attract mode.  Ex. 1004, 3:20–21.

Dr. Hart testifies that a person of ordinary skill in the art would have understood that these graphic elements "need not be generated in real-time and an efficient implementation would have used a premade video file for these elements."  Ex. 2009 ¶ 66; Tr. 45:7–46:14.  Once a user activates Wiltshire's gaming system by touching the screen, the casino floor image shown in Figure 4B, reproduced below, is displayed on screen.  Ex. 1004, 8:45–51.



Fig. 4B

Figure 4B is an image displayed on the screen of a
client computer showing a virtual casino floor.
Ex. 1004, 3:22–24.

Dr. Hart testifies that a person of ordinary skill in the art would have
similarly understood that the appropriate manner in which to display such a
casino floor image would have been through a pre-encoded MPEG file that
would be utilized for the display. Ex. 2009 ¶ 67. Wiltshire discloses that
each of the available games is represented by a virtual button and once the
user selects any of those games by clicking on a section of the screen, that
command is passed along to game program 112, which updates the state of
the game possibly modifying the image displayed on the client's screen.
Ex. 1004, 8:51–63. For example, if the user selects Bertha on display shown
in Figure 4B, the image shown in Figure 5A is displayed to the user, and
when the user pulls the lever shown in Figure 5A to activate the slot
machine, the image shown in Figure 5B is displayed to the user. *Id.* at 8:66–
9:8.

29

Figures 5A and 5B of Wiltshire are reproduced below.



Figures 5A and 5B are a images displayed on the screen
of a client computer showing a front view of a slot
machine. Ex. 1004, 3:26–30.

In view of Wiltshire's disclosure, Dr. Hart's testimony that each of these "updated" or "modified" displays could have been accomplished through the use of pre-encoded files is persuasive. *See* Ex. 2009 ¶ 62; Tr. 47:17–48:25. Wiltshire's example screens in Figures 4A–9D suggest that these could have simply been pre-existing images and would not necessarily need to be generated in real time. We therefore agree with Patent Owner that "Wiltshire's disclosure [is] completely silent as to the content or origin of that 'compressed video MPEG stream'" and that Petitioner imparts to Wiltshire something Wiltshire never discloses. PO Resp. 27–28 (citing Ex. 2009 ¶¶ 60–68).

Fundamentally, Petitioner's contentions as to the "generating" claim limitation are based not on a specific disclosure in Wiltshire but rather on how a person of ordinary skill in the art would have understood Wiltshire's gaming system to operate from Wiltshire's limited disclosure. As explained above, the examples provided by Petitioner do not persuade us by a preponderance of the evidence that one of ordinary skill in the art would

30

have understood Wiltshire's system as operating differently than as proposed by Patent Owner. As a result, we do not find it more probable than not that one of ordinary skill in the art would have understood Wiltshire's system to operate as Petitioner proposes. And even though one of ordinary skill in the art would have recognized that client display in Wiltshire's system is updated in response to user input signals, we find that Petitioner has not established by a preponderance of the evidence that an updated image is *generated* as part of that process.

Moreover, in arguing that Patent Owner fails to show how each of the interactive games listed in Wiltshire's background section would be implemented in Wiltshire's system, Petitioner improperly attempts to shift the burden to Patent Owner. *See, e.g.*, Pet. Reply 13. "In an *inter partes* review, the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' 35 U.S.C. § 316(e), and that burden never shifts to the patentees." *Dynamic Drinkware*, 800 F.3d at 1378. Even in the context of the burden of production, "no burden shifts from the patent challenger to the patentee . . . where the only issues to be considered are what the prior art discloses, whether there would have been a motivation to combine the prior art, and whether that combination would render the patented claims obvious." *Magnum Oil Tools*, 829 F.3d at 1376. Patent Owner's argument is that Wiltshire's disclosure is silent as to the content or origin of that MPEG stream, and therefore, Wiltshire fails to teach the "generating" limitation. *See* PO Resp. 28. It is Petitioner's burden to demonstrate, by a preponderance of the evidence, that a person of ordinary skill in the art would have necessarily understood Wiltshire's disclosure in the manner that Petitioner proposes. *See, e.g., Magnum Oil Tools*, 829 F.3d at 1377–79 (holding that the Board

erred where it required Patent Owner to rebut Petitioner's assertions that a skilled artisan would have been motivated to combine the prior art references, where Petitioner's evidence failed to support its assertion in the first place).

We find that Petitioner has failed to meet that burden as to the "generating" limitation of claims 1 and 8 of the '109 patent.

### 2. Conclusion as to Obviousness of Claims 1, 3–12

"Once all relevant facts are found, the ultimate legal determination [of obviousness] involves the weighing of the fact findings to conclude whether the claimed combination would have been obvious to an ordinary artisan." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1361 (Fed. Cir. 2017). Because we conclude, based on the evidence and arguments presented by Petitioner in its Petition and the Reply, that Petitioner has not met its burden to show by a preponderance of the evidence that a person of ordinary skill in the art would have understood the combination of Wiltshire and Saha as teaching "generating at least one updated image at the server in response to updating the state of the interactive software application," as claimed, Petitioner has not shown that the subject matter of claims 1 and 8 of the '109 patent would have been obvious over Wiltshire and Saha at the time of the invention. For the same reasons, we conclude that Petitioner has not shown that the subject matter of dependent claims 3–7 and 9–12 of the '109 patent would have been obvious over Wiltshire and Saha at the time of the invention. *Mylan Pharm. Inc. v. Research Corp. Techs., Inc.*, 914 F.3d 1366, 1376 (Fed. Cir. 2019) ("Dependent claims, with added limitations, are generally not obvious when their parent claims are not."); Pet. 34–41, 45–51.

32

F.  *Obviousness over Wiltshire, Saha, and Chen; Obviousness over Wiltshire, Saha, and PC Magazine*

Petitioner contends that the subject matter of claim 2 would have been obvious in view of Wiltshire, Saha, and Chen.  Pet. 3, 58–65.  Petitioner further contends that the subject matter of claims 6, 11, and 12 would have been obvious in view of the combination of PC Magazine with Wiltshire and Saha.  *Id.* at 3–4, 66–73.  In each of these grounds, however, Petitioner relies upon the same analysis discussed above in connection with the Wiltshire and Saha ground for the "generating" limitation of independent claims 1 and 8.  *See* Pet. 58–73.  Accordingly, for the same reasons discussed above regarding the "generating" limitation of claims 1 and 8 in the context of the Wiltshire-Saha ground, Petitioner has not shown by a preponderance of the evidence that the combined teachings of Wiltshire, Saha, and Chen would have rendered the subject matter of claim 2 obvious or that the combined teachings of Wiltshire, Saha, and PC Magazine would have rendered the subject matter of claims 6, 11, and 12 obvious to one of ordinary skill in the art at the time of the invention.

## IV.    PATENT OWNER'S MOTION TO EXCLUDE

Patent Owner filed a motion to exclude Exhibits 1024, 1029, and 1030, and a portion of Dr. Fuchs's declaration (Exhibit 1033 ¶ 79).  Paper 31, 1–6; Paper 33, 1–5.

Exhibit 1024 is an exhibit to the deposition of Dr. Hart, and Petitioner does not refer to that exhibit in its briefing.  Paper 32, 10.  Petitioner has no objection to excluding Exhibit 1024 from the record.  *Id.*  Accordingly, Patent Owner's motion to exclude as to Exhibit 1024 is *granted*.

Petitioner relies on Exhibits 1029 and 1030 as well as paragraph 79 of Dr. Fuchs's declaration in Petitioner's Reply for demonstrating that a person

33

of ordinary skill in the art would have been motivated to combine Chen with Wiltshire and Saha. *See* Pet. Reply 25–27. Under the particular circumstances in this case, we need not assess the merits of Patent Owner's Motion to Exclude as to these exhibits  As discussed above, because we determine that Petitioner has not demonstrated by a preponderance of the evidence that the combination of Wiltshire and Saha teaches the "generating" limitation of independent claims 1 and 8 of the '109 patent, we do not address Petitioner's contentions based on the combination of Wiltshire, Saha, and Chen as to dependent claim 2 of the '109 patent. Accordingly, Patent Owner's motion to exclude as to Exhibits 1029 and 1030 as well as paragraph 79 of Exhibit 1033 is *dismissed* as moot.

## V.  CONCLUSION

For the reasons discussed above, Petitioner has not demonstrated, by a preponderance of the evidence, that claims 1–12 of the '109 patent are unpatentable.  Our conclusions regarding the Challenged Claims are summarized below:

| Claims Challenged | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 3–12 | 103(a) | Wiltshire, Saha | | 1, 3–12 |
| 2 | 103(a) | Wiltshire, Saha, Chen | | 2 |
| 6, 11, 12 | 103(a) | Wiltshire, Saha, PC Magazine | | 6, 11, 12 |
| **Overall Outcome** | | | | 1–12 |

## VI. ORDER

It is, therefore,

ORDERED that claims 1–12 of U.S. Patent No. 10,681,109 B2 are not determined to be unpatentable;

FURTHER ORDERED that Patent Owner's motion to exclude (Paper 31) is *granted in part* and *dismissed in part*; and

FURTHER ORDERED that, because this a Final Written Decision, parties to this proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2021-00237
Patent 10,681,109 B2

FOR PETITIONER:

Joseph Haag
Daniel Williams
WILMER CUTLER PICKERING HALE & DORR LLP
joseph.haag@wilmerhale.com
daniel.williams@wilmerhale.com


FOR PATENT OWNER:
Douglas R. Wilson
Michelle E. Armond
Forrest M. McClellen
ARMOND WILSON LLP
doug.wilson@armondwilson.com
michelle.armond@armondwilson.com
forrest.mcclellen@armondwilson.com

NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**SONY INTERACTIVE ENTERTAINMENT LLC,**
*Appellant*

**v.**

**INTELLECTUAL PIXELS LIMITED,**
*Appellee*

---

2022-2118

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2021-00237.

---

Decided:  October 13, 2023

---

JAMES MURPHY DOWD, Wilmer Cutler Pickering Hale and Dorr LLP, Los Angeles, CA, argued for appellant.  Also represented by HENRY NIKOGOSYAN; MARK DONNELL FLANAGAN, JOSEPH F. HAAG, Palo Alto, CA.

DOUGLAS R. WILSON, Armond Wilson LLP, Austin, TX, argued for appellee.  Also represented by MICHELLE ARMOND, JOSEPHER LI, PATRICK MALONEY, Newport Beach, CA.

---

**Appx37**

Before DYK, PROST, and STOLL, *Circuit Judges.*

DYK, *Circuit Judge.*

Sony Interactive Entertainment, LLC ("Sony") appeals the Patent Trial and Appeal Board's ("the Board") final written decision declining to find claims of U.S. Patent No. 10,681,109 ("the '109 patent") unpatentable as obvious. We *vacate* and *remand.*

## BACKGROUND

Intellectual Pixels Limited ("IPL") owns the '109 patent, entitled "Image Display System with Visual Server," which concerns "an image display system and method of displaying images on a client through the use of the resources of a remote visual server." '109 patent, col. 3, ll. 41–43. Each client generates image-modifying data and transmits that data to the visual server. "[T]he server selectively receives image-modifying data from one or more clients corresponding to a generated image, and the server generates a modified image based on the image-modifying data, and then transmits the modified image as compressed data back to the client." '109 patent, col. 3, ll. 52–57. The client is capable of uncompressing the data and displaying the new image.

Independent claim 1 of the '109 patent is representative:

1. A method of hosting an interactive software application comprising:

> running at a server the interactive software application;
>
> receiving at the server user input signals from a client device, wherein the user input signals are used to control updating of the state of the interactive software application;

> generating at least one updated image at the server in response to updating the state of the interactive software application; and
>
> compressing the at least one updated image and transmitting the compressed updated image to the client device, wherein the server transmits the updated image as a compressed frame that can be decompressed and displayed as an updated image at the client device.

'109 patent, col. 9, l. 55–col. 10, l. 2 (emphasis added). Independent claim 8 recites the same "generating" limitation.

On December 4, 2020, Sony filed a petition for *inter partes* review with the Board, challenging claims 1–18 of the '109 patent. In its preliminary response, IPL disclaimed claims 13–18. Sony argued that claims 1–12 were obvious over several different combinations of prior art references. As to each combination, Sony argued that U.S. Patent No. 6,409,602 ("Wiltshire") disclosed the "generating" limitation. The Board instituted review on claims 1–12 in IPR2021-00237.

In its final written decision, the Board ruled that "generating an updated image, as claimed, requires creation of a new image in response to updating the state of the interactive software application." *Sony Interactive Ent. LLC v. Intell. Pixels Ltd.*, No. IPR2021-00237, 2022 WL 2124910, at *8 (P.T.A.B. June 8, 2022) ("*'109 Patent Decision*"). The Board found that "modifying what is displayed on the client device merely by selecting a pre-existing image does not meet the 'generating' limitation." *Id.* The Board determined that Wiltshire only disclosed selecting an already available image to display on the client, rather than creating a new image. Because all of Sony's prior art combinations relied on Wiltshire to disclose the "generating" limitation, the Board concluded that claims 1–12 were not shown to have been obvious.

Sony appeals.  We have jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

### DISCUSSION

"In reviewing the Board's determination on the question of obviousness, we review the Board's legal conclusions de novo and its factual findings for substantial evidence." *Becton, Dickinson & Co. v. Baxter Corp. Englewood*, 998 F.3d 1337, 1339 (Fed. Cir. 2021) (internal quotation marks, citation, and alterations omitted).  "What a reference teaches and the differences between the claimed invention and the prior art are questions of fact which we review for substantial evidence." *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1280 (Fed. Cir. 2015).

The sole issue on appeal is whether the Board properly determined that Wiltshire does not teach the "generating" limitation.  The Board determined "that generating an updated image, as claimed, requires creation of a new image in response to updating the state of the interactive software application." *'109 Patent Decision*, 2022 WL 2124910, at *8.  The Board further clarified "modifying what is displayed on the client device merely by selecting a pre-existing image does not meet the 'generating' limitation." *Id.* For purposes of deciding this case, we assume the Board's construction of the "generating" limitation is correct but conclude there is not substantial evidence to support the Board's determination that Wiltshire does not disclose the "generating" limitation under the Board's construction.

Wiltshire teaches a system that "execut[es] gaming programs on a server/host computer" played on client terminals. Wiltshire, J.A. 1320, at abstract. Wiltshire defines "games" and "gaming" to "include all types of electronic, electromechanical or mechanical gambling and casino game facsimiles . . . video based games such as Doom, Pong, Packman, Myst; [and] video games based on sports," among other types of games. Wiltshire, J.A. 1340, col. 1, ll. 26–44.  The parties agree that executing Doom requires

generating new images. *See '109 Patent Decision*, 2022 WL 2124910, at *10 (noting petitioner's expert's testimony that using pre-loaded images for Doom would "make no sense"); Oral Argument at 33:30–33:40 (IPL conceding that Doom requires generating new images).

In Wiltshire, the system "execute[s] [the] game program on [the] server." Wiltshire, J.A. 1324; J.A. 1343, col. 7, ll. 8–9. The system then determines whether to "[d]isplay/update image?" Wiltshire, J.A. 1324; Wiltshire, J.A. 1343, col. 7, ll. 8–12. "The image is generated by [the] game computer program [] and passed to [the] server/host interface program . . . ." Wiltshire, J.A. 1343, col. 7, ll. 18–19. "In turn, the image is transferred over communication pathways [] to [the] client/terminal computer [] via the network services provided by [the] server operating system []." *Id.* at col. 7, ll. 20–22. The "[c]lient/terminal program [] then causes the image to be displayed on a screen of client/terminal computer." *Id.* at col. 7, ll. 25–27. If the client sends back input commands, the process repeats itself and the system will update the image on the screen. Figure 2 of Wiltshire is a flow diagram illustrating this process.

The Board interpreted Wiltshire's Figure 2 to just state "display/update image?" without "explain[ing] what 'display/update image?' means." *'109 Patent Decision*, 2022 WL 2124910, at *8. The Board, therefore, determined that Wiltshire's Figure 2 only disclosed asking the question of updating the image and not how the image was to be modified. The Board erred in reaching this conclusion by ignoring a portion of the specification which explains that if the answer is yes, "[t]he *image is generated* by game computer program 112," i.e., a program on the server. Wiltshire, J.A. 1343, col. 7, ll. 18–19 (emphasis added).

There is nothing in Wiltshire that suggests that the term "generated" has a different meaning than the term "generating" in the '109 Patent. To the contrary, Figure 2, and the text in Wiltshire describing it, J.A. 1343, col. 7, ll.

7–45, and descriptions of other embodiments in Wiltshire, J.A. 1343, col. 8, ll. 2–7 (disclosing in some embodiments only parts of an image are updated or modified), demonstrate that Wiltshire discloses generation of a new image, contrary to the Board's conclusions.

The Board, however, concluded the expert testimony of Dr. Hart, the patent owner's expert, supported its conclusion that Wiltshire does not disclose creating a new image. As the Board noted, Dr. Hart testified "that a person of ordinary skill in the art would have understood Wiltshire's disclosure 'that the "image [] generated by the game computer program" *could include* the contents of a pre-existing compressed image file,' rather than requiring the image be updated." *'109 Patent Decision*, 2022 WL 2124910, at *10 (emphasis added).

The Board's conclusions based on Dr. Hart's testimony that Wiltshire does not disclose generating a new image are incorrect. The record shows Dr. Hart merely testified that the updating or modifying images *could be* through selecting pre-existing images, but he said nothing about whether Wiltshire also discloses the creation of new images. Nowhere did Dr. Hart testify that Wiltshire does not disclose "generating images" under the Board's construction. Dr. Hart's testimony does not support the Board's finding that Wiltshire only discloses selecting pre-existing images.

Petitioner's expert, Dr. Fuchs, testified that "Wiltshire discloses that the decision to 'update' or 'modify' an image at the server is in response to the updated game state running on the server, meaning that *the server will, at times, update or modify the image in response to the updated game state. . . .*" *Id.* at *9 (emphasis in original). The Board rejected Dr. Fuchs' testimony because it found Wiltshire's disclosure did "not support that 'updating' or 'modifying' the image displayed on the client <u>necessarily requires</u> *generating* an updated image in response to the updated game

state instead of simply selecting a pre-existing image to display." *Id.* (first emphasis added). But the Board made the same mistake with respect to Dr. Fuchs' testimony as it did with respect to Dr. Hart's. The Board's claim construction does not require Wiltshire to disclose that images must be generated *only* through creating a new image; it requires the ability to generate new images in some instances. The Board's construction would not exclude a system that both generates images by creating new images and pre-selecting existing images. That Wiltshire discloses that selecting pre-existing images *can* be used as a method of generating images in some instances does not mean that Wiltshire does not also disclose creating a new image as another way of generating images. Dr. Fuchs' testimony that Wiltshire discloses the "generating" limitation under the Board's construction is uncontradicted.

The Board similarly erred by focusing on embodiments in Wiltshire where images are pre-loaded. The existence of those examples does not exclude other examples where new images are created. Although both parties agree the game Doom requires creating new images, the Board determined that listing Doom in the specification was not a sufficient disclosure because "Wiltshire does not teach using the operation disclosed in Figure 2 with Doom" and it found "nothing in Wiltshire to suggest that a person of ordinary skill in the art would have understood that Wiltshire's system could possibly have supported that game in the manner." *Id.* at \*10; *see id.* at \*11 ("Wiltshire's disclosure only provides details as to how its system is used to implement casino games . . . ."). The Board understood the significance of Doom to be just one game in a "lengthy list of games that Wiltshire states as included in the definition of the term 'game' or 'gaming.'" *Id.* at \*10.

The Board erred in its interpretation of Wiltshire as Wiltshire specifically recites "[t]he terms 'game' and 'gaming,' as used herein, include all types of electronic, electro-mechanical or mechanical gambling and casino game

facsimiles . . . video based games such as Doom, Pong, Packman, Myst; [and] video games based on sports . . . ." Wiltshire, J.A. 1340, col. 1, ll. 26–44.  The use of the phrase "as used herein" signals that this sentence is definitional. *See Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1378 (Fed. Cir. 2022) (finding lexicography by use of the phrase "referred to herein"); *Abbott Lab'ys v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1210 (Fed. Cir. 2007) (finding the patent "unambiguously provides definitions of other claim terms" by using the phrase "as used herein"). The terms "computer gaming program" or "computer gaming system," covers Doom, and Wiltshire recites that "FIG. 2 is a flow diagram of operation 200 of *computer gaming system 100*," Wiltshire, J.A. 1343, col. 7, ll. 7–8 (emphasis added).  Therefore, as discussed earlier, Wiltshire explicitly discloses that Figure 2 is to be applied to games like Doom.

The Board's exclusion of Doom seems to have been based on finding that a person of ordinary skill in the art would not be enabled to practice Wiltshire with a game like Doom.  *'109 Patent Decision*, 2022 WL 2124910, at *10 ("[W]e find nothing in Wiltshire to suggest that a person of ordinary skill in the art would have understood that Wiltshire's system could possibly have supported that game in the manner proposed by [p]etitioner.").  But that does not mean that Wiltshire does not disclose applying the system of Wiltshire to a game like Doom.  *See Raytheon Techs. Corp. v. Gen. Elec. Co.*, 993 F.3d 1374, 1380 (Fed. Cir. 2021) ("In general, a prior art reference asserted under [35 U.S.C.] § 103 does not necessarily have to enable its own disclosure, i.e., be 'self-enabling,' to be relevant to the obviousness inquiry."); *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989) ("Even if a reference discloses an inoperative device, it is prior art for all that it teaches.").  The Board erred when it narrowed the disclosure of Wiltshire to exclude Doom and only focused on the more detailed examples.  *See CRFD Rsch., Inc. v. Matal*, 876 F.3d 1330, 1349 (Fed. Cir. 2017) ("A reference

must be considered for everything that it teaches, not simply the described invention or a preferred embodiment." (quoting *In re Applied Materials, Inc.*, 692 F.3d 1289, 1298 (Fed. Cir. 2012))). Therefore, the Board erred by not crediting Wiltshire's disclosure of applying its system to video games like Doom, which require "generating" new images under the Board's construction.

## CONCLUSION

The Board's determination that Wiltshire does not disclose the "generating" limitation under the Board's construction is not supported by substantial evidence. We need not reach the issues of whether the Board's construction is correct or whether the Board committed an Administrative Procedure Act violation here in adopting a new claim construction without providing an opportunity to respond.

Because the Board's finding was not supported by substantial evidence and was central to its non-obviousness determination, we vacate the Board's final written decision, and remand for further proceedings consistent with this opinion.

## VACATED AND REMANDED

### COSTS

Costs to Appellant.

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

SONY INTERACTIVE ENTERTAINMENT LLC,
Petitioner,

v.

INTELLECTUAL PIXELS LIMITED,
Patent Owner.

---

IPR2021-00237
Patent 10,681,109 B2

---

Before STACY B. MARGOLIES, ROBERT J. WEINSCHENK, and
IFTIKHAR AHMED, *Administrative Patent Judges.*

AHMED, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision on Remand
Determining All Challenged Claims Unpatentable
*35 U.S.C. §§ 144, 318*

# I.    INTRODUCTION

This case is on remand from the United States Court of Appeals for the Federal Circuit to address the patentability of claims 1–12 of U.S. Patent No. 10,681,109 B2 (Ex. 1001, "the '109 patent"). *Sony Interactive Ent. LLC v. Intell. Pixels Ltd.*, No. 2022-2118, 2023 WL 6773879, at *1 (Fed. Cir. Oct. 13, 2023).  For the reasons discussed herein, we determine that Sony Interactive Entertainment LLC ("Petitioner") has shown, by a preponderance of the evidence, that claims 1–12 are unpatentable.

# II.    BACKGROUND

## A.  Procedural History

Petitioner requested an *inter partes* review of claims 1–18 of U.S. Patent No. 10,681,109 B2 (Ex. 1001, "the '109 patent").  Paper 3 ("Petition" or "Pet.").  Intellectual Pixels Limited ("Patent Owner") filed a Preliminary Response.  Paper 11.  In its Preliminary Response, Patent Owner informed us that it had disclaimed claims 13–18.  *Id.* at 5 (citing Ex. 2001 (Notice of Filing a Statutory Disclaimer of Claims in a Patent under 37 C.F.R. § 1.321(a))).  Applying the standard set forth in 35 U.S.C. § 314(a), we instituted an *inter partes* review of claims 1–12 (the "Challenged Claims")[1] of the '109 patent.  Paper 13 ("Inst. Dec.").

After institution, Patent Owner filed a Patent Owner Response (Paper 17, "PO Resp."), Petitioner filed a Reply to Patent Owner's Response (Paper 22, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 26, "PO

---

[1] Because Patent Owner filed a statutory disclaimer of claims 13–18 of the '109 patent (*see* Ex. 2001) prior to our institution decision, no *inter partes* review was instituted as to those claims.  Inst. Dec. 6–7; *see also* 37 C.F.R. § 42.107(e) ("No *inter partes* review will be instituted based on disclaimed claims.").

Sur-reply"). An oral hearing was held on March 10, 2022, and a copy of the transcript was entered in the record. Paper 37 ("Tr.").

We issued a Final Written Decision determining that Petitioner had not proven by a preponderance of evidence that the Challenged Claims are unpatentable. Paper 38 ("Final Written Decision" or "Final Dec."), 34. In particular, our Final Written Decision addressed only one of the arguments raised by Patent Owner—whether Petitioner established that the combination of Wiltshire and Saha teaches or suggests the "generating at least one updated image" limitation of independent claims 1 and 8 of the '109 patent ("the 'generating' limitation"). *Id.* at 16–32.

Petitioner filed a Notice of Appeal of the Final Written Decision with the Federal Circuit. *See* Paper 39. On October 13, 2023, the Federal Circuit issued a decision in the appeal vacating our Final Written Decision and remanding for further proceedings consistent with its decision. *Sony*, 2023 WL 6773879. The Federal Circuit found that our determination that Petitioner's asserted reference Wiltshire does not disclose the "generating" limitation of claims 1 and 8 was not supported by substantial evidence. *Id.* at *2–4. The Court vacated our Final Written Decision and remanded for further proceedings consistent with the Court's opinion. *Id.* at *5.

After the Federal Circuit issued its mandate, we asked the parties to propose a procedure on remand. Ex. 3001, 2. The parties proposed an agreed-upon procedure to allow post-remand briefing with no additional evidence or expert declarations. *Id.* at 1. We issued an Order authorizing each party to file opening and responsive briefs. Paper 43. The parties then filed the following briefs: Petitioner's Opening Brief Pursuant to Paper No. 43 (Paper 47, "Pet. Remand Br."), Patent Owner's Opening Brief on Remand (Paper 46, "PO Remand Br."), Petitioner's Response Brief Pursuant

to Paper No. 43 (Paper 48, "Pet. Remand Resp. Br."), and Patent Owner's Response Brief on Remand (Paper 49, "PO Remand Resp. Br.").

## B. Related Proceedings

According to the parties, the '109 patent is asserted in *Intellectual Pixels Ltd. v. Sony Interactive Entertainment LLC*, No. 8:20-cv-01422-JVS-KES (C.D. Cal). Pet. 1; Paper 5, 1. That proceeding has been stayed pending resolution of this *inter partes* review. Paper 7, 2.

## C. The '109 Patent (Ex. 1001)

The '109 patent, titled "Image Display System with Visual Server," was filed on June 29, 2017, and claims priority to a provisional application filed on January 24, 2001. Ex. 1001, codes (22), (54), (60), (63). The '109 patent issued on June 9, 2020.[2] *Id.* at code (45). The '109 patent "relates to computer graphics and a graphical image display system that use a visual server to generate and transmit images to a client." *Id.* at 1:30–33.

---

[2] In our decision to institute *inter partes* review, we determined that the Challenged Claims of the '109 patent have an effective filing of at least November 15, 2011, and was therefore eligible for *inter partes* review on December 4, 2020, the filing date of the Petition. Inst. Dec. 8–9.

Figure 1 of the '109 patent is reproduced below.



Figure 1 shows image display system 10 including visual server 12 and associated components in communication with a plurality of clients (i.e., set-top box 22, personal digital assistant ("PDA") 18, and cellular telephone 20). Ex. 1001, 5:36–54. The '109 patent notes that "for reasons of cost, size, and power consumption, sophisticated three dimensional graphics are not available on common consumer client devices such as personal digital assistants (PDAs)[,] mobile telephones and set-top boxes." Ex. 1001, 3:26–30; *id.* at 5:51–52 (listing Palm Pilot and Handspring Visor as examples of PDAs).

The '109 patent describes displaying such graphics on these clients "through the use of the resources of a remote visual server." Ex. 1001, 3:41–43. The server has image data processing capabilities, receives image-modifying data corresponding to a generated image from a client, generates

5

**Appx50**

a modified image based on that image-modifying data, and transmits the modified image as compressed data back to the client. *Id.* at 3:51–57.

Figures 2B and 2D of the '109 patent are reproduced below.



Fig. 2B          Fig. 2D

**Appx51**

Figures 2B and 2D show a flowchart of the process on the server in receiving image-modifying data from the client, and then generating and transmitting a modified client image to the client. Ex. 1001, 5:24–29.

"In generating the image-modifying data at the client and processing the image-modifying data at the visual server, the typical data processing segment is a frame," and "compressed data comprising a frame" is transmitted to the client. Ex. 1001, 4:10–12, 4:48–55, 6:63–7:1. The '109 patent teaches use of "a protocol such as MPEG4" for compressing and transmitting an image to a client. *Id.* at 9:26–28. According to the patent, "[t]he use of an industry standard image compression protocol such as MPEG allows . . . use of facilities that are already present in most clients." *Id.* at 9:32–34. The clients include "processing ability to uncompress the compressed image data . . . and display the image defined by the decompressed data on the client image display." *Id.* at 3:67–4:3.

Figure 3 of the '109 patent is reproduced below.

Figure 3 is a schematic of data and procedural flow in an embodiment of the '109 patent. Ex. 1001, 5:30–31. The '109 patent describes that image data is compressed at the server and transmitted to the client, where it is decompressed and displayed to the user. *See id.* at 8:1–22; *see also id.* at Figs. 2A–2D (a flowchart illustrating the processes executed on the server as well as the client to facilitate image generation).

### D. Challenged Claims

We instituted review of independent claims 1 and 8, and dependent claims 2–7 and 9–12. Claim 1 is reproduced below.

> 1. A method of hosting an interactive software application comprising:
>
> running at a server the interactive software application;
>
> receiving at the server user input signals from a client device, wherein the user input signals are used to control updating of the state of the interactive software application;
>
> generating at least one updated image at the server in response to updating the state of the interactive software application; and
>
> compressing the at least one updated image and transmitting the compressed updated image to the client device, wherein the server transmits the updated image as a compressed frame that can be decompressed and displayed as an updated image at the client device.

Ex. 1001, 9:55–10:2.

### E. *The Instituted Grounds of Unpatentability and Declaration Evidence*

As against the Challenged Claims, Petitioner asserts the following grounds of unpatentability, relying on the declaration testimony of Dr. Henry Fuchs (Exs. 1002, 1033). Pet. 3–4, 19–73.

| Claim(s) Challenged | 35 U.S.C. §[3] | References |
|---|---|---|
| 1, 3–12 | 103(a) | Wiltshire[4], Saha[5] |
| 2 | 103(a) | Wiltshire, Saha, Chen[6] |
| 6, 11, 12 | 103(a) | Wiltshire, Saha, PC Magazine[7] |

Patent Owner supports its arguments with a Declaration by John C. Hart, Ph.D. (Ex. 2016).

## III. ANALYSIS

### A. *Principles of Law*

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden of persuasion never

---

[3] Because the Challenged Claims of the '109 patent have an effective filing date before March 16, 2013 (*see supra* n.2), patentability is governed by the pre-AIA version of 35 U.S.C. § 103.
[4] U.S. Patent No. 6,409,602 B1, filed Nov. 24, 1998, issued June 25, 2002 (Ex. 1004, "Wiltshire").
[5] U.S. Patent No. 6,404,817 B1, filed Nov. 20, 1997, issued June 11, 2002 (Ex. 1005, "Saha").
[6] Walter Y. Chen, The Development and Standardization of Asymmetrical Digital Subscriber Line, IEEE COMMUNICATIONS MAGAZINE, Vol. 37, No. 5, 68–72 (May 1999) (Ex. 1006, "Chen").
[7] PC MAGAZINE, Vol. 18:16, Sept. 21, 1999 (Ex. 1007, "PC Magazine").

shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

As set forth in 35 U.S.C. § 103(a),

[a] patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). An obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). However, Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016). Instead, Petitioner must articulate a reason why a person of ordinary skill in the art would have combined the prior art references. *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016).

B. *Level of Ordinary Skill in the Art*

In the Final Written Decision, we stated the following:

Petitioner contends that a person of ordinary skill in the art "would have had at least (1) an undergraduate degree in computer science, electrical engineering, or an equivalent

subject, together with two years of post-graduate experience in computer graphics; or (2) a master's degree in computer science, electrical engineering, or equivalent subject, together with one year of postgraduate experience in computer graphics." Pet. 14 (citing Ex. 1002 ¶ 23). Patent Owner agrees. *See* PO Resp. 10 (citing Ex. 2009 ¶¶ 24–25).

We determine that the parties' agreed level of ordinary skill is consistent with the '109 patent and the asserted prior art. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995); *In re Oelrich*, 579 F.2d 86, 91 (CCPA 1978). We adopt that level of ordinary skill in determining the patentability of the Challenged Claims.

Final Dec. 9–10. Our finding as to the level of ordinary skill in the art was not disturbed on appeal and we see no reason to reach a different result on essentially the same record. Thus, we again find that one of ordinary skill in the art at the time of the invention "would have had at least (1) an undergraduate degree in computer science, electrical engineering, or an equivalent subject, together with two years of post-graduate experience in computer graphics; or (2) a master's degree in computer science, electrical engineering, or equivalent subject, together with one year of postgraduate experience in computer graphics." *See* Ex. 1002 ¶ 23; Ex. 2009 ¶¶ 24–25.

## C. Claim Construction

In this *inter partes* review, claims are construed using the same claim construction standard that would be used to construe the claims in a civil action under 35 U.S.C. § 282(b). *See* 37 C.F.R. § 42.100(b). The claim construction standard includes construing claims in accordance with the ordinary and customary meaning of such claims as understood by one of ordinary skill in the art at the time of the invention. *See id.*; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–14 (Fed. Cir. 2005) (en banc). In construing

claims in accordance with their ordinary and customary meaning, we take into account the specification and prosecution history. *Phillips*, 415 F.3d at 1315–17. Additionally, only terms that are in controversy need to be construed, and these need be construed only to the extent necessary to resolve the controversy. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (holding that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy"); *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (citing *Vivid Techs.* in the context of an *inter partes* review).

Petitioner initially asserts that it "does not believe the claim terms need to be construed to resolve the issues presented in this Petition." Pet. 18–19. Patent Owner proposes two claim terms for construction: the term "frame" in independent claims 1 and 8, and the term "mobile device" in dependent claims 6, 11, and 12. PO Resp. 10–21. In its Reply, Petitioner disagrees with Patent Owner's proposed constructions for both of those terms. Pet. Reply 1–12; PO Sur-reply 2–12. In the Final Written Decision, we determined that it was not necessary to provide an express interpretation of these or any other claim term. Final Dec. 11.

On remand, we consider whether it is necessary to construe the term "frame." In our Institution Decision, we rejected Patent Owner's argument that the term "frame" should be construed narrowly to mean "a single instance of the display." Inst. Dec. 13–14. We now determine that it is not necessary to address Patent Owner's claim construction arguments or to expressly construe the term "frame" because, as discussed below (§ III.E.1), even under Patent Owner's proposed construction, we determine that

Petitioner has shown that the combination of Wiltshire and Saha teaches a frame, as recited in claims 1 and 8.

We address the term "mobile device" below.

1.  *"mobile device"*

    a)  *Patent Owner's Contentions*

Patent Owner contends that the term "mobile device" recited in challenged claims 6, 11, and 12 means "handheld computing device." PO Resp. 19. Patent Owner seeks to distinguish a laptop computer, which Petitioner relies on for its obviousness arguments, from the claimed "mobile device." *Id.* at 18–19 (citing Pet. 40).

Patent Owner asserts that the specification provides two examples of such devices, PDAs and mobile telephones, which are both "handheld computing devices." *Id.* (citing Ex. 1001, 3:26–30, 5:51–59; Ex. 2009 ¶ 53). Relying on certain district court claim constructions as to unrelated patents, Patent Owner contends that the ordinary meaning of the term "mobile device" is "handheld computing device." *Id.* at 20 (citing *U.S. Auto. Ass'n v. Wells Fargo Bank, N.A.*, No. 2:18-cv-366-JRG, 2019 WL 3423652, at *11-12 (E.D. Tex. July 29, 2019); *Uniloc 2017 LLC v. Google LLC*, No. 2:18-CV-00493-JRG-RSP, 2020 WL 339802, at *21 (E.D. Tex. Jan. 20, 2020); Ex. 2009 ¶ 54). According to Patent Owner, "[t]his ordinary meaning is confirmed by computer textbooks, such as Discovering Computers: Fundamentals, which distinguishes between mobile devices and mobile computers like laptops." *Id.* (citing Ex. 2007, 24–26; Ex. 2009 ¶ 55). Patent Owner points out that the textbook classifies laptop computers as portable, personal computers designed to fit on your lap. *Id.* (citing Ex. 2007, 24–25). Patent Owner further contends that even Petitioner's asserted PC Magazine reference refers to the iBook laptop as a "portable" computer, not a mobile

device.  *Id.* at 20–21 (citing Ex. 1007, 10; Ex. 1002 ¶ 216; Ex. 2009 ¶ 56).

Patent Owner contends that "[t]here is no evidence in this record, intrinsic or

extrinsic, from which the Board could conclude that a 'mobile device'

includes a portable laptop computer."  *Id.* at 21.

   b)  *Petitioner's Reply*

   Petitioner responds that "the claim language recites a 'mobile

device'—not a handheld computing device," and that "[i]f the applicant

wanted to limit 'mobile device' to handhelds like PDAs or mobile phones, it

could have done so, just as it did in an earlier patent in the same patent

family."  Pet. Reply 8 (citing Ex. 1001, 10:19–20; Ex. 1034 (U.S. Patent

No. 8,131,826 B2), claims 5, 6).  Petitioner contends that the specification

lacks any "expressions of manifest exclusion or restriction, representing a

clear disavowal of claim scope" to limit "mobile device."  *Id.*  Petitioner

further contends that the specification generally refers to "common

consumer client devices," and that "[b]oth sides' experts agree that laptops

were 'common consumer devices' in 2001."  *Id.* (citing Ex. 1001, 3:26–33,

5:49, 9:13, 9:42; Ex. 1025, 23:8–25:11; Ex. 1033 ¶ 35).  Petitioner argues

that PDAs and cellular telephones mentioned in the specification are mere

exemplary clients and it is improper to use examples from the specification

to import limitations into the claims.  *Id.* at 9 (citing Ex. 1001, 5:51–59).

   As to Patent Owner's cited textbook, Petitioner points out that the

textbook was published in 2008, seven years *after* the '109 patent's priority

date, and is not probative of a person of ordinary skill's understanding of

"mobile device" at the time of the claimed '109 patent invention, i.e.,

January 2001.  *Id.* at 11 (citing Ex. 1033 ¶ 37).  Instead, Petitioner points us

to other references that list laptops as examples of mobile devices.  *Id.*

(citing Ex. 1026, 4; Ex. 1027, 36; Ex. 1028, 27; Ex. 1033 ¶¶ 38–39).  For

example, Petitioner cites an FCC Report that states that "[m]obile data devices include . . . laptop computers equipped with wireless modems," as well as an Encyclopedia of Computer Science that lists laptops as examples of mobile devices. *Id.* (citing Ex. 1027, 36)

Petitioner further points to Patent Owner's positions taken in the parallel district court litigation as contrary to its arguments presented in this proceeding. *Id.* at 7 (citing Ex. 1031, 20–21).

     *c)*   *Patent Owner's Sur-reply*

Patent Owner responds that the specification's reference to "common consumer client devices" is irrelevant to whether a laptop is a "mobile device" within the meaning of the claims. PO Sur-reply 9. Patent Owner contends that Petitioner's cited FCC Report actually corroborates Patent Owner's cited textbook distinguishing "handheld devices" from devices such as "laptop computers." *Id.* (citing Ex. 1027, 9; Ex. 2007). Patent Owner argues that "the FCC Report does not state that laptop computers are mobile devices, but instead says that '[m]obile *data* devices' include 'laptop computers *equipped with wireless modems*.'" *Id.* at 11 (citing Ex. 1027, 36). According to Patent Owner, wireless modems refers to cellular modems and "the 'mobile data' sector addressed in the report focuses on cellular and satellite technology." *Id.* (citing Ex. 1027, 6 n.8). Patent Owner also contends that Petitioner's remaining extrinsic evidence either does not support Petitioner's position or does not reflect a widely held view of persons of ordinary skill in the art. *Id.* at 12 (citing Ex. 1026; Ex. 1028, 27).

     *d)*   *Our Analysis*

In our Institution Decision, we preliminarily rejected Patent Owner's proposal to construe "mobile device" as "handheld computing device." *See*

Inst. Dec. 14–15.  For the reasons discussed below, based on our review of the full trial record, we maintain our claim construction.

"In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005 (Fed. Cir. 2006).  We begin our analysis with the claim language.  Independent claims 1 and 8 recite "a client device," and dependent claims 6, 11, and 12 recite "wherein the client device is a *mobile device*."  The claims do not provide any further guidance on the meaning of a mobile device.

The phrase "mobile device" is not used in the specification.  The specification, however, provides some guidance regarding examples of *client devices*.  *See* PO Resp. 19 (citing Ex. 1001, 3:26–30, 5:51–59).  Specifically, the specification states that

> for reasons of cost, size, and power consumption, sophisticated three dimensional graphics are not available on common consumer client devices such as personal digital assistants (PDAs), mobile telephones and set-top boxes used to decode cable and satellite television signals.  Consequently, it would be advantageous to display complex three dimensional graphics, such as those used by games, on these consumer client devices.

Ex. 1001, 3:26–33; *see also id.* at 5:51–59 ("Another [sic] exemplary clients are PDA 18, such as a Palm Pilot or a Handspring Visor, which has a display screen 26, and cellular telephone 20, which includes a display screen 28."), 9:4–9.  Although we agree with Patent Owner that the specification provides examples of client devices that may have been handheld computing devices, the '109 patent also makes clear that these are mere examples of client devices.  *See id.* at 5:51–53 ("Another [sic] *exemplary* clients are PDA 18 . . . and cellular telephone 20 . . . ." (emphasis added)), 3:26–30 ("consumer

client devices *such as* personal digital assistants (PDAs), mobile telephones" (emphasis added)). The Federal Circuit has warned against importing exemplary embodiments from the specification into broader claim terms. *See Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); *see also SIPCO, LLC v. Emerson Electric Co.*, 980 F.3d 865, 872 (Fed. Cir. 2020) (holding that "the Board did not err in declining to import exemplary embodiments of 'instruction code' from the specification into the broader claim term 'instruction data'").

Patent Owner argues that "a patent applicant need not expressly state 'my invention does not include X' to indicate his exclusion of X from the scope of his patent because 'the patentee's choice of preferred embodiments can shed light on the intended scope of the claims.'" PO Sur-reply 8–9 (quoting *Trustees of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016)). Although we agree with Patent Owner on the cited authority, we find nothing in the specification indicating that the term "mobile device" is limited to a handheld computing device, especially given that the specification does not even mention that term. *See, e.g.*, *Trustees of Columbia Univ.*, 811 F.3d at 1366 (noting "the overwhelming evidence" in the specification demonstrating the intended definition of the disputed term). In fact, the *only* mention of "mobile" in the specification is in reference to "mobile telephone," which is listed as an example of a consumer client device. *See, e.g.*, Ex. 1001, 3:26–30. The Federal Circuit has repeatedly "cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification." *See Williamson v. Citrix Online,*

*LLC*, 792 F.3d 1339, 1346–47 (Fed. Cir. 2015) (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1328 (Fed. Cir. 2002)).

Instead, the specification refers to "consumer client devices" and generally discloses addressing the problem that such devices do not support three dimensional graphics "for reasons of cost, size, and power consumption." *See* Ex. 1001, 3:26–33. We are not persuaded that consumer client devices such as laptops that also are portable would fall outside the scope of the claimed "mobile device," as Patent Owner argues. *See* PO Resp. 20–21, 44–45. As Petitioner points out, Dr. Fuchs and Dr. Hart agree that laptops were in fact considered "common consumer devices" in 2001. Pet. Reply 8 (citing Ex. 1025, 23:8–25:11; Ex. 1033 ¶ 35). Patent Owner argues that the fact that laptops were common consumer devices "is irrelevant to whether a laptop is a 'mobile device' within the meaning of claims 1 and 8." PO Sur-reply 9. But the discussion and examples of "common consumer client devices" are the most relevant disclosures found in the specification, and those are also the portions of the specification that Patent Owner itself points us to as supporting its construction. *See* PO Resp. 19 (citing Ex. 1001, 3:26–30, 5:51–59). And as explained above, those descriptions in the specification are not definitional or limiting. We therefore determine that the specification does not support Patent Owner's proposed limiting construction of the claim term.

Patent Owner also does not point us to, and we do not find, anything in the prosecution history that supports construing the term "mobile device" in the manner argued by Patent Owner. *See generally* Ex. 2004.

Turning to extrinsic evidence, we determine that the evidence offered by Patent Owner also does not support Patent Owner's interpretation of the term "mobile device" as "handheld computing devices." The textbook

proffered by Patent Owner as distinguishing mobile devices from portable devices was in fact published *seven* years *after* the '109 patent's priority date, and is not probative of a person of ordinary skill's understanding of "mobile device" at the time of the invention. *See* Pet. Reply 11 (citing Ex. 2007, 6; Ex. 1033 ¶ 37). Even if we were to consider that textbook to be relevant, we are not persuaded that it supports the clear distinction between laptop computers and mobile devices that Patent Owner seeks to draw. *See, e.g.*, Ex. 2007, 24–25 (referring to laptop computers as "*mobile* computers").

Petitioner, on the other hand, points us to an FCC Report from September 2000 that states that "*[m]obile devices* include . . . *laptop computers* equipped with wireless modems." Pet Reply 11 (citing Ex. 1027, 36). Patent Owner responds that that FCC Report discusses mobile data services using wireless or cellular modems, and classifies "laptop computers *equipped with wireless modems*" as "mobile *data* devices." PO Sur-reply 11 (citing Ex. 1027, 6 n.8, 36, 69). We find Patent Owner's distinction irrelevant to the issue at hand given that the reference at least demonstrates that laptop computers would have been considered mobile devices in certain contexts at the time of the invention. Similarly, Patent Owner's arguments distinguishing two other references that teach laptops as examples of mobile devices are also not persuasive. *See id.* at 12 (arguing that the Wang reference is "merely a research paper," and that the Encyclopedia of Computer Science is not clear enough in identifying laptop computers as mobile devices) (citing Ex. 1026; Ex. 1028, 27). Patent Owner cites no authority to support its contention that a research paper from a reputable university is not relevant extrinsic evidence. *See* Ex. 1026, 20 (stating also that the research described in the paper "was sponsored in part by the Defense Advanced Research Projects Agency"). And although the

Encyclopedia of Computer Science does not expressly list laptops as examples of mobile devices, the cited portion discusses types of displays in mobile devices, including laptop computers. *See* Ex. 1028, 27 (repeatedly referring to "mobile devices" in the same paragraph). We are thus persuaded that Petitioner's proffered extrinsic evidence further supports our interpretation that "mobile devices" are not limited to "handheld computing devices," or exclude laptop computers, as argued by Patent Owner.

We also do not find persuasive the cases cited by both parties (*see* PO Resp. 20; Pet. Reply 9–11; PO Sur-reply 10) involving claim construction of "mobile device" terms in various patents, unrelated to the '109 patent, because each of those constructions is specifically based on the disclosures of the construed patent in that case. *See, e,g., Rothschild Mobile Imaging Innovations, LLC v. Mitek Sys., Inc.*, IPR2016-00457, Paper 8, 9–10 (PTAB July 27, 2016) (construing the term "mobile device" based primarily on statements in specification of the challenged patent in that case).

For these reasons, we decline to adopt Patent Owner's proposed construction of the term "mobile device." We need not further construe the term other than to conclude that it encompasses a laptop computer.

## D. Overview of the Asserted Prior Art

### 1. Wiltshire (Ex. 1004)

Wiltshire discloses a "slim terminal gaming system" that claims to "drastically reduce[] the cost and substantially increase[] the tamper resistance of individual gaming stations" by "allow[ing] concurrent access to multiple computer gaming programs from individual gaming stations by a patron." Ex. 1004, code (54), 2:21–28.

Figure 1D of Wiltshire is reproduced below.



Figure 1D shows an overview of Wiltshire's system, with "server/host computer 110 connected to a plurality of remote client/terminal computers 120." Ex. 1004, 3:62–66. The client computers may have minimal storage, memory, and processing power because "the overwhelming majority of the gaming related and regulated processing is performed on the server/host computer." *Id.* at 5:17–23. The game program running on the server determines which images are to be displayed on the display connected to each client computer (e.g., display devices 140) and also processes any input commands detected by the client computer. *Id.* at 5:50–65.

Figure 2 of Wiltshire is reproduced below.



Figure 2 is a flow diagram showing the operation of Wiltshire's system.
Ex. 1004, 7:7–8. Wiltshire explains that "an image is sent from server/host
computer 110 to client/terminal computer 120," where the "image may
include any type of graphical information including a bitmap, a JPEG file, a
TIFF file or even an encoded audio/video stream such as a compressed video
MPEG stream." *Id.* at 7:11–18. The image transmitted to the client/terminal
computer 120, where "program 122 then causes the image to be displayed on
a screen of client/terminal computer 120 in stage 240." *Id.* at 7:18–27. If an
input command, such as a keystroke or a mouse click, is detected at stage

250, that command is transmitted back to the server at stage 260. *Id.* at 7:27–38.

2. *Saha (Ex. 1005)*

Saha "relates to the field of video compression, and in particular to a video decoder which provides robust error detection and concealment." Ex. 1005, 1:6–8, 5:66–67. Saha describes that, in contrast to intraframe or still image compression techniques, "video compression algorithms for motion video use a concept referred to as interframe compression to remove temporal redundancies between frames." *Id.* at 1:24–28, 1:44–47. Saha discloses that the "compression standard referred to as MPEG (Moving Pictures Experts Group) compression is a set of methods for compression and decompression of full motion video images[,] which uses the interframe and intraframe compression techniques." *Id.* at 1:64–2:1. Saha explains

> Interframe compression methods such as MPEG are based on the fact that, in most video sequences, the background remains relatively stable while action takes place in the foreground. The background may move, but large portions of successive frames in a video sequence are redundant. MPEG compression uses this inherent redundancy to encode or compress frames in the sequence.
>
> An MPEG stream includes three types of pictures, referred to as the Intra (I) frame, the Predicted (P) frame, and the Bi-directional Interpolated (B) frame. The I (intra) frames contain the video data for the entire frame of video and are typically placed every 10 to 15 frames . . . and are generally only moderately compressed. Predicted frames are encoded with reference to a past frame, i.e., a prior Intraframe or Predicted frame. Thus P frames only include changes relative to prior I or P frames [and] receive a fairly high amount of compression.

*Id.* at 2:14–30.

### 3. *Chen (Ex. 1006)*

Chen discusses the development and standardization of asymmetrical digital subscriber line ("ADSL"), one of a variety of digital subscriber line ("DSL") systems built upon the existing twisted-pair telephone technology. Ex. 1006, Abstract, 68.[8] Chen discusses that ADSL can provide higher speed download bandwidth to a user along with lower speed upload bandwidth from the user, making it "well suited to the concept of a video-on-demand service." *Id.* at 69. The video, audio channel, and associated overhead can be transmitted within a 1.5 Mb/s downstream channel, sufficient to receive on-demand MPEG video. *Id.* An upstream channel of 16–64 kb/s is provided to send back control signals for interactive commands such as pause, play, and so forth. *Id.*

### 4. *PC Magazine (Ex. 1007)*

PC Magazine is a magazine article that provides details about Apple's then newly-announced iBook portable computer. Ex. 1007, 9. The article describes the iBook as weighing 6.6 pounds, with a 12.1 inch display, a 300 MHz G3 processor, and a battery life of over six hours. *Id.* According to the article, iBook users can roam up to 150 feet from base stations using Apple's AirPort wireless technology that supports a data-transfer rate of 11 Mbps. *Id.*

### E. *Obviousness of Claims 1 and 3–12 over Wiltshire and Saha*

Petitioner contends that claims 1 and 3–12 are unpatentable as obvious over the combination of Wiltshire and Saha. Pet. 13–58. For the reasons that follow, we are persuaded that Petitioner has established by a

---

[8] Page numbers cited in this Decision are the underlying page numbers of the references themselves.

preponderance of the evidence, including Dr. Fuchs's testimony, that claims 1 and 3–12 are unpatentable under § 103(a) as obvious over Wiltshire and Saha.

### 1. Independent Claim 1

#### a) "A method of hosting an interactive software application comprising:"

Petitioner contends Wiltshire teaches the preamble because it discloses hosting gaming programs on its server. Pet. 19 (citing Ex. 1004, code (57), 1:26–43, 2:35–44, 7:8–9; Ex. 1002 ¶ 56). Petitioner contends that users interact with the gaming programs by sending input commands "such as mouse movements, mouse clicks or keystrokes" from the client computer to the server running the gaming program, and these input commands are used by the gaming program to "determine[] which images are to be displayed on a screen of the client/terminal computer." *Id.* at 20 (citing Ex. 1004, 5:57–65; Ex. 1002 ¶ 57).

Patent Owner does not specifically respond to these arguments. *See generally* PO Resp. We find Petitioner's arguments persuasive as to the preamble of claim 1 and supported on the complete record before us, and, therefore, we adopt them as our own findings. Accordingly, for the reasons explained by Petitioner, we find that Wiltshire teaches the preamble of claim 1.

#### b) "running at a server the interactive software application;"

Petitioner contends that Wiltshire discloses this limitation because Wiltshire's server "exclusively" executes the gaming programs, and the gaming program is an interactive software application because a player interacts with the gaming program. Pet. 20–21 (citing Ex. 1004, 2:35–39, 3:62–66, 7:8–9, Figs. 1A, 2; Ex. 1002 ¶¶ 60–63).

Patent Owner does not specifically respond to these arguments. *See generally* PO Resp. We find Petitioner's arguments persuasive as to this limitation and supported on the complete record before us, and, therefore, we adopt them as our own findings. Accordingly, for the reasons explained by Petitioner, we find that Wiltshire teaches this limitation.

c) *"receiving at the server user input signals from a client device, wherein the user input signals are used to control updating of the state of the interactive software application;"*

Petitioner contends that Wiltshire teaches this limitation because Wiltshire discloses input commands detected at the client device that are transmitted back to the server. Pet. 21–23 (citing Ex. 1004, 7:27–41, Fig. 2; Ex. 1002 ¶¶ 65–67). Petitioner further contends that Wiltshire teaches that the user input signals received by the server are passed to the game program at the server for updating the state of the game program. *Id.* at 23–24 (citing Ex. 1004, 5:57–65, 7:42–43, 8:61–63, 12:44–51, 13:51–59, Fig. 2; Ex. 1002 ¶¶ 65–68).

Patent Owner does not specifically respond to these arguments. *See generally* PO Resp. We find Petitioner's arguments persuasive as to this limitation and supported on the complete record before us, and, therefore, we adopt them as our own findings. Accordingly, for the reasons explained by Petitioner, we find that Wiltshire teaches this limitation.

d) *"generating at least one updated image at the server in response to updating the state of the interactive software application;"*

(1) *Petitioner's Contentions*

Petitioner contends that Wiltshire teaches this limitation because it discloses that at stage 270 of Wiltshire's method, the game program processes the input command and updates the state of the game accordingly.

Pet. 24–25 (citing Ex. 1004, 7:41–45, Fig. 2; Ex. 1002 ¶¶ 73–74). Petitioner further contends that at stage 220 of Wiltshire's method, the determination of whether an image is to be displayed includes deciding whether to update the image on the client in response to updates to the game state. *Id.* at 26 (citing Ex. 1004, 8:61–63). According to Petitioner, a person of ordinary skill in the art would have understood that the game program at the server would determine whether to generate an updated image in response to the updated game state. *Id.* (citing Ex. 1002 ¶ 76). Petitioner contends that it is the server that generates the updated image in Wiltshire. *Id.* (citing Ex. 1004, 2:35–39, 2:45–46, 5:44–46, 7:8–9, 7:18–20; Ex. 1002 ¶¶ 77–78).

### (2) Patent Owner's Arguments

Patent Owner argues that Wiltshire does not disclose generating an updated image in response to user input, as required by the claims. *See* PO Resp. 24–32. Patent Owner argues that although Wiltshire discloses sending an image from the server to a client and that the image may include "a compressed video MPEG stream," Wiltshire is entirely silent as to the content or origin of that compressed video MPEG stream, and therefore does not disclose generating an updated image, compressing that updated image, and then transmitting the compressed updated image. *Id.* at 27–28 (citing Ex. 1004, 7:13–18). According to Patent Owner, Wiltshire's failure to teach the generating step is confirmed by Wiltshire's disclosure that "in some embodiments, images for use by computer gaming system 100 are preloaded into a memory of client/terminal computers 120 to further reduce the amount of communication network bandwidth required." *Id.* (quoting Ex. 1004, 8:8–11). Patent Owner argues images that are preloaded onto the client are preexisting images and are not "generated" in response to "updating the state

of the interactive software application" as required by claims 1 and 8.  *Id.* at 28–29 (citing Ex. 2009 ¶¶ 61–63).

Patent Owner also faults Petitioner's characterization of step 220 shown in Figure 2 of Wiltshire, arguing that Petitioner simply assumes the single word "update" in Figure 2 means that Wiltshire would generate an "updated image" in response to an updated software state when it could simply mean update the display by choosing a different preexisting image to display, possibly an image that is already resident on the client.  PO Resp. 29–30 (citing Ex. 1004, 7:9–12, 8:8–11, Fig. 2); *see also* Tr. 42:3–14, 42:25–43:17.

### (3)  *The Federal Circuit's Remand and Our Analysis*

As discussed briefly above, our determination as to this limitation was the focus of the appeal to the Federal Circuit.  *Sony*, 2023 WL 6773879, at *2–4.  The Federal Circuit found that we erred by interpreting Wiltshire's disclosure narrowly as only disclosing selecting an already available image to display on the client, rather than creating a new image.  *Id.* at *1–2.  Specifically, the Court explained that we incorrectly interpreted Wiltshire's Figure 2 to just ask the question "display/update image?" without "explain[ing] what 'display/update image?' means."  *Id.* at *3.  In doing so, we ignored "a portion of the specification which explains that if the answer is yes, '[t]he *image is generated* by game computer program 112,' i.e., a program on the server."  *Id.* ((citing Ex. 1004, 7:18–19).  The Court also found that Figure 2, the text in Wiltshire describing it, and descriptions of other embodiments in Wiltshire demonstrate that Wiltshire discloses generation of a new image.  *Id.* (citing Ex. 1004, 7:7–45, 8:2–7).  The Court explained that Dr. Fuchs's testimony that Wiltshire discloses the "generating" limitation was uncontradicted.  *Id.*

The Court found that we also incorrectly ignored other examples in Wiltshire, such as the playing of the game Doom, where new images are created:

> The Board erred in its interpretation of Wiltshire as Wiltshire specifically recites "[t]he terms 'game' and 'gaming,' as used herein, include all types of electronic, electromechanical or mechanical gambling and casino game facsimiles . . . video based games such as Doom, Pong, Packman, Myst; [and] video games based on sports . . . ." The use of the phrase "as used herein" signals that this sentence is definitional. The terms "computer gaming program" or "computer gaming system," covers Doom, and Wiltshire recites that "FIG. 2 is a flow diagram of operation 200 of computer gaming system 100." Therefore, as discussed earlier, Wiltshire explicitly discloses that Figure 2 is to be applied to games like Doom.

*Id.* at *4 (citing Ex. 1004, 1:22–44, 7:7–8; *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1378 (Fed. Cir. 2022); *Abbott Lab'ys v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1210 (Fed. Cir. 2007)). The Court explained that even if a person of ordinary skill in the art would not be enabled to practice Wiltshire with a game like Doom, "that does not mean that Wiltshire does not disclose applying the system of Wiltshire to a game like Doom." *Id.* (citing *Raytheon Techs. Corp. v. Gen. Elec. Co.*, 993 F.3d 1374, 1380 (Fed. Cir. 2021); *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989)). We therefore erred when we "narrowed the disclosure of Wiltshire to exclude Doom and only focused on the more detailed examples," and did not credit "Wiltshire's disclosure of applying its system to video games like Doom, which require 'generating' new images." *Id.*

In light of the Federal Circuit's decision, we determine that Wiltshire teaches this limitation. As the Court explained in detail, Figure 2 and its

29

**Appx74**

accompanying description sufficiently disclose generation of a new image, as required by this limitation. Ex. 1004, 7:7–45, 8:2–7, 8:61–63, Fig. 2; Pet. 24–26; Pet. Reply 12–13. Further, the Court found the following testimony from Dr. Fuchs's to be uncontroverted:

> Wiltshire discloses that the decision to "update" or "modify" an image at the server is in response to the updated game state running on the server, meaning that *the server will, at times, update or modify the image in response to the updated game state. . . .* For example, if the decision at step 220 of Figure 2 is to "update [the] image," Wiltshire's server will do so, as Wiltshire explicitly describes, including at column 8, lines 61–63.

Ex. 1033 ¶ 41.

On remand, we apply Wiltshire's Figure 2 to games like Doom. Petitioner argues that "interactive video games like 'Doom,' . . . generate updated images in response to user inputs in real time." Pet. Reply 13 (citing Ex. 1033 ¶¶ 42–43; Ex. 1025, 52:16–23, 53:19–54:9). Dr. Fuchs provides screenshots from a YouTube video showing an example of gameplay from the game Doom. Ex. 1033 ¶ 42. Dr. Fuchs testifies that in Doom, the player's perspective changes dynamically based on what the user is doing in real time and each image is updated to reflect the current state of the player within the game world. *Id.* ¶ 43. In light of the Federal Circuit's guidance on Wiltshire's disclosure, we find Dr. Fuchs's testimony persuasive. Dr. Hart also agrees that Doom generates images in response to user input. Ex. 1025, 52:16–23; *see also Sony*, 2023 WL 6773879, at *2 (noting Patent Owner's concession that Doom requires generating new images). When Figure 2's question at step 220 "display/update image?" is applied to Doom and the answer to the question is yes, Wiltshire teaches that

the server will generate an updated image in response to the updated game state before sending it to the client at step 230. *See* Ex. 1004, Fig. 2.

In its post-remand briefing, Patent Owner argues that the Federal Circuit found that Wiltshire discloses the "generating" limitation only through what Patent Owner calls "Wiltshire's Doom embodiment." PO Remand Br. 1–2. Patent Owner argues that, in light of the Court's decision, "the Petition would have had to show that all of the other limitations of the Challenged Claims allegedly disclosed by Wiltshire are disclosed in Wiltshire's Doom embodiment." *Id.* at 2. We do not agree with Patent Owner because, as Petitioner argues, "Doom is *not* a separate embodiment from Wiltshire's client-server system upon which the Petition relies." Pet. Remand Resp. Br. 1. As the Court explained, a proper reading of Wiltshire *applies* the disclosure about its system, including Figure 2, to the games like Doom. *Sony*, 2023 WL 6773879, at *4. We are therefore not persuaded that treating the dozens of games listed in Wiltshire as separate embodiments, in the manner argued by Patent Owner, is proper.

Considering the complete record on remand, we determine that Wiltshire teaches this limitation.

> e) *"compressing the at least one updated image and transmitting the compressed updated image to the client device, wherein the server transmits the updated image as a compressed frame that can be decompressed and displayed as an updated image at the client device."*

> *(1) Petitioner's Contentions*

Petitioner contends that the combination of Wiltshire and Saha teaches this limitation. Pet. 27. Petitioner asserts that at stage 230 of Wiltshire's method, the updated image is sent from the server/host computer to the client/terminal computer. *Id.* (citing Ex. 1004, 7:13–14). Petitioner

31

further asserts that to reduce bandwidth requirements, Wiltshire discloses that the server may compress the updated images as "a compressed video MPEG Stream." *Id.* at 27–28 (citing Ex. 1004, 7:15–18; 7:62–64). Petitioner adds that, as recognized by the '109 patent, MPEG is an example of compressing an image. *Id.* at 28 (citing Ex. 1001, 6:56–62; Ex. 1002 ¶ 81).

Petitioner contends that Wiltshire discloses that the MPEG stream may be transmitted to the client and the client "causes the image[s] to be displayed on a screen of the client/terminal computer." *Id.* (citing Ex. 1004, 7:15–18, 7:26–27). Petitioner argues that a person of ordinary skill in the art would have understood from Wiltshire that the client computer must be capable of decompressing the compressed MPEG stream (including the compressed image frame) because without decompression, the compressed MPEG stream could not be displayed at the client computer. *Id.* (citing Ex. 1002 ¶¶ 83–84). Petitioner further argues that although Wiltshire does not discuss the details of MPEG decompression at the client, an ordinarily skilled artisan would have known those details based on their knowledge of the well-understood MPEG standard, as confirmed by Saha. *Id.* (citing Ex. 1002 ¶¶ 83–85; Ex. 1008; Ex. 1009).

Petitioner points out that Saha provides an overview of the two "predominant MPEG standards" in 1998, and that these MPEG standards "describe an encoder to generate compressed 'frames' (also called 'pictures')" of three types. *Id.* at 28–29 (citing Ex. 1005, 1:64–2:1, 2:5–14, 2:19–35; Ex. 1002 ¶¶ 49, 88). Petitioner further asserts that Saha also discloses MPEG decoders that receive the compressed frames and decompress them for display. *Id.* at 29–30 (citing Ex. 1005, 4:9–13, 4:51–58, 4:63–5:4, 5:43–45; 5:28–37; Ex. 1002 ¶ 90). Petitioner argues that

a person of ordinary skill in the art "would have known that MPEG includes 'compressed frames' and provides a method for both compression and decompression of frames." *Id.* at 30 (citing Ex. 1004, 6:56–62, 7:13–18, 7:25–27, 7:62–64; Ex. 1002 ¶ 91; Ex. 1008; Ex. 1009). Petitioner points out that the '109 patent indicates that MPEG was an industry standard form of video compression that was already present in client devices before the '109 patent. *Id.* (citing Ex. 1001, 9:32–38; Ex. 1002 ¶ 91).

Petitioner next contends that a person of ordinary skill in the art would have been motivated to apply Saha's teaching of MPEG decompression of compressed frames to Wiltshire's client computer. *Id.* (citing Ex. 1002 ¶¶ 92–93). Petitioner argues that Wiltshire provides an express motivation to combine with Saha because Wiltshire teaches that its system may use the MPEG standard for compressing the updated images that are sent to the client and because Saha details the MPEG standards, including decompressing compressed frames. *Id.* at 30–31 (citing Ex. 1004, 7:15–19; Ex. 1005, 2:21–35; 4:9–13; Ex. 1002 ¶ 94). Petitioner further argues that decompressing an MPEG stream at the client is one of just a finite number of identified and predictable solutions known to a person of ordinary skill in the art and that such a person would have recognized that decompressing the stream using MPEG such that the image can be displayed at the client computer would have been an obvious, if not the only, choice. *Id.* at 31–32 (citing Ex. 1002 ¶ 95).

According to Petitioner, there would have been a reasonable expectation of success in applying Saha's teachings of MPEG's decompression of a compressed frame to the teachings of Wiltshire because Saha's teaching of MPEG and compressed frames would be used for its intended purpose of providing compression for various applications and to

reduce the bandwidth requirements. *Id.* at 32–33 (citing Ex. 1004, 7:62–65; Ex. 1005, 2:10–13, 4:9–13, 5:46–56; Ex. 1002 ¶ 96).

### (2) Patent Owner's Arguments

Patent Owner responds that neither Wiltshire nor Saha discloses the server transmitting the updated image as a compressed frame, under Patent Owner's proposed construction of "frame"—"a single instance of the display." PO Resp. 33. Patent Owner argues that "Wiltshire only disclose[s] transmitting 'an image'" and that Wiltshire "never disclose[s] or suggest[s] that the 'image' was or even could be a frame." *Id.* (citing Ex. 1004, 7:13–15, 7:18–22; Ex. 2009 ¶¶ 83–85). Patent Owner argues that Wiltshire is "completely silent on what part or component of any display, much less the client display the 'image' comprise[s]." *Id.* In fact, Patent Owner argues, Wiltshire discloses less than the prior art reference Yamada that applicant overcame during prosecution of the '109 patent. *Id.* at 35 (citing Ex. 2004, 235, 273, 289; Ex. 2005, 19:33–35) (noting that Yamada discloses an "MPEG decoder [that] decompresses image data such as a background image and a character image used in the game, supplied from the STB 6 via the wireless communication").

Turning to Saha, Patent Owner argues that "applying MPEG to [Wiltshire's] image is simply a form of compressing the image," and "does not change the nature of the input image into something more than it was before applying compression." *Id.* at 36 (citing Pet. 28–29). Patent Owner asserts that "'frame' in the MPEG context simply means picture." *Id.* at 37 (citing Pet. 29). According to Patent Owner, Saha's disclosure of frames "is not the 'frame' of claims 1 and 8 as the applicant successfully asserted during prosecution when arguing that Yamada's disclosure of MPEG did not disclose the use of frames." *Id.* (citing Ex. 2004, 235, 273). Patent Owner

contends that Wiltshire's disclosure of using a compressed MPEG stream fares no better than Yamada's disclosure of the same because applicant's argument during prosecution "at least establishes that *something more* than transmitting images using MPEG compression is required to show the use of a 'frame.'" *Id.* at 23 (emphasis added).

Separately, Patent Owner argues that Wiltshire does not disclose compressing any updated image, and Figure 2 of Wiltshire "describe[s] moving straight from determining whether an image was to be displayed at the client (step 220) to sending the image (step 230)." PO Resp. 30 (citing Ex. 1004, 7:9–15). Patent Owner contends that "Wiltshire simply state[s] that the transmitted image 'may include' a compressed video MPEG stream" and that Wiltshire does not disclose that any image generated in step 220 should be compressed to reduce bandwidth. *Id.* at 30–31 (citing Ex. 1004, 7:15–18; Ex. 2009 ¶¶ 64–68). According to Patent Owner, "a [person of ordinary skill in the art] would not have thought using MPEG compression for a live transmission, such as an interactive game, was trivial in view of Saha, which discloses offline MPEG encoding." *Id.* (citing Ex. 1005, 2:60; Ex. 2009 ¶¶ 69–79).

### (3) Petitioner's Reply

Petitioner responds that "even under Patent Owner's incorrect construction, Wiltshire and Saha would still disclose a 'frame.'" Pet. Reply 19. Petitioner contends that "Saha discloses 'frames' and compressed 'frames' using MPEG." *Id.* (citing Ex. 1005, 1:64–2:1, 2:19–35; Ex. 1025, 104:21–105:5; Ex. 1033 ¶ 55).

Petitioner also contends that "Wiltshire provides multiple examples of 'images' that are '*displayed on a screen* of a client/terminal computer,'" and "[e]ach of these images are full displays." *Id.* at 19–20 (citing Ex. 1004,

3:23–57, 8:38–41, Figs. 4–9; Ex. 1033 ¶ 59). Petitioner further contends that Wiltshire's primary embodiment uses "full screen refreshes" on the client display because Wiltshire discloses "alternative embodiments that may use partial screen updates." *Id.* (citing Ex. 1004, 8:1–7; Ex. 1033 ¶¶ 56–58).

With regard to compressing, Petitioner responds that Wiltshire's text and Figure 2 disclose compressing an updated image for transmission. *Id.* at 14–15 (citing Ex. 1004, 7:15–18, 7:57–64, Fig. 2; Ex. 1033 ¶¶ 44–47). Petitioner's annotated version of Wiltshire's Figure 2 is reproduced below.



Petitioner's annotated version of Figure 2 shows what Petitioner contends is the sum of Wiltshire's text and Figure 2 disclosing compressing an updated image for transmission. *Id.* at 14.

As to Patent Owner's argument that Saha's MPEG is limited to off-line encoding and that a person of ordinary skill in the art would not have understood how to use MPEG for Wiltshire's interactive games,

Petitioner responds that "the '109 patent also does not disclose details of how to use MPEG for live, realtime interactive games" because "the details of real-time image compression (including by using MPEG) were already well known" to a person of ordinary skill in the art. *Id.* at 16–18 (citing Ex. 1001, Fig. 2D; Ex. 1002 ¶ 27; Ex. 1004, 7:13–17; Ex. 1016, 21; Ex. 1025, 146:17–149:5; Ex. 1033 ¶¶ 51–53).

### (4) *Patent Owner's Sur-reply*

Patent Owner responds that Petitioner provides no support for its assertion that Wiltshire's Figures 4–9 are *full* displays. PO Sur-reply 15. Further, Patent Owner argues, Wiltshire mentions "full screen refreshes" but "Wiltshire [is] silent about other embodiments (including any embodiments with full screen refreshes), and silence cannot establish the presence of a limitation." *Id.* at 16 (citing EX1025, 55:15–57:9). Patent Owner reiterates that Wiltshire's "reference to 'compressed video MPEG stream' says nothing about any image allegedly generated in step 220 being compressed to reduce bandwidth." *Id.* at 13. Patent Owner distinguishes the use of MPEG compression in the '109 patent arguing that the specification includes "more specific disclosure regarding how to apply compression to a live stream of rendered images." *Id.* at 14–15 (citing Ex. 2009 ¶¶ 74, 82).

### (5) *Our Analysis*

Based on our review of the complete record, and in view of the Federal Circuit's guidance as to Wiltshire's disclosure, we are persuaded that Petitioner has shown that the combination of Wiltshire and Saha teaches this limitation.

We agree with Petitioner that "Wiltshire provides multiple examples of 'images' that are '*displayed on a screen* of a client/terminal computer,'" and "[e]ach of these images are full displays." Pet. Reply 19–20 (citing

Ex. 1004, 3:23–57, 8:38–41, Figs. 4–9; Ex. 1033 ¶ 59). As Petitioner points out, Wiltshire expressly discloses "full screen refreshes" on the client display because Wiltshire discloses "alternative embodiments that may use partial screen updates." *Id.* (citing Ex. 1004, 8:1–7; Ex. 1033 ¶¶ 56–58). At stage 230 (Figure 2) of Wiltshire's method, the updated images are sent from the server/host computer to the client/terminal computer and Wiltshire discloses that the server may compress updated images as "a compressed video MPEG Stream." Ex. 1004, 7:13–18; 7:62–64. Wiltshire further discloses that the MPEG stream may be transmitted to the client and the client "causes the image[s] to be displayed on a screen of the client/terminal computer." *Id.* at 7:26–27; Fig. 2 (steps 235, 240). We agree with Petitioner that the combination of Wiltshire's disclosure with Saha's disclosure relating to MPEG— "encod[ing] or compress[ing] frames in the sequence," including frames (or pictures) of three types—teaches "the server transmit[ing] the updated image as a compressed frame," as claimed. Ex. 1005, 1:64–2:1, 2:5–14, 2:19–35; Ex. 1002 ¶¶ 49, 88. Saha further discloses MPEG decoders that receive the compressed frames and decompress them for display. Ex. 1005, 4:9–13, 4:51–58, 4:63–5:4, 5:43– 45; 5:28–37; Ex. 1002 ¶ 90. Petitioner argues, and we agree, that a person of ordinary skill in the art "would have known that MPEG includes 'compressed frames' and provides a method for both compression and decompression of frames." Pet. 30 (citing Ex. 1004, 6:56–62, 7:13–18, 7:25–27, 7:62–64; Ex. 1002 ¶ 91; Ex. 1008; Ex. 1009). Petitioner persuasively shows that a person of ordinary skill in the art would have been motivated to apply Saha's teaching of MPEG decompression of compressed frames to Wiltshire's client computer. Ex. 1002 ¶¶ 92–93. We are therefore

persuaded that Petitioner has shown that the combination of Wiltshire and Saha teaches this limitation.

Turning to Patent Owner's arguments, even under Patent Owner's proposed construction that the claim term "frame" should be limited to "a single instance of the display," the combination of Wiltshire and Saha teaches transmitting such a "frame." Saha expressly discloses transmitting an image as a compressed frame that can be decompressed and *displayed* as an image at the client device. Ex. 1005, 2:14–17 (discussing "[i]nterframe compression methods such as MPEG"), 2:21–23 ("An MPEG stream includes three types of pictures, referred to as the Intra (I) frame, the Predicted (P) frame, and the Bi-directional Interpolated (B) frame."). Saha also expressly discloses that "[t]he I (intra) frames contain the video data for the *entire frame of video* and are typically placed every 10 to 15 frames." *Id.* at 2:24–26 (emphasis added). Saha discloses that "Intraframes provide entry points into the file for random access" and explains that without such complete frames (or single instances of the display), frames that come later, such as P-frames, which only include the relative changes to prior frames, could not be decoded. *Id.* at 2:26–46 ("Predicted frames are encoded with reference to a past frame."), 2:47–49 ("encoder generally first creates the I-frames").[9] *See* Tr. 65:22–69:5.

---

[9] We also are not persuaded by Patent Owner's reliance on the prosecution history of the '109 patent to argue that an MPEG frame is different from the claimed "frame." *See* PO Resp. 37. First, we are not persuaded that applicants, without even mentioning MPEG, disclaimed the MPEG I-frame by arguing over a brief disclosure in Yamada that does not even mention a frame (*see* Ex. 2004, 273; Ex. 2005, 19:33–49). Second, as discussed below, we are persuaded that Wiltshire, through its disclosure of full screen displays and full screen refreshes, combined with Saha's disclosure of I-Frames and MPEG compression, teaches a "frame" under Patent Owner's construction.

Patent Owner agrees that Saha's frames could "include something that takes up the entire display," but argues that "that is not inherent in MPEG." *Id.* at 68:16–69:5. Patent Owner's argument is not persuasive because Saha states that I-frames provide entry points for random access, which, when combined with Wiltshire's teaching of updated images (from Doom) transmitted as an MPEG stream, teaches that a single instance of the *entire* display from which a video sequence may be played is provided in order for the video sequence to be displayed. *See* Ex. 1005, 2:47–49 ("When an MPEG encoder receives a video file or bitstream, the MPEG encoder generally first creates the I-frames."); *see also* Ex. 1002 ¶ 89.

Moreover, we agree with Petitioner that Wiltshire "provides multiple examples of 'images' that are '*displayed on a screen* of a client/terminal computer.'" Pet. Reply 19 (citing Ex. 1004, 3:23–57, 8:38–41, Figs. 4–9). Each of the images shown in Wiltshire's Figures 4–9 are in fact full displays, not partial ones. For example, Figures 5A and 5B of Wiltshire are reproduced below.



Figures 5A and 5B are images displayed on the screen of
a client computer showing a front view of a slot machine.
Ex. 1004, 3:26–30.

Based on these figures and Wiltshire's description of these figures, we are persuaded each of these is a single instance of the display, transmitted to the client, and "*displayed on a screen* of a client/terminal computer." Ex. 1004, 3:26–27 (emphasis added).

Further, Wiltshire makes clear that its system can support both "full screen refreshes" or partial screen updates on the client. *Id.* at 8:1–7 ("In some embodiments, to further reduce the amount of network bandwidth required for the operation of computer gaming system 100, image updates (once an image has been displayed) are limited to areas of the screen that are actually modified rather than *full screen refreshes*."). A full screen refresh means displaying the entire screen again, and would thus entail a single instance of the display.

Relying on Dr. Hart's testimony, Patent Owner contends that "Wiltshire [is] silent about other embodiments (including any embodiments with full screen refreshes), and silence cannot establish the presence of a limitation." PO Sur-reply 16 (citing Ex. 1025, 55:15–57:9). We are not persuaded that more is needed. Dr. Fuchs testifies that Wiltshire's disclosure teaches full screen disclosures. He testifies that "by disclosing alternative embodiments that use[] 'partial screen' updates, Wiltshire discloses that its *default* embodiment of transmitting images from the server to the client results in 'full screen refreshes' on the client," and that "[t]his means the compressed frame transmitted from the server to the client is for the full client screen, further confirming that a [person of ordinary skill in the art] would understand Wiltshire's images to be full screen images." Ex. 1033 ¶ 89. Between the two experts, we find Dr. Fuchs's testimony persuasive given that Wiltshire's images are clearly depicted and described as full screen images or single instances of a display. Wiltshire further

discloses that an image is sent from the server to the client and the client "causes the *image* to be displayed on a screen of the client/terminal computer." Ex. 1004, 7:12–18, 7:26–27 (emphasis added). This further supports Dr. Fuchs's testimony that Wiltshire teaches that the server transmits a full screen image.

Patent Owner's argument that Wiltshire's disclosure, discussed above, is not enough to teach full screen refreshes, is not unlike the argument that the Federal Circuit rejected on appeal—that Wiltshire's disclosure needs to provide more detail or that it be detailed enough to enable a person of ordinary skill in the art to practice Wiltshire with a specific game. *See Sony*, 2023 WL 6773879, at *4 (explaining that we erred when we required more detailed disclosure of Wiltshire) (citing *Raytheon Techs. Corp. v. Gen. Elec. Co.*, 993 F.3d 1374, 1380 (Fed. Cir. 2021)). As the Federal Circuit explained in *Raytheon*, "a prior art reference asserted under § 103 does not necessarily have to enable its own disclosure, i.e., be 'self-enabling,' to be relevant to the obviousness inquiry." *Raytheon*, 993 F.3d at 1380. We find Wiltshire's disclosure, including that of full screen refreshes, teaches the claimed frame under Patent Owner's construction.

Petitioner additionally relies on Saha for teachings of MPEG, including the teaching of Intra-frames (or I-frames), which as discussed above, are entire frames. Pet. 27–30. Petitioner points out that "Saha explains that these MPEG standards describe an encoder to generate compressed 'frames' (also called 'pictures')," and specifically quotes Saha's disclosure of I-frames. Wiltshire's disclosure of using an MPEG stream and providing full screen refreshes, in combination with Saha's disclosure of MPEG, teaches transmitting a compressed frame.

On remand, Petitioner argues that "the Federal Circuit's ruling that Doom applies to Wiltshire's Figure 2 means that Wiltshire and Saha disclose a 'frame' even under PO's flawed claim construction." Pet. Remand Br. 6. According to Petitioner, "Doom generates 'frames' under [Patent Owner's] construction, and those 'frames,' when input into Saha's MPEG encoder, result in '[compressed] frames' just as [Patent Owner] conceded." *Id.* at 6–7 (citing Ex. 1025, 52:2–8, 53:22–25). Petitioner cites to Dr. Fuchs's testimony that Doom generates frames, including by providing example screen displays from Doom in his Reply declaration—each one a full instance of the display as opposed to just part of the display. *Id.* at 7 (citing Ex. 1033 ¶ 42).

We agree that Petitioner persuasively shows that Wiltshire's Figure 2 and the accompanying description as applied to Doom in combination with Saha teaches this claim limitation. The Federal Circuit determined that "Wiltshire explicitly discloses that Figure 2 is to be applied to games like Doom." *Sony*, 2023 WL 6773879, at *4. In his Reply declaration, Dr. Fuchs testifies in detail regarding how the application of Doom to Figure 2 of Wiltshire teaches the claim limitation. Ex. 1033 ¶¶ 42–59. As shown below, Dr. Fuchs reproduces a sequence of screenshots from a YouTube video example of gameplay from the game Doom. *Id.* ¶ 42.







**Appx89**

Dr. Fuchs testifies that "[i]n Doom, the player's perspective changes dynamically based on what the user is doing in real time (using inputs from the user), as illustrated in the above screen shots, where the player is running up the stairs," and "the game running on the server generates the image based on the game state, compresses the image (using MPEG), and transmits the image to the [client]." *Id.* ¶ 43. Specifically, as to the claimed "frame," Dr. Fuchs testifies that "it would make no sense to a [person of ordinary skill in the art] to run games such as Doom on the server . . . and output something other than the image generated by the Doom application," but instead a person of ordinary skill in the art would have understood "the Doom application running on the server would output its full image at any given instance in time for transmission to the client for display." *Id.* ¶ 59 (citing Ex. 1004, 1:26–43). We credit Dr. Fuchs's testimony and find that it supports our determination that Wiltshire discloses transmitting a compressed "frame," under Patent Owner's construction of "frame."

Patent Owner argues that applying Doom to Figure 2 of Wiltshire to find that Wiltshire teaches the claimed "compressed frame," is a "new argument on remand . . . running afoul of Board rules, the APA, and Section 312(a)(3)." PO Remand Resp. Br. 3–5. We disagree. As discussed above, Dr. Fuchs testifies in detail about how Doom teaches the claim limitation, and Petitioner cited to specific portions of that testimony in its Reply (i.e., before the remand). *See, e.g.*, Pet. Reply 20 (citing Ex. 1033 ¶¶ 56–59); *see also* Pet. 20 (referencing Wiltshire's disclosure of games such as Doom).

To the extent Patent Owner argues that these contentions were not detailed in the Petition, Petitioner's Reply arguments were in response to Patent Owner's contentions, which in turn were based on a construction of the term "frame" that we did not agree with in our Institution Decision. We

45

therefore find Petitioner's arguments do not present a new theory of unpatentability and are indeed timely. Similarly, Petitioner's post-remand arguments seek to highlight these contentions in light of the Federal Circuit's reading of Wiltshire, which the Court found we improperly ignored. *See* Paper 43 at 1 (granting briefing as "to the impact of the Federal Circuit's decision on the parties' arguments made during the *inter partes* review"). Moreover, Patent Owner has had an opportunity to respond to these arguments. For example, Patent Owner had an opportunity, and did, respond to Petitioner's arguments in its Sur-reply as well as at oral argument, and more recently, its post-remand briefing. *See* PO Sur-reply 12–13; PO Remand Resp. Br. 1–5. We are therefore not persuaded that Petitioner's arguments are untimely or improper.

Turning now to the compressing aspect of this limitation, we are persuaded that Petitioner has shown that Wiltshire teaches compressing the updated image and transmitting the updated image as a compressed frame. Pet. 27–30. Stage 230 of Wiltshire's Figure 2 shows that an updated image is sent from server to the client device and Wiltshire teaches that to reduce bandwidth requirements, the server may compress the updated images in the form of "a compressed video MPEG stream." Ex. 1004, 7:13–18; 7:62–64. Saha details MPEG standards and describes how MPEG compression "encode[s] or compress[es] frames in the sequence." Ex. 1005, 2:19–35. Dr. Fuchs testifies that a person of ordinary skill in the art "would have understood that MPEG was well known and widely used to compress and decompress image or video data years before the '109 patent." Ex. 1002 ¶ 91. Dr. Fuchs further testifies that real-time image compression (including by using MPEG) was also well known at the time of the invention, as evidenced by the Levoy article. Ex. 1033 ¶ 53 (citing Ex. 1002 ¶ 27,

Ex. 1016, 21).  We find this testimony credible given the disclosure of Saha and the Levoy article.  *See, e.g.*, Ex. 1016, 21 (discussing "advances in realtime image compression and decompression hardware," and the ease of "compressing and transmitting an image stream to the client").

As discussed above, we determine that the combination of Wiltshire and Saha teaches the claimed "frame," when a frame is compressed using MPEG, that would result in a "compressed frame" within the meaning of the claims.  Tr. 58:24–59:3; Pet. Remand Br. 6 (arguing that Doom generates "frames," and those frames when input into Saha's MPEG encoder result in compressed frames).  Thus, the combination of Wiltshire with Saha teaches compressing the updated image.

Patent Owner argues "Wiltshire does not disclose on-the-fly creation and compression of an MPEG stream, but instead could have used a pre-existing MPEG stream."  PO Remand Br. 5; *see also* PO Resp. 27–29.  Patent Owner points us to Dr. Hart's testimony that "a [person of ordinary skill in the art] would have understood Wiltshire to disclose that the 'image [] generated by the game computer program' could include the contents of a preexisting compressed image file."  PO Remand Br. 5 (citing Ex. 2009 ¶ 62).  Patent Owner therefore argues that "Wiltshire does not disclose an 'MPEG stream' resulting from newly-generated images (in response to user input) that are compressed before being sent to the client."  *Id.*  Patent Owner also points us to our Final Written Decision finding that Wiltshire is silent as to the content of that compressed MPEG stream, and argues that that finding was not rejected by the Federal Circuit.  *See id.* 5–8; *see also* PO Remand Resp. Br. 1–2.

We disagree.  In our Final Written Decision, we "focus[ed] on embodiments in Wiltshire where images are pre-loaded."  *Sony*, 2023 WL

6773879, at *4. The Federal Circuit concluded that was improper. As the Court explained, "the existence of those examples does not exclude other examples where new images are created," and "[a]lthough both parties agree[d] the game Doom requires creating new images, [we incorrectly] determined that listing Doom in the specification was not a sufficient disclosure." *Id.* Contrary to Patent Owner's assertion, the logical conclusion from the Federal Circuit's reasoning is that our finding that Wiltshire is silent as to the content of that compressed MPEG stream has now been rejected. We must "credit[] Wiltshire's disclosure of applying its system to video games like Doom, which require 'generating' new images." *Id.* Based on that reading of Wiltshire, Petitioner persuasively shows that the combination of Wiltshire and Saha teaches compressing those new images using MPEG and transmitting those as compressed frames. Dr. Fuchs testifies that a person of ordinary skill in the art would have understood from Wiltshire's disclosure that "if the image is displayed or updated, it is then sent to the client in the form of a 'video stream,'" and that "[t]ransmitting the updated images as a video stream allows Wiltshire's system to be used with the wide variety of games it contemplates, including arcade games (like Doom) that continually update images on the screen." Ex. 1033 ¶ 46; *see also id.* ¶ 49 ("The video stream must be dynamically generated because Wiltshire system must be capable of playing real-time interactive games like Doom."); Pet. Reply 13–16. We find Dr. Fuchs's testimony persuasive and consistent with the Court's guidance as to Wiltshire's disclosure.

Patent Owner also argues that an ordinarily skilled artisan would not have understood *how* to use MPEG for live, real-time interactive games disclosed in Wiltshire in view of Saha's MPEG disclosure. PO Resp. 30–31;

PO Remand Br. 6–7; PO Remand Resp. Br. 3. Dr. Fuchs's testimony discussed above, and the fact that both Wiltshire and the '109 patent refer to the MPEG standard without providing further detail as to the *how*, establish that compressing frames generated in Wiltshire using MPEG was within an ordinarily skilled artisan's knowledge.[10] *See, e.g.*, Ex. 1001, 8:26–28 ("When the drawing is complete the resulting image is compressed and transmitted to the client using a protocol such as MPEG4. . . . The use of an industry standard image compression protocol such as MPEG allows us to make use of facilities that are already present in most clients."); Ex. 1033 ¶ 53 (citing Ex. 1002 ¶ 27; Ex. 1016, 21); Pet. Reply 18; Pet. Remand Opp. Br. 4–5.

Patent Owner also asserts that "Petitioner never argued that Doom, or any other video game for that matter, required MPEG streams, much less MPEG streams that were compressed in realtime." PO Remand Br. 7–8; *see also* PO Remand Resp. Br. 2. First, the Petition's discussion of claim 1 begins by referencing Wiltshire's disclosure of various games, including Doom. *See* Pet. 20. As to the compressing limitation, the Petition states that MPEG would be used for its intended purpose of providing compression for various applications, including *video games*. *Id.* at 32.

---

[10] Patent Owner and Dr. Hart seek to distinguish the barebones disclosure of MPEG in the '109 patent by arguing that "the '109 [patent] has a specific component . . . that compresses the image data, that's component number 66" and "[t]hat component is missing from the design . . . of Wiltshire." PO Remand Br. 7 (citing Ex. 1025 at 144:12–15; Ex. 2009 ¶ 82). But that specific component is simply a box in a flowchart that says "Compress the image data" (Ex. 1001, Fig. 2D), which we find is no different than Wiltshire's teaching to "us[e] data compression techniques." Ex. 1004, 7:62–64.

**Appx94**

Next, in response to Patent Owner's arguments regarding Wiltshire's disclosure of transmitting a "compressed video MPEG stream," Petitioner's Reply specifically argues how Wiltshire's disclosure would apply to Doom. Pet. Reply 16 (citing Ex. 1033 ¶¶ 49–50). As discussed above, Dr. Fuchs's Reply declaration provides details about how a person of ordinary skill in the art would have understood Wiltshire's disclosure, as applied to Doom. *See* Ex. 1033 ¶ 49–50 (testifying that the "compressed video MPEG stream" disclosed in Wiltshire "must be dynamically generated because [the] Wiltshire system must be capable of playing real-time interactive games like Doom"). We therefore fail to see how Petitioner's arguments are new or improper.

Aside from the arguments discussed above, Patent Owner does not otherwise respond to Petitioner's remaining contentions as to the asserted combination's teaching of this limitation. *See generally* PO Resp. We find Petitioner's contentions persuasive and supported on the complete record before us, and, therefore, we adopt them as our own findings. Pet. Pet. 27–34; Reply 12–20; Pet Remand Br. 1–7. Accordingly, for the reasons explained by Petitioner, we find that the combination of Wiltshire and Saha teaches this limitation.

> f) *Reason to Combine and Reasonable Expectation of Success*

Petitioner persuasively argues that "Wiltshire teaches that the system may use the MPEG standard for compressing the updated images that are sent to the client, and thus provides an express motivation to combine with Saha, which describes the predominant MPEG standards known at the time of Wiltshire, including additional details that MPEG includes decompressing compressed frames." Pet. 30–31 (citing Ex. 1004, 7:15–19; Ex. 1005, 2:21–35; 4:9–13). We agree with Petitioner that "Wiltshire's teaching that a

50

client displays frames that had been compressed by a server using MPEG would thus have motivated a [person of ordinary skill in the art] to incorporate Saha's teaching to decompress the compressed frames of an MPEG video stream sent by a server to display those images at the client." *Id.* at 31 (citing Ex. 1002 ¶ 94). Petitioner also persuasively argues that there would have been a reasonable expectation of success in applying Saha's MPEG related teachings to the teachings of Wiltshire because [t]he "combination thus uses MPEG in the intended manner that both Saha and Wiltshire instruct." *Id.* at 32 (citing Ex. 1004, 7:62–65; Ex. 1005, 2:10–13; 4:9–13 5:46–56).

Patent Owner does not respond to Petitioner's contentions as to the reason to combine Wiltshire with Saha or the reasonable expectation of success in combining those references. *See generally* PO Resp.; PO Sur-reply; PO Remand Br. On the complete record, we determine Petitioner persuasively shows why one of ordinary skill in the art would have combined the teachings of Wiltshire and Saha, with a reasonable expectation of success.

### g) Objective Indicia of Nonobviousness

Patent Owner does not present evidence of objective indicia of nonobviousness. *See generally* PO Resp.

### h) Conclusion as to Obviousness of Claim 1

"Once all relevant facts are found, the ultimate legal determination [of obviousness] involves the weighing of the fact findings to conclude whether the claimed combination would have been obvious to an ordinary artisan." *Arctic Cat Inc. v. Bombardier Recreational Products Inc.*, 876 F.3d 1350, 1361 (Fed. Cir. 2017). Considering the complete record before us, Petitioner has established, by a preponderance of the evidence, that the combination of

51

Wiltshire and Saha would have rendered the subject matter of claim 1 obvious to one of ordinary skill in the art at the time of the invention.

### 2. Independent Claim 8

Claim 8 recites "an image display system" and "a server having a processor and memory configured to execute an interactive software application," and also recites other limitations that are similar to those in claim 1. Ex. 1001, 10:27–45.

Petitioner asserts that Wiltshire teaches an image display system because it discloses that each client device is connected to a display device. Pet. 42 (citing Ex. 1004, 3:66–67, 7:25–27, Figs. 1A, 1D, 2; Ex. 1002 ¶ 127).

Petitioner contends that Wiltshire teaches the claimed server because it discloses a server/host computer that runs Wiltshire's game program. Pet. 43 (citing Ex. 1004, 4:49–65; Ex. 1002 ¶¶ 130, 131).

Claim 8 also recites "the client device is configured for decompressing of the compressed updated image and displaying the updated image on a display coupled to the client device." Ex. 1001, 10:42–45. Petitioner contends that the combination of Wiltshire and Saha discloses that the client device receiving and displaying the compressed MPEG stream is configured "for decompressing of the compressed updated image and displaying the updated image on a display coupled to the client device." Pet. 45 (citing *id.* § XI(A)(1)(e); Ex. 1002 ¶¶ 135–138).

For the remaining limitations of claim 8, Petitioner relies on its arguments directed to claim 1. Pet. 43–45 (citing Pet. §§ XI(A)(1)(a)–(d); Ex. 1002 ¶¶ 133–138). Petitioner therefore contends that claim 8 is unpatentable over Wiltshire in combination with Saha. *Id.* at 45 (citing Ex. 1002 ¶ 139).

Patent Owner's arguments for claim 8 are the same as those directed to claim 1. *See, e.g.*, PO Resp. 24–39 (arguing both claims together); PO Sur-reply 2, 12–15.

We agree with Petitioner that the combination of Wiltshire and Saha teaches each of the limitations of claim 8 that are slightly different from those in claim 1 for the reasons argued by Petitioner. For the reasons discussed above with regard to claim 1, and because Petitioner persuasively shows that the combination of Wiltshire and Saha discloses limitations of claim 8 that are slightly different than those of claim 1, we determine that Petitioner has established, by a preponderance of the evidence, that the combination of Wiltshire and Saha would have rendered the subject matter of claim 8 obvious to one of ordinary skill in the art at the time of the invention.

### 3. *Dependent Claims 3–5, 7, 9, and 10*

Petitioner argues that claim 3 would have been obvious in view of Wiltshire and Saha. Pet. 34–36. Claim 3 depends on claim 1 and additionally recites "wherein the server is configured for bidirectional communications with a plurality of client devices, the bidirectional communication including receiving at the server user input signals and transmitting the compressed updated image." Ex. 1001, 10:8–12. Petitioner persuasively shows that Wiltshire teaches this additional limitation because Wiltshire's system connects its server to a plurality of client devices, and data is transmitted from the server to the client device in one direction and from the client device to the server in the other direction. Pet. 34–36 (citing Ex. 1004, 3:62–66, 4:52–59, 7:13–15, 7:34–39, Figs. 1D, 2; Ex. 1002 ¶¶ 101–103). As Petitioner notes, at stage 230 of Wiltshire's method, an image is sent from the server to the client, and at stage 250, user input

commands detected at the client program are transmitted back to the server. *Id.* at 36 (citing Ex. 1004, 7:13–15, 7:34–39; Ex. 1002 ¶ 104). We therefore agree with Petitioner that claim 3 is unpatentable over Wiltshire in combination with Saha. *Id.* (citing Ex. 1002 ¶ 105).

Claim 4 depends on claim 1 and additionally recites "wherein the server is configured to receive user input data and transmit compressed updated images with a plurality of client devices." Ex. 1001, 10:13–15. Petitioner persuasively shows, based on its arguments directed at claim 3, that Wiltshire also teaches the additional limitation of claim 4. Pet. 37 (citing Pet. § XI(A)(2); Ex. 1004, 7:13–15; 7:34–39; Fig. 1D; Ex. 1002 ¶ 107). We therefore agree with Petitioner that claim 4 is unpatentable over Wiltshire in combination with Saha. *Id.* (citing Ex. 1002 ¶ 108).

Claim 5 depends on claim 1 and additionally recites "wherein at least two of the plurality of client devices include different device platforms." Ex. 1001, 10:16–18. Petitioner persuasively shows that Wiltshire teaches the additional limitation of claim 5 because it discloses various client devices such as Intel x86 or Pentium based computers, Mac PowerPC computers, and Sun SPARC computers, which a person of ordinary skill in the art would have understood as examples of different device platforms. Pet. 38 (citing Ex. 1004, 5:14–23; Ex. 1002 ¶ 111). Petitioner further contends, and we agree, that a person of ordinary skill in the art would have been motivated to use different device platforms with Wiltshire's server because it would allow more players using different client platforms to play the same game, and that there would have been a reasonable expectation of success that different device platforms would have operated successfully in Wiltshire. *Id.* at 38–39 (citing Ex. 1004, 4:43–48, 6:44–48, 8:24–33, Figs. 1C, 3; Ex. 1002 ¶¶ 113–115). We therefore agree with Petitioner that

claim 5 is unpatentable over Wiltshire in combination with Saha. *Id.* at 39 (citing Ex. 1002 ¶ 117).

Claim 7 depends on claim 1 and additionally recites "wherein the interactive software application is an interactive game that is configured to run at the server, which is in bidirectional communication with a plurality of client devices, and wherein said updating the state of the software application includes updating the game state of the interactive game." Ex. 1001, 10:21–26. Petitioner persuasively shows, based on its arguments directed at claims 1 and 3, that Wiltshire teaches the additional limitation of claim 7. Pet. 41 (citing Pet. §§ XI(A)(1)(b), XI(A)(1)(d), XI(A)(2); Ex. 1002 ¶¶ 122–125). We therefore agree with Petitioner that claim 7 is unpatentable over Wiltshire in combination with Saha. *Id.* (citing Ex. 1002 ¶ 126).

Claim 9 depends on claim 8 and additionally recites "wherein the user input signals are generated at the client device to update the state of the interactive software application from the state that initiated the current image displayed on the display coupled to the client device." Ex. 1001, 10:46–50. Petitioner persuasively shows, based on its arguments directed at claim 1, that Wiltshire teaches (1) user input signals are generated at the client device, (2) those user input signals update the state of the game at the server, (3) an updated image is generated at the server and transmitted to the client, and (4) the updated image is displayed on the client device. Pet. 45–46 (citing Pet. §§ XI(A)(1)(c)–(d); Ex. 1002 ¶ 141). Petitioner further contends, and we agree, that Wiltshire also provides examples showing how a user input signal generated at the client updates the current image displayed at the client display with a new state of the game. *Id.* at 46 (citing Ex. 1004, 7:7–8, 8:39–11:54, Fig. 2; Ex. 1002 ¶ 142). As Petitioner points

**Appx100**

out, in the blackjack game example in Wiltshire, the initial image of a blackjack table on a client display is modified when the user presses the "double down button." *Id.* at 46–48 (citing Ex. 1004, 7:25–27, 8:39–41, 9:13–14, 9:63–65, Figs. 6A, 6B; Ex. 1002 ¶¶ 143–144). We therefore agree with Petitioner that claim 9 is unpatentable over Wiltshire in combination with Saha. *Id.* at 49 (citing Ex. 1002 ¶ 145).

Claim 10 depends on claim 8 and additionally recites "wherein the server is configured to exchange user input data and compressed updated images with a plurality of client devices." Ex. 1001, 10:51–53. Petitioner persuasively shows, based on its arguments directed at claims 1 and 3, that Wiltshire teaches the additional limitations of claim 10. Pet. 49–50 (citing Pet. §§ XI(A)(1)(c), XI(A)(1)(e), XI(A)(2); Ex. 1004, 7:65–8:2; Ex. 1002 ¶¶ 147–149). We therefore agree with Petitioner that claim 10 is unpatentable over Wiltshire in combination with Saha. *Id.* (citing Ex. 1002 ¶ 150).

Patent Owner does not raise any arguments directed specifically to claims 3–5, 7, 9, and 10. *See generally* PO Resp.; PO Sur-reply. Considering the complete record before us, we determine that Petitioner has established, by a preponderance of the evidence, the combination of Wiltshire and Saha would have rendered the subject matter of claims 3–5, 7, 9, and 10 obvious to one of ordinary skill in the art at the time of the invention for the reasons provided by Petitioner.

4. *Dependent Claims 6, 11, and 12*

a) *Petitioner's Contentions*

Petitioner argues that claim 6 would have been obvious in view of Wiltshire and Saha. Pet. 39–40. Claim 6 depends on claim 1 and additionally recites "wherein the client device is a mobile device."

Ex. 1001, 10:19–20. Petitioner contends that Wiltshire discloses this additional limitation because Wiltshire's clients can include "wireless communication pathways" to "allow[] a patron to participate in a mobile gaming environment." Pet. 40 (citing Ex. 1004, code (57), 13:20–25). According to Petitioner, a person of ordinary skill in the art would have understood that Wiltshire's client devices with wireless communication capabilities must be mobile devices in order to be used in the described "mobile gaming environment." *Id.* Petitioner contends that, based on Wiltshire's disclosure that a client computer "can also be any type of cost effective special purpose or general purpose computer such as an Intel® x86 or Pentium® based computer [or] a Mac® PowerPC computer," a person of ordinary skill in the art would have understood that such computers could be, for example, laptops, and that those laptops could be used in Wiltshire's "mobile gaming environment." *Id.* (citing Ex. 1007, 9; Ex. 1020, 7–12; Ex. 1002 ¶¶ 119–120). Petitioner therefore contends that claim 6 is unpatentable over Wiltshire in combination with Saha. *Id.* (citing Ex. 1002 ¶ 121).

Claim 11 depends on claim 8 and additionally recites "wherein the interactive software application is a game and wherein the client device is a mobile device." Ex. 1001, 10:54–56. Petitioner relies on its arguments directed at claim 1 to argue that Wiltshire teaches a game program that is an interactive software application. Pet. 50 (citing Pet. § XI(A)(1)(a)–(b); Ex. 1002 ¶ 152). Petitioner relies on its arguments directed at claim 6 to argue that Wiltshire teaches a mobile device. *Id.* at 51 (citing Pet. § XI(A)(5); Ex. 1002 ¶ 153). Petitioner therefore contends that claim 11 is unpatentable over Wiltshire in combination with Saha. *Id.* (citing Ex. 1002 ¶ 154).

Claim 12 depends on claim 10 and additionally recites "wherein the interactive software application is a game and wherein at least one of the plurality of client devices is a mobile device." Ex. 1001, 10:57–59. Petitioner relies on its arguments directed at claim 1 to argue that Wiltshire teaches a game program that is an interactive software application. Pet. 50 (citing Pet. §§ XI(A)(1)(a)–(b); Ex. 1002 ¶ 156). Petitioner relies on its arguments directed at claim 6 to argue that Wiltshire teaches a mobile device. *Id.* at 51 (citing Pet. § XI(A)(5); Ex. 1002 ¶ 157). Petitioner therefore contends that claim 12 is unpatentable over Wiltshire in combination with Saha. *Id.* (citing Ex. 1002 ¶ 158).

### b) *Patent Owner's Arguments*

Patent Owner responds that "even if Petitioner were correct that Wiltshire disclose[s] a laptop, and it is not, a laptop is not a mobile device within the meaning of claims 6, 11, and 12." PO Resp. 39.

According to Patent Owner, Wiltshire discloses that "(stereo) head mounted displays with separate input controls such as a six degrees of freedom joystick/mouse can be used *in place of touch screen display devices*." *Id.* at 41 (citing Ex. 1004, code (57); 4:19–22). Patent Owner contends that "the touch screen display devices in Wiltshire [are] *not* the client devices. Rather, the display devices [are] connected to the client devices." *Id.* (citing Ex. 1004, 3:66–67, 4:4–7). Patent Owner annotates Figure 1D as shown below.



Fig. 1D

Patent Owner contends that the "mobile gaming" client, annotated in red, is the same client/terminal computer as the others, including with a Wager-Acceptor, but without the separate display 140 shown on the other client/terminal computers, and therefore, that Wiltshire does not provide a reason to use a "mobile" client as required by claims 6, 11, and 12. *Id.* at 42 (citing Ex. 2009 ¶¶ 90–91).

Patent Owner argues that Petitioner's reliance on Wiltshire's disclosure of "[a] cost effective special purpose or general purpose computer" as teaching a mobile device is also misplaced because Wiltshire does not mention or suggest use of a laptop computer, which, according to Patent Owner, is not surprising given the nature of the clients in Wiltshire's commercial gambling system. *Id.* at 42–43 (citing Ex. 1004, Fig. 1D). Lastly, Patent Owner argues, based on its proposed claim construction, that even if Wiltshire suggests use of a laptop, a laptop is a portable device, not a mobile device, as claimed. *Id.* at 29 (citing Ex. 1007, 10; Ex. 2009 ¶ 56.).

c) *Petitioner's Reply*

Petitioner responds that Wiltshire's Figure 1D shows that the communication pathways are lines labeled 130 connecting each client to the

59

**Appx104**

server—*not* lines connecting the head mounted display and joystick to the client. Pet. Reply 20. Petitioner contends that "Wiltshire defines 'communication pathway' 130 as the 'pathways suitable for connecting *server/host* computer 100 to the *client/terminal* computers 120,'" and further discloses that "communication pathway[s] between clients and [the] server can include 'RF links,' which are wireless connections." *Id.* at 20–21 (citing Ex. 1004, 3:67–4:3, 5:38–51; Ex. 1025, 155:4–18). Thus, Petitioner contends, Wiltshire's "wireless communication pathways" that allow "a mobile gaming environment" are wireless connections between the clients and the servers. *Id.* at 21 (citing Ex. 1004, code (57); Ex. 1033 ¶ 61).

Petitioner also argues that to the extent clients in Wiltshire require Wager-Acceptors, those can include a "smart-card reader" or "credit card reader," which could be used with laptops without preventing mobility since they do not hold cash or coins. *Id.* (citing Ex. 1004, 4:33; Ex. 1033 ¶ 62). According to Petitioner, Wiltshire discloses that the clients can run "Windows CE," which is an operating system suitable for use in handheld devices. *Id.* (citing Ex. 1004, 6:55–59; Ex. 1033 ¶ 63).

    *d) Patent Owner's Sur-reply*

Patent Owner responds that Wiltshire's mention of "wireless communication pathways" in its Abstract and claim 11 "is not referring to the same communication pathways 130 shown in Wiltshire's Figure 1D." PO Sur-reply 17–18 (citing Ex. 1004, code (57), 13:20–24). And even if it were, Patent Owner argues, Wiltshire still does not disclose any "mobile device." *Id.* at 18. Patent Owner also disputes Petitioner's contention that Wager-Acceptors could be smart-card or credit card readers used with laptops, because Patent Owner contends Wiltshire does not disclose laptops. *Id.* As to Petitioner's reliance on Wiltshire's reference to Windows CE,

which is suitable for handheld devices, Patent Owner contends that even if that were true, "Windows CE cannot substitute for Wiltshire's failure to disclose the claimed mobile device." *Id.*

### e) Our Analysis

Based on the complete record, we agree that Petitioner has shown that Wiltshire discloses a mobile device as a client device. Wiltshire discloses that its "invention allows a patron to participate in a *mobile* gaming environment." Ex. 1004, code (57) (emphasis added). Wiltshire's client/terminal computers are "cost effective special purpose or general purpose computer[s] such as an Intel® x86 or Pentium® based computer, a Mac® PowerPC computer, a Sun® SPARC®," or "WinTerm™ 3315SE terminals." *Id.* at 5:14–30. Dr. Fuchs persuasively testifies that a person of ordinary skill in the art "was well aware and understood that such computers could be, for example, laptops, and that those laptops could be used in a 'mobile gaming environment' as Wiltshire describes," and thus, would have understood that "Wiltshire discloses that the client device is a 'mobile device.'" Ex. 1002 ¶ 120 (citing Ex. 1007, 9; Ex. 1020, 7–12). Dr. Fuchs further testifies that Wiltshire discloses that its clients can run Windows CE, which a person of ordinary skill in the art would have understood as "a scaled down version of the Windows operating system designed for devices with less memory, storage, and slower processing speed, such as smaller handheld devices," and thus would have understood that Wiltshire contemplates using such devices for its mobile gaming platform. Ex. 1033 ¶ 63 (citing Ex. 1004, 6:55–60; Ex. 1026, 6; Ex. 1037).

First, we agree with Petitioner that in light of the Federal Circuit's decision, Wiltshire is not limited to casino games, and that applying the system of Wiltshire to a game like Doom means that a person of ordinary

skill in the art would have envisioned using a laptop in Wiltshire's system. *Sony*, 2023 WL 6773879, at *5. As discussed above, we determine that the claimed "mobile device" does include computers such as laptops (*supra* § II.C.1). We also are persuaded, in light of Dr. Fuchs's testimony, that Wiltshire's disclosed client devices include laptops, and that Wiltshire teaches a "mobile device." *See* Ex. 1002 ¶ 120; Ex. 1033 ¶ 62.

Second, we find Dr. Fuchs's uncontroverted testimony persuasive that in light of Wiltshire's disclosure of Windows CE devices as client devices, Wiltshire teaches a "mobile device." Patent Owner argues "Windows CE cannot substitute for Wiltshire's failure to disclose the claimed mobile device." PO Sur-reply 18. But Dr. Fuchs's testimony (Ex. 1033 ¶ 63) relies on evidence showing that Windows CE devices include smartphones and handheld devices similar to those listed in the '109 patent specification, which meet even Patent Owner's proposed construction of a "mobile device" (i.e., handheld computing device). *See, e.g.*, Ex. 1037, 1–2 (listing smartphones and tablets as Windows CE devices).

Patent Owner further argues that the mention of "wireless communication pathways" in Wiltshire relates to the use of "a stereo head-mounted display together with a joystick input device," and not to the pathways between the server and clients. PO Resp. 40–41 (citing Ex. 1004, code (57); Ex. 2009 ¶ 90); PO Sur-reply 17–18. Even if we agree with Patent Owner that Wiltshire does not expressly disclose wireless communication pathways between its server and clients, considering Wiltshire's disclosure in its entirety, including the various examples disclosed for its client devices, along with Dr. Fuchs's testimony, and in light of the guidance provided by the Federal Circuit, we are persuaded that Wiltshire teaches a mobile gaming system which supports laptops and

handheld computing devices as client devices, even under Patent Owner's proposed construction of a "mobile device." Patent Owner's remaining arguments (such as its argument that laptops cannot be used with betting devices) are based on a narrow reading of Wiltshire as limited to casino games, and that reading has been rejected by the Federal Circuit.

Accordingly, on the complete record, we are persuaded that Petitioner has shown that Wiltshire teaches a client device that is a "mobile device." We are also persuaded that, for claims 11 and 12, Petitioner has shown that Wiltshire teaches a game program that is an interactive software application. *See* Pet. 50. We are therefore persuaded that Petitioner has shown that the combination of Wiltshire and Saha renders claims 6, 11, and 12 obvious.

5. *Determination as to Petitioner's Ground 1*

Petitioner has established by a preponderance of the evidence that the combination of Wiltshire and Saha would have rendered the subject matter of claims 1 and 3–12 obvious to one of ordinary skill in the art at the time of the invention.

F. *Obviousness of Claims 6, 11, and 12 over Wiltshire, Saha, and PC Magazine*

1. *Petitioner's Contentions*

Petitioner contends that claims 6, 11, and 12 would have been obvious in view of the combination of PC Magazine with Wiltshire and Saha. Pet. 66–73. Petitioner contends that PC Magazine describes the Apple iBook as a "portable" laptop computer for mobile use, and it includes "wireless technology" that allows users to "roam up to 150 feet" from a base station. *Id.* at 67 (citing Ex. 1007, 9). Petitioner further contends that given the iBook's six-hour battery life, a person of ordinary skill in the art would

have understood that the iBook is a mobile device capable of operating when not connected to a power outlet. *Id.*

Petitioner contends that a person of ordinary skill in the art would have been motivated to use laptops, such as the iBook disclosed in PC Magazine, as the client computers in Wiltshire because the iBook uses a G3 processor, which is a "PowerPC processor," and falls within Wiltshire's teaching of "client/terminal computers." *Id.* at 68 (citing Ex. 1004, 5:14–17; Ex. 1007, 9; Ex. 1021, 3:23–25; Ex. 1019, Abstract; Ex. 1002 ¶¶ 217–218). Petitioner asserts that the iBook is equipped with wireless communication technology and sufficient hardware to play interactive games in Wiltshire's system, which would have further motivated an ordinarily skilled artisan to use the iBook as the client device to support "mobile gaming" in Wiltshire. *Id.* at 68–69 (citing Ex. 1004, code (57), 13:20–25; Ex. 1007, 9; Ex. 1002 ¶ 219).

Petitioner contends that using a mobile device for a client device would have been just one of a finite number of known options contemplated by a person of ordinary skill in the art for use in Wiltshire, i.e., either the client devices can be non-mobile or the client devices can be mobile. *Id.* at 69. Petitioner asserts that because mobile devices were well known at the time of the '109 patent invention, using mobile devices would have been a predictable and identified option that was obvious to try. *Id.* (citing Ex. 1007, 9; Ex. 1002 ¶ 220). Petitioner argues that its proposed substitution of a laptop would have been a simple one of one known element for another to obtain predictable results. *Id.* (citing Ex. 1002 ¶ 221).

Petitioner contends that a person of ordinary skill in the art would have had a reasonable expectation of success in using the laptops described in PC Magazine as the client computers in Wiltshire's computing system.

*Id.* According to Petitioner, a person of ordinary skill in the art would have understood that the iBook's "300-MHz G3 processor" would have been more than sufficient to decode MPEG-1 and MPEG-2 encoded video streams, and that iBook's wireless speeds fall within Wiltshire's stated bandwidth requirement. *Id.* at 70 (citing Ex. 1004, code (57), 5:14–17; Ex. 1007, 9; Ex. 1002 ¶¶ 50, 222–224). Petitioner also asserts that Wiltshire, Saha, and PC Magazine are analogous art to the '109 patent and are thus properly used for the obviousness combination. *Id.* at 70–71 (citing Ex. 1001, code (57), 1:29–33, 3:34–37; Ex. 1007, 9; Ex. 1002 ¶ 226).

Petitioner relies on the same arguments for the "mobile device" limitation of claims 11 and 12. *Id.* at 71–73.

### 2. *Patent Owner's Arguments*

Patent Owner presents two arguments as to this ground: (1) the iBook disclosed in PC Magazine is not a "mobile device," as claimed, and (2) a person of ordinary skill in the art would not have been motivated to use laptops, such as the iBook disclosed in PC Magazine, as the client computers in Wiltshire. PO Resp. 45–52.

Patent Owner argues that the iBook disclosed in PC Magazine is a "portable" computer, not the claimed "mobile device," which according to Patent Owner is a handheld computing device. *Id.* at 45 (citing Ex. 1007, 10; Ex. 2009 ¶ 56).

Patent Owner also contends that Petitioner ignores that Wiltshire's system is a commercial gambling system in which the client computers are equipped to facilitate that purpose, and that Petitioner has not explained how an iBook, even if it could be client computer 120 in Wiltshire's system, would function with a Wager-Acceptor (i.e., a commercial betting device) attached, much less be mobile. *Id.* at 46–47 (citing Ex. 1004, code (57),

2:45–51, 4:30–33; Ex. 2009 ¶¶ 111–112). Moreover, Patent Owner contends, a person of skill in the art would not have thought a mobile coin or bill collector, or even a mobile device containing credit card information, was a good idea because mobility makes theft much easier. *Id.* at 47–48 (citing Ex. 2006, 1:14–30; Ex. 2009 ¶ 112). Patent Owner further contends that because Wiltshire does not teach the use of mobile devices in its system, Wiltshire does not provide a reason to use a laptop computer as a client. *Id.* at 33–34 (citing PO Resp. § V.C.2; Ex. 1004, code (57), Fig. 1D; Ex. 2009 ¶¶ 108–109).

In response to Petitioner's "obvious to try" argument, Patent Owner argues that the options for Wiltshire's clients are not so limited because Petitioner ignores that portable devices were also available as an option. *Id.* at 49. Patent Owner also argues that the fact that mobile devices were known is not, by itself, a reason to use them in Wiltshire's system. *Id.* (citing *L.A. Biomed. Rsch. Inst. at Harbor-UCLA Med. Ctr. v. Eli Lilly & Co.*, 849 F.3d 1049, 1064 (Fed. Cir. 2017)). Patent Owner asserts that "Petitioner does not even suggest, for example, that a person of skill in the art would have had a reason to use a mobile phone or PDA in Wiltshire's commercial gambling system." *Id.*

Patent Owner argues that even present-day commercial gambling establishments still use large, bulky gaming stations, and "Petitioner cannot point to any apparent reason to use a laptop as a gambling station when every incentive is to make gambling stations, like ATM machines, hard to raid or steal." *Id.* at 51 (citing Ex. 2006, 1:14–30; Ex. 2010, 58:2–60:9, 59:6–19; Ex. 2009 ¶¶ 111–112). According to Patent Owner, Wiltshire itself acknowledges that its invention was designed to substantially increase the tamper resistance of individual gaming stations, and Petitioner cannot show

that use of laptops could possibly benefit Wiltshire's commercial gambling system.  *Id.* (citing Ex. 1004, 2:22–25).

Patent Owner contends that the results of Petitioner's proposed combination would not have been predictable given the constraints on Wiltshire's commercial gambling system and that a person of ordinary skill in the art would not have had a reasonable expectation of success in using the laptops in Wiltshire's system where mobility is a detriment.  *Id.* at 51–52 (citing Ex. 2006, 1:24–30).

3.  *Petitioner's Reply*

Petitioner responds that under the correct meaning of the term, which includes laptops, the Apple iBook laptop, with its wireless capability, is a "mobile device."  Pet. Reply 22 (citing Ex. 1033 ¶ 66).  Petitioner contends that the iBook is not just portable, but uses "wireless technology" to allow it to be used in a mobile fashion.  *Id.* (citing Ex. 1033 ¶ 67).

In support of its argument, Petitioner asserts that "[w]hen the Apple iBook was first unveiled during MacWorld in 1999, Steve Jobs demonstrated its mobile and wireless capability by browsing multiple websites while holding the iBook in his left hand."  *Id.* (citing Ex. 1007, 9; https://youtu.be/3iTNWZF2m3o?t=876; https://youtu.be/HFngngjy4fk?t=57).  Petitioner reproduces a screen capture from one of the cited videos:



On motivation to combine, Petitioner contends that Wiltshire is not limited to a casino environment in which mobile devices would not be used because Wiltshire broadly defines "game" and "gaming," to which its disclosure applies and expressly contemplates "non-casino games," including video games such as "Doom" and "Myst," neither of which are casino games. *Id.* at 24–25 (citing Ex. 1004, 1:26–43, 12:11; Ex. 1025, 36:1–25). Petitioner also asserts that Wiltshire discloses input commands "such as mouse movements, mouse clicks or keystrokes," which a person of ordinary skill in the art would have understood as applying to non-casino gaming like playing Doom or Myst. *Id.* at 25 (citing Ex. 1004, 5:59–65; Ex. 1033 ¶ 74). Petitioner contends that PC Magazine discloses the iBook and other laptops being advertised to both businesses and consumers, and Dr. Hart admitted to using laptops extensively before 2001. *Id.* (citing Ex. 1025, 169:8–170:25; Ex. 1002 ¶ 220; Ex. 1033 ¶ 75).

### 4. *Patent Owner's Sur-reply*

In its Sur-reply, Patent Owner argues that PC Magazine's Apple iBook laptop is not a "mobile device" under the proper construction of the term (handheld computing device), and the mere availability of wireless capability in a device does not make a device mobile. PO Sur-reply 19. According to Patent Owner, PC Magazine refers to the iBook as a portable device and mobile devices are a subcategory of portable devices. *Id.* As to screenshots from the 2009 YouTube video featuring Steve Jobs holding the iBook in his left hand, Patent Owner points out that a desktop computer or a VHS player can similarly rest on one's hand, but no one would consider either a "mobile device," and doing so would eviscerate the claim requirement that the client device be a "mobile device." *Id.* at 19–20.

Patent Owner also reiterates that a person of ordinary skill in the art would not have been motivated to use the iBook in Wiltshire's commercial gambling system. *Id.* at 20. Patent Owner contends Petitioner's argument that laptops with connected card readers would not present any security risk ignores that even present-day commercial gambling establishments still use large, bulky gaming stations and Wiltshire's teaching that its invention was designed to "substantially increase[] the tamper resistance of individual gaming stations." *Id.* (citing Ex. 1004, 2:22–25; Ex. 2010, 58:2–60:9). Patent Owner further contends that Wiltshire's disclosure is focused on gambling and in particular commercial gambling operations provided by a "house" or a "casino," which is why Wiltshire's Figure 1D shows "Wager-Acceptor" devices on each client computer. *Id.* at 21 (citing Ex. 1004, 12:10–13; Ex. 1025, 38:6–40:14, 33:23–35:16; Ex. 2009 ¶ 111). Patent Owner also argues that the prevalence of laptop products at the time of the invention only shows that a person of ordinary skill in the art could

have made, not would have been motivated to make, the combinations or modifications of prior art to arrive at the claimed invention. *Id.* at 22.

   5. *Our Analysis*

      a) *Reasons to Combine*

"Whether an ordinarily skilled artisan would have been motivated to modify the teachings of a reference is a question of fact." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1327 (Fed. Cir. 2016) (citations omitted). "[W]here a party argues a skilled artisan would have been motivated to combine references, it must show the artisan 'would have had a reasonable expectation of success from doing so.'" *Arctic Cat*, 876 F.3d at 1360–61 (quoting *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1068–69 (Fed. Cir. 2012)).

Based on our review of the complete record, we determine that Petitioner provides persuasive reasons why one of ordinary skill in the art would have had reason to combine the iBook disclosed in PC Magazine in Wiltshire's system, with a reasonable expectation of success.[11] Pet. 68–71. We are specifically persuaded by Petitioner's argument that using a laptop for a client device would have been just one of a finite number of known options contemplated by an ordinarily skilled artisan for use in Wiltshire's system and would have been a predictable and identified option that was obvious to try. Pet. 69 (citing Ex. 1002 ¶ 220). Dr. Fuchs testifies in support of Petitioner's rationale to combine that "[a]s can be seen in commercial magazines such as PC Magazine, the personal computer

---

[11] As discussed above, we are persuaded that Wiltshire alone teaches the claimed "mobile device." *See supra* § III.E.4. Even if Wiltshire does not teach a "mobile device," we are persuaded that Petitioner's combination of Wiltshire with PC Magazine does so.

industry had already begun shifting towards offering viable mobile laptop products to the general public" and "many businesses competed to offer their own laptop models to potential customers." Ex. 1002 ¶ 220 (citing Ex. 1007). We are persuaded by this testimony. *See also* Ex. 1025, 169:8–170:25 (Dr. Hart discussing his extensive use of his laptop in 2000).

We agree with Petitioner that a laptop described in PC Magazine would have been a simple substitution of one known element for another to obtain predictable results. Pet. 69. Wiltshire describes using "any type of cost-effective special purpose or general purpose computer such as an Intel® x86 or Pentium® based computer, a Mac® PowerPC computer, a Sun® SPARC®, etc." Ex. 1004, 5:14–17. Dr. Fuchs testifies that the Apple iBook described in PC Magazine uses a 300-MHz PowerPC "G3 processor," and that a person of ordinary skill in the art would have understood the Apple iBook, which was noteworthy when it was released in 1999, as a suitable client device in Wiltshire's system. Ex. 1002 ¶ 218 (citing Ex. 1007, 9; Ex. 1019, Abstract; Ex. 1021, 3:23–25). *See KSR*, 550 U.S. at 420 ("[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed").

We are persuaded by Petitioner's argument and Dr. Fuchs's testimony that a person of ordinary skill in the art would have understood that "Wiltshire's disclosure that 'any' general purpose computer can be used for the client includes the Apple iBook," as disclosed in the PC Magazine. Pet. 68 (citing Ex. 1002 ¶ 218). In light of the Federal Circuit's decision, we determine that Wiltshire is not limited to a casino environment but instead broadly defines "game" and "gaming," expressly contemplating "non-casino games" such as Doom and Myst. *See Sony*, 2023 WL 6773879, at *2–4

(explaining that we erred when we improperly "narrowed the disclosure of Wiltshire to exclude Doom and only focused on the more detailed examples"); Ex. 1004, 1:26–43, 12:11; *see also* Pet. Remand Br. 7–8 (arguing that the Federal Circuit's finding that Wiltshire is not limited to casino games confirms that a person of ordinary skill in the art would have been motivated to combine Wiltshire with PC Magazine's iBook). Wiltshire discloses input commands "such as mouse movements, mouse clicks or keystrokes." Ex. 1004, 5:59–65. Relying on Dr. Fuchs's testimony, Petitioner persuasively argues that a person of ordinary skill in the art would have understood this disclosure as applying to non-casino gaming like playing Doom or Myst. Pet. Reply 25; Ex. 1033 ¶ 74. Dr. Fuchs testifies that a person of ordinary skill in the art would have understood based on all the non-casino teachings set forth in Wiltshire that its system applies to these other contexts, including using a *laptop as the client device in a user's home* or other building while the game is running on a remote server. Ex. 1033 ¶ 74. In view of the Federal Circuit's decision that Wiltshire is not limited to a casino environment, we credit Dr. Fuchs's testimony and determine that a person of ordinary skill in the art would have had reason to combine the iBook taught by PC magazine with Wiltshire's system, to be able to use a laptop as the client device in a user's home to play a game such as Doom.

For the same reason, we reject Patent Owner's arguments that there would have been no motivation to use a laptop as a client device because Wiltshire's preferred embodiments are directed to commercial casino establishments, which use "large, bulky gaming stations." PO Resp. 46–52. Patent Owner argues that even present-day commercial gambling establishments still use large, bulky gaming stations, and there would have been no reason to use a laptop as a gambling station, which need to be

difficult to raid or steal. *Id.* at 50–51. The size of gambling stations is not as important because we do not read Wiltshire as limited to gambling or casino environments. Wiltshire's disclosure contemplates playing games such as Doom away from the casino, without concerns of theft.

Patent Owner's argument as to the lack of reasonable expectation of success in using the laptops described in PC Magazine as the "client/terminal computers" in Wiltshire's systems is also not persuasive. Dr. Fuchs testifies in support of Petitioner's rationale to combine that "the personal computer industry had already begun shifting towards offering viable mobile laptop products to the general public" and the iBook was targeted at students and consumers. Ex. 1002 ¶ 220 (citing Ex. 1007, 9); *see also* Ex. 1033 ¶ 75. He further testifies that the iBook's "300-MHz G3 processor" would have been more than sufficient to decode MPEG-1 and MPEG-2 encoded video streams, and a person of ordinary skill in the art would have fully expected the iBook to be able to decode MPEG streams as taught by Wiltshire combined with Saha. Ex. 1002 ¶ 223 (citing Ex. 1007, 9; Ex. 1019, 324). He also testifies that the iBook's network connectivity would have met Wiltshire's stated bandwidth requirements. *Id.* ¶ 224. We credit this testimony because it is consistent with PC Magazine's disclosure.

Patent Owner's remaining arguments and Dr. Hart's testimony are premised on reading Wiltshire as limited to a casino environment (which has already been rejected by the Federal Circuit), and therefore, do not undermine Petitioner's showing of a reason to combine. *See, e.g.*, PO Resp. 47 (arguing that Petitioner fails to explain how an iBook, even if it could be client/terminal computer 120, would function with a Wager-Acceptor attached); PO Remand Resp. Br. 5 ("That Wiltshire's casino gaming system can play non-casino games is no reason to replace the casino-standard

"immobile" "large, bulky gaming stations" with PC Magazine's "iBook" laptop which would be inappropriate in a casino environment.").

On the complete record, we determine Petitioner persuasively shows that one of ordinary skill in the art would have had reason to combine the teachings of Wiltshire with PC Magazine in the manner claimed, with a reasonable expectation of success, as asserted by Petitioner.

b)   *Mobile Device*

As discussed above (*supra* § III.C.2), we are not persuaded to construe the claimed "mobile device" as "handheld computing device," excluding portable devices such as laptops, in the manner argued by Patent Owner.  We therefore determine that PC Magazine's disclosure of an Apple iBook is sufficient to teach the claimed "mobile device."  Ex. 1007, 9. Dr. Fuchs testifies that a person of ordinary skill in the art "would have understood that the Apple iBook laptop was both portable *and* mobile" because "the iBook design included features to allow it to be used in a mobile fashion, including its 'wireless technology' and small form factor." Ex. 1033 ¶ 67; Pet. Reply 22.  We find Dr. Fuchs's testimony persuasive because it is consistent with the disclosure of PC Magazine, which explains that "iBook users can roam up to 150 feet" from a base station.  Ex. 1007, 9.

In our view, screenshots from the YouTube video clips reproduced by Petitioner further indicate that the iBook is a mobile device.  For example, the screenshot reproduced above from an iBook launch video shows Mr. Jobs browsing the web while holding the iBook with one hand.  Pet. Reply 23; Ex. 1033 ¶ 69.  The iBook demonstration shows the wireless capabilities of the iBook as well as the ability to use the device in a mobile fashion, and further supports that the iBook is a *mobile* device.  Patent Owner's arguments that PC Magazine does not teach a "mobile device" are

based on its claim construction position, which we reject. PO Resp. 45; PO Sur-reply 19–20.

As to claims 11 and 12, Petitioner has persuasively shown that Wiltshire teaches a game program that is an interactive software application. *See* Pet. 71–72.

Accordingly, we find that Petitioner persuasively shows that the combination of Wiltshire, Saha, and PC Magazine would have rendered the subject matter of claims 6, 11, and 12 of the '109 patent obvious to one of ordinary skill in the art at the time of the invention.

### G. Obviousness of Claim 2 over Wiltshire, Saha, and Chen

#### 1. Petitioner's Contentions

Petitioner argues that claim 2 would have been obvious in view of Wiltshire, Saha and Chen. Pet. 39–40. Claim 2 depends on claim 1 and additionally recites "wherein a first bandwidth for transmitting the user input data between the client device and the server and a second bandwidth for transmitting the compressed updated image from the server to the client device are asymmetric." Ex. 1001, 10:3–7. Petitioner contends that Chen discloses the additional limitation of claim 2, and that the combination of Chen with Wiltshire and Saha renders this claim obvious. Pet. 59 (citing Ex. 1002 ¶ 193). Petitioner asserts that Chen describes the ADSL standard, which discloses a first bandwidth of 16–64 kb/s for upstream transmissions and second bandwidth of 1.544 Mb/s for downstream transmissions. *Id.* at 59–60 (citing Ex. 1006, 69; Ex. 1001, 6:14–16; Ex. 1002 ¶ 195).

Petitioner further contends that a person of ordinary skill in the art would have been motivated to apply Chen's teaching of two asymmetric bandwidths to the combination of Wiltshire and Saha because Wiltshire

describes using the Internet as a communication pathway between its server and clients, and Chen teaches that ADSL is an "ideal vehicle for Internet access" and other "telecommuting applications." *Id.* at 61 (citing Ex. 1004, 5:30–32; Ex. 1006, 69). Petitioner further contends that Chen describes ADSL as "well suited to the concept of video-on-demand service" and Wiltshire's system provides a form of "video-on-demand." *Id.* at 61–63 (citing Ex. 1006, 69; Ex. 1002 ¶ 198). Petitioner also contends that using ADSL would have been just one of a finite number of known options for providing Internet connectivity described in Wiltshire because at that time, broadband Internet access was typically provided by either ADSL or cable networks. *Id.* at 63 (citing Ex. 1006, 69; Ex. 1007, 76; Ex. 1002 ¶ 201). According to Petitioner, a person of ordinary skill in the art would have had a reasonable expectation of success in the combination because Wiltshire describes using a communication pathway such as the Internet, Wiltshire discloses a video-on-demand system that uses MPEG for transmitting video streams, and the proposed combination would have used ADSL, which supports MPEG, in the intended manner. *Id.* at 63–64 (citing Ex. 1002 ¶¶ 202–204).

2. *Patent Owner's Arguments*

Patent Owner responds that "Petitioner's proposed use of Chen's ADSL *for home installation* relies on hindsight and ignores Wiltshire's description of its system as a gambling system *for commercial establishments* that is not disclosed or suggested to be installed in homes." PO Resp. 53 (emphases added).

Patent Owner argues that "Chen only disclose[s] using ADSL in the residential context and describe[s] a proposal for ADSL 'having the traditional duplex [plain old telephone service] channels, occupying the

frequency band between 300 Hz to 4 kHz, an upstream control channel of 16–64 kb/s, occupying the frequency band between 10 kHz to 50 kHz, and a downstream channel of 1.544 Mb/s, occupying the frequency band between 100 and 500 kHz.'" *Id.* at 53–54 (citing Ex. 1006, 69). According to Patent Owner, "Chen justified the use of ADSL for residential applications: 'Researchers realized that for residential applications, a POTS service, where the traditional telephone service can be provided whether the ADSL is on or off, was more practical than ISDN service.'" *Id.* at 54 (citing Ex. 1006, 69). Patent Owner argues that Chen includes a "simulation study of the effect of the in-house wiring," and teaches only "the use of ADSL in residential homes." *Id.* (citing Ex. 1006, 71–72).

Patent Owner contends that a person of ordinary skill in the art would have understood Wiltshire's system was designed for a commercial gambling establishment, not in residential homes. *Id.* at 56–57 (citing Ex. 1004, code (57), 1:16–18, 2:22–25, 2:45–65; Ex. 2009 ¶ 111). Patent Owner argues that Petitioner fails to address why a person of ordinary skill in the art would want to use a technology meant to optimize bandwidth on residential telephone systems in a commercial establishment. *Id.* at 58 (citing Ex. 2009 ¶¶ 95–100).

Patent Owner argues Wiltshire's disclosure that the communication pathway between server and clients may be the Internet does not in any way suggest that the clients are located in residences. *Id.* at 58–59 (citing Ex. 2009 ¶ 96). Patent Owner further argues that Wiltshire's system is not a video-on-demand system and Petitioner's reliance on Chen's suitability for video-on-demand to combine it with Wiltshire is misplaced. *Id.* at 59–60 (citing Ex. 1004, 12:10–13; Ex. 1002 ¶ 198; Ex. 2009 ¶ 97). Patent Owner contends that "[e]ven if Chen's ADSL were well-suited to video on demand

in residences, that does not suggest that a person of skill in the art would have thought it was a good solution for a video-on-demand system in a commercial establishment." *Id.*

Patent Owner further argues that "with a bandwidth requirement of 1.3 Mb/s for an MPEG video stream, Chen disclose[s] that ADSL's downstream bandwidth can provide only *one* MPEG video stream on a single pair of copper wires." *Id.* at 61 (citing Ex. 2009 ¶¶ 103–104). According to Patent Owner, Petitioner's motivation assumes that a commercial gambling operation, like that in Wiltshire, could operate successfully even though it would only be receiving a single video stream, whereas a commercial gaming operation would likely have tens of gaming stations in a *single* location and a remote server. *Id.* at 61–62. Citing to Dr. Fuchs's testimony, Patent Owner argues that even if Wiltshire's "bandwidth requirement can be further reduced using data compression techniques to about 100 KB/sec, that is still a bandwidth requirement of 0.8 Mb/s, meaning ADSL's downstream bandwidth disclosed in Chen can provide still *just one video stream*." *Id.* at 62 (citing Ex. 1004, 7:62–64; Ex. 2010, 15:2–4, 19:20–20:1, 74:11–21, 75:21–76:7; Ex. 1002 ¶ 224).

Patent Owner also disagrees that ADSL was just one of a finite number of known options for providing Internet connectivity described in Wiltshire given the existence of other services such as DSL lines and SOHO networks. *Id.* at 62 (citing Ex. 1007, 76 (discussing home and Small Office Home Office ("SOHO") networks)). Patent Owner thus contends that Petitioner has failed to prove, by a preponderance of the evidence, its assertion that the combination of Chen with Wiltshire and Saha would have rendered claim 2 obvious. *Id.* at 63 (citing Ex. 2009 ¶¶ 100–105).

### 3.  *Petitioner's Reply*

Petitioner responds that Wiltshire is not limited to commercial casino establishments and nor is Chen limited to residential applications.  Pet. Reply 26.  Petitioner reiterates that Wiltshire "teaches use of its system in a variety of gaming contexts, including playing games like Doom at home." *Id.*  Conversely, Petitioner contends, "Chen discloses more than just ADSL in residential contexts, but also for business applications like accessing database records and tele-education." *Id.* (citing Ex. 1006, 69).  Petitioner further contends that "it was well known that ADSL could be used for the 'last mile' to both 'businesses and residences.'" *Id.* (citing Ex. 1029, Abstract; Ex. 1030, Abstract; Ex. 1033 ¶¶ 77–78).   Petitioner argues that it is immaterial whether ADSL could support more than one concurrent MPEG video stream because a person of ordinary skill in the art would have understood that "any given application in Wiltshire need not consume the entire 1.3 Mbps bandwidth," and "Wiltshire contemplates games like Pong or simpler games that could stream multiple concurrent MPEG videos that total less than 1.3 Mbps." *Id.* at 27 (citing Ex. 1033 ¶ 79).

Petitioner also argues a person of ordinary skill in the art would have understood DSL, discussed in the PC Magazine article, to refer to ADSL because the article discloses that ADSL was the "ideal vehicle for providing Internet Access" and the '109 patent uses the term DSL in the same manner. *Id.* (citing Ex. 1006, 69; Ex. 1001, 6:14–16. Ex. 1033 ¶ 80).

### 4.  *Patent Owner's Sur-reply*

Patent Owner responds that Petitioner's argument seeking to read both Wiltshire and Chen broadly and Petitioner's reliance on its newly-submitted evidence are an attempt to bolster its deficient *prima facie* case that exceeds the proper scope of reply under 37 C.F.R. § 42.23(b).  PO Sur-reply 22–23.

Patent Owner argues that Wiltshire's system is directed at commercial gaming involving "stake games," and Chen's reference to tele-education and database records does not show the use of ADSL outside the home. *Id.* at 23 (citing Ex. 1025, 162:1–164:12). Patent Owner also argues that Petitioner's additional references do not show that a person of ordinary skill in the art would have "thought ADSL could successfully be employed in a commercial gaming operation involving tens of gaming stations in a single location," or that it "was an adequate choice for a commercial gaming establishment." *Id.* (citing Ex. 1029; Ex. 1030, 2). Patent Owner contends that because the Petition referred to Wiltshire's disclosure of a plurality of clients, Petitioner's reply argument that "Wiltshire discloses a system . . . with only one client computer" proffers "an entirely new theory of invalidity." *Id.* at 23–24. According to Patent Owner, Petitioner's assertion that Wiltshire contemplates games "that could stream multiple concurrent MPEG videos that total less than 1.3 Mbps" is unsupported by any citation to Wiltshire and should be rejected. *Id.* at 24–25.

Patent Owner also argues that the various versions of DSL themselves present numerous options for Internet connectivity, therefore rejecting Petitioner's contention that ADSL was one of a finite number of options for providing Internet connectivity. *Id.* at 25 (citing Ex. 1029, 9; Ex. 1030, 2).

5. *Analysis*

Based on our review of the complete record, we determine that Petitioner persuasively shows that one of ordinary skill in the art would have had reason to combine Chen's teaching of a first bandwidth and a second bandwidth that are asymmetric with the combination of Wiltshire and Saha. Pet. 60–65.

Petitioner persuasively shows that a person of ordinary skill in the art would have been motivated to apply Chen's ADSL teachings to implement the Internet access described in Wiltshire. *Id.* at 61 (citing Ex. 1002 ¶ 197). Wiltshire discloses that "communication pathways 130 is any type of local area, wide area or global communication pathways, including the Internet," and Chen states that "ADSL has been considered as an ideal vehicle for Internet access." *See* Ex. 1004, 5:31–44; Ex. 1006, 69. As Dr. Fuchs testifies, Wiltshire's teaching would have motivated an ordinarily skilled artisan to apply Chen's ADSL teachings in implementing the Internet access described in Wiltshire. Ex. 1002 ¶ 197 (citing Ex. 1006, 69).

Petitioner persuasively shows that ADSL would have been "well-suited to exchange the same type of information (i.e., user input controls on one hand and image/video data on the other) as disclosed in Wiltshire." Pet. 62 (citing Ex. 1002 ¶¶ 199–200). As Dr. Fuchs testifies, a person of ordinary skill in the art would have understood that keyboard data (such as the data from a key press) is typically encoded as 8-bit ASCII data and Wiltshire's upstream input commands would have required less bandwidth than the downstream video transmissions. Ex. 1002 ¶¶ 199–200 (citing Ex. 1018, code (57)). Further, as mentioned in Chen, a person of ordinary skill in the art would have understood that an MPEG stream may have required rates of at least 1.3 megabits per second, which is many times greater than the typical 8 or 16 bits per second required for transmitting a user input command. *Id.* (citing Ex. 1006, 69). As Dr. Fuchs testifies, a person of ordinary skill in the art would have been motivated to use the smaller bandwidth of ADSL for exchanging user input commands and the larger bandwidth of ADSL for transmitting the compressed image using MPEG to provide a better user experience, particularly for real-time

81

interactive games. *Id.* ¶ 200. We are persuaded by Dr. Fuchs's testimony because it is consistent with the disclosures of Wiltshire and Chen, and determine that a person of ordinary skill in the art would have had reason to combine Chen's teaching of ADSL with the teachings of Wiltshire and Saha, as proposed by Petitioner.

We are not persuaded by Patent Owner's arguments that "Petitioner's failure to consider Chen's narrow focus on residential applications dooms its proposed obviousness combination." PO Resp. 53–55. Chen does not expressly limit the use of ADSL to residential service. *See generally* Ex. 1006. Although we agree with Patent Owner that Chen does discuss a simulation study of the effect of in-house wiring on the performance of ADSL (*id.* at 71–72), that is simply one portion—i.e., Chen's Appendix— and not the focus of Chen's disclosure. Patent Owner also points us to Chen's statement that "[r]esearchers realized that for residential applications, a POTS service, where the traditional telephone service can be provided whether the ADSL is on or off, was more practical than ISDN service." Ex. 1006, 69. But this statement does not indicate that ADSL was proposed as *solely* for use in residential homes; instead, it explains why the proposed ADSL architecture was more practical than ISDN service for residential applications. In fact, Chen mentions other applications of ADSL that may not have necessarily been residential. *See id.* (explaining that "[t]he capabilities of ADSL are also well suited to applications such as network computing where software and database records could be stored on network servers and retrieved at a speed equivalent to CD-ROM access, and tele-education, where a specialist can be shared with a large student population through downstream channels, and individual feedback can be provided through upstream channels").

Even if were to agree with Patent Owner that ADSL is in fact limited to residential applications, given the Federal Circuit's guidance, we read Wiltshire's system as applying to games such as Doom and Myst, i.e., games that are typically played at a user's residence, and thus ADSL would have been a suitable communication pathway between Wiltshire's server and client devices when applying Wiltshire's system to such games. *See Sony*, 2023 WL 6773879, at *2–4; Ex. 1004, 1:26–43, 12:11; *see also* Pet. Remand Br. 9–10 (arguing that the Federal Circuit's finding that Wiltshire is not limited to casino games confirms that a person of ordinary skill in the art would have been motivated to combine Wiltshire with Chen).

Dr. Fuchs testifies that a person of ordinary skill in the art would have understood that Wiltshire "discloses a gaming system that could be used in a variety of contexts, including *in homes and including for video games*." Ex. 1033 ¶ 78 (citing *id.* § IV.F). Dr. Fuchs further testifies that a person of ordinary skill in the art "would have understood based on all the non-casino teachings set forth in Wiltshire that its system applies to these other contexts, including using a laptop as the client device in a user's home or other building while the game is running on a remote server." *Id.* ¶ 74. Reading Wiltshire's disclosure as not limited to casino games, we find Dr. Fuchs's testimony credible because it is consistent with how video games such as Doom and Myst had traditionally been played. Dr. Hart, for example, testified that he has "played [Doom] on a desktop and laptop computer in the '90s." Ex. 1025, 36:4–12; Pet. Remand Br. 10.

Patent Owner argues that Chen's tele-education application is really directed to students accessing educational materials from their residences. Under Patent Owner's argument, the video game application that Dr. Fuchs describes—with client devices placed in users' homes while the game is

running a remote server—would have used the same network setup as Chen's tele-education application. *See* Ex. 1033 ¶ 79 (explaining that "games like Pong or simpler games . . . could stream multiple concurrent MPEG videos that total much less than 1.3 Mbps"); Ex. 1002 ¶¶ 199–200; PO Sur-reply 23 (citing Ex. 1025, 162:1–164:12).

We are also persuaded by Petitioner's argument that ADSL was just one of a finite number of known options for providing Internet connectivity described in Wiltshire. First, we do not agree with Patent Owner that DSL mentioned in PC Magazine is a different Internet connectivity option than ADSL. PO Resp. 62 (citing Ex. 1007, 17). Chen itself discusses the different standardized systems of DSL and explains that it is the third standardized system, ADSL, that "[m]ost recently . . . has been considered as an ideal vehicle for Internet access." Ex. 1006, 68–69. Dr. Fuchs persuasively testifies that PC Magazine was published the same year as Chen, and when read in conjunction, a person of ordinary skill in the art "would have understood the reference to 'DSL' in PC Magazine to mean 'ADSL.'" Ex. 1033 ¶ 80. In view of these references, Dr. Fuchs testifies that a person of ordinary skill in the art "would have known that ADSL was a widespread and common choice for broadband Internet access in the 1998–2000 time frame," and that it "would have been—at a minimum— obvious to try when implementing Wiltshire's system with an Internet connection." Ex. 1002 ¶ 201. We credit Dr. Fuchs's testimony because it is consistent with our reading of PC Magazine and Chen. We are therefore persuaded that Petitioner has shown that a person of ordinary skill in the art would have had reason to use Chen's ADSL Internet connectivity in Wiltshire's system. *See KSR*, 550 U.S. at 421 ("When there is a design need or market pressure to solve a problem and there are a finite number of

identified, predictable solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp.").

Petitioner also persuasively shows that a person of ordinary skill in the art would have had a reasonable expectation of success in Petitioner's proposed combination given Wiltshire's teaching of the use of MPEG for transmitting video streams, suggesting that the system would be compatible with ADSL. Pet. 63–64. Patent Owner argues that given the bandwidth requirement of 1.3 Mbps for an MPEG video stream, ADSL's downstream bandwidth can provide just one video stream and a person of ordinary skill in the art would not have considered that ADSL could have been successfully employed in Wiltshire's commercial gaming operation, which would likely have tens of gaming stations in a single location. PO Resp. 61–62. First, because we reject Patent Owner's view of Wiltshire as limited to commercial gaming, we are also not persuaded that Wiltshire's system has to support tens of gaming stations in a single location. We agree with Petitioner that an ordinarily skilled artisan would have understood that Wiltshire's system could have been implemented with a single client. Pet. Reply 27 (citing Ex. 1004, claim 1; Ex. 1025, 31:22–32:21). Second, we disagree that every game in Wiltshire's list requires the same amount of bandwidth. Dr. Fuchs persuasively testifies that a person of ordinary skill in the art

> would understand that any given application in Wiltshire need not consume the entire 1.3 Mbps bandwidth used for MPEG's full motion video (over ADSL's 1.544 Mb/s downstream link). The fact that an MPEG stream may require rates of 1.3 Mb/s for "full motion video" using MPEG . . . does not mean that this full 1.3 Mb/s will be required for all uses or all applications. To the contrary, it was common, especially in 2001 and earlier, to use much lower transmission rates. For example, Wiltshire

contemplates games like Pong or simpler games that could stream multiple concurrent MPEG videos that total much less than 1.3 Mbps. Pong's graphics were rudimentary and would have required a small fraction of the full 1.3Mbps bandwidth.

Ex. 1033 ¶ 79 (citing Ex. 1006, 69); Ex. 1004, 1:26–44 (listing games).

Patent Owner's remaining arguments and Dr. Hart's testimony are premised on reading Wiltshire as limited to a casino environment, and therefore, do not undermine Petitioner's showing of a motivation to combine. *See, e.g.*, PO Resp. 47 (arguing that Petitioner fails to address why a person of ordinary skill in the art would want to use a technology meant to optimize bandwidth on residential telephone systems in a commercial establishment); PO Remand Resp. Br. 5 ("But Wiltshire's teaching of 'non-casino' games remained in a casino environment.").

As discussed above, we are persuaded by Dr. Fuchs's testimony that non-casino games in Wiltshire could have been played on laptops in a user's home. *See, e.g.*, Ex. 1033 ¶ 74. Patent Owner points us to Wiltshire's disclosure of "the house taking a percentage of the stake for providing the game" as support for its argument that Wiltshire's teaching of non-casino games remained in a casino environment. PO Remand Resp. Br. 5 (citing Ex. 1004 at 12:10–13). First, the quoted sentence in Wiltshire appears to be incomplete. *See* Tr. 77:2–17. Moreover, we read that statement as applying to "any casino game or other non-casino games where players play against each other *for money*." Ex. 1004, 12:10–12 (emphasis added). We are not persuaded that it applies to every single game, including Doom, listed in Wiltshire's long list of games. *Id.* at 1:26–44 (specifically listing "non-house stake games between two or more players"). Indeed, in the same paragraph as the quoted sentence, Wiltshire states that the invention therein "is not limited to any particular game." *Id.* at 12:9–10.

Lastly, we address Patent Owner's argument that Petitioner's Reply arguments related to disclosure of Wiltshire and Chen exceed the proper scope of reply under 37 C.F.R. § 42.23(b). We disagree because we find Petitioner's arguments and reliance on additional evidence to be squarely in response to arguments raised in the Patent Owner Response, and not in support of contentions different from those in the Petition. *See Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 707 (Fed. Cir. 2020) (finding that the Board abused its discretion in ignoring petitioner's responsive arguments to issues raised by patent owner during trial). As discussed above, the Petition identified Wiltshire as disclosing various games, including Doom and Myst. *See* Pet. 20. The Petition also states that Chen's ADSL was well-suited to exchange the same type of information (i.e., user input controls on one hand and image/video data on the other) as disclosed in Wiltshire. *Id.* at 61; *see also id.* at 64 (arguing that "ADSL in particular were well-understood technologies by the middle of the dot-com boom, 1998, when Wiltshire was filed"). In response, Patent Owner argued that ADSL, as disclosed in Chen, was designed for residential use and Wiltshire teaches a gambling system for commercial use. PO Resp. 53–57. Petitioner's arguments, supported by Dr. Fuchs's testimony and other references, that Wiltshire is not limited to commercial casino establishments, and that Chen is not limited to residential applications, are responsive to Patent Owner's arguments.

Accordingly, on the complete record, we determine Petitioner persuasively shows that one of ordinary skill in the art would have had reason to combine Chen's ADSL teaching with the teachings of Wiltshire and Saha in the manner asserted by Petitioner.

Aside from the arguments discussed above, Patent Owner does not otherwise respond to Petitioner's remaining contentions as to claim 2. *See*

*generally* PO Resp. We find Petitioner's contentions persuasive and supported on the complete record before us. We agree with Petitioner that Chen discloses a first bandwidth for upstream transmissions and second bandwidth for downstream transmissions, and that the bandwidths are asymmetric. Pet. 60 (citing Ex. 1006, 69; Ex. 1002 ¶ 195). We are also persuaded that "Wiltshire and Chen . . . teach toward one another, and a [person of ordinary skill in the art] would have had reason to apply Chen's ADSL teachings to implement the Internet communication access described in Wiltshire." *Id.* at 60–63 (citing Ex. 1004, 5:30–32; Ex. 1006, 69; Ex. 1002 ¶¶ 197–200). And we agree with Petitioner that a person of ordinary skill in the art would have had a reasonable expectation of success with the combination of Wiltshire and Chen. *Id.* at 63–64 (citing Ex. 1006, 69; Ex. 1002 ¶¶ 202–204)

Accordingly, for the reasons explained by Petitioner and those discussed above, we find that Petitioner persuasively shows that the combination of Wiltshire, Saha, and Chen would have rendered the subject matter of claim 2 obvious to one of ordinary skill in the art at the time of the invention.

## IV. PATENT OWNER'S MOTION TO EXCLUDE

Patent Owner filed a motion to exclude Exhibits 1024, 1029, and 1030, and a portion of Dr. Fuchs's declaration (Exhibit 1033 ¶ 79). Paper 31, 1–6; Paper 33, 1–5.

Patent Owner, as the "moving party," "has the burden of proof to establish that it is entitled to the requested relief." 37 C.F.R. § 42.20.

Exhibit 1024 is an exhibit to the deposition of Dr. Hart, and Petitioner does not refer to that exhibit in its briefing. Paper 32, 10. Petitioner has no

objection to excluding Exhibit 1024 from the record. *Id.* Accordingly, Patent Owner's motion to exclude as to Exhibit 1024 is *granted*.

Petitioner relies on Exhibits 1029 and 1030 as well as paragraph 79 of Dr. Fuchs's declaration in Petitioner's Reply for demonstrating that a person of ordinary skill in the art would have been motivated to combine Chen with Wiltshire and Saha. *See* Pet. Reply 25–27. Patent Owner contends this evidence should be excluded because it is improper new argument and evidence that were not made of record at the institution stage, were filed for the first time with Petitioner's Reply, and are relied upon by Petitioner to fill a gap in its *prima facie* case. Mot. 2–3.

Patent Owner argues that Petitioner relies on Exhibits 1029 and 1030 in an attempt to close the gap in its Reply, by asserting that Wiltshire is not "limited to commercial casino establishments" and that Chen is not "limited to residential applications." *Id.* at 3; *see also* Mot. Reply 2–3.

As for Dr. Fuchs's declaration, Patent Owner argues that Dr. Fuchs's opinions that Wiltshire's system can work with only one client and that a given client in Wiltshire need not consume the entire 1.3 Mbps bandwidth are newly presented opinions in support of Petitioner's reply that change both the Petition's theories and Dr. Fuchs's original testimony. Mot. 4–5. On the contrary, Patent Owner argues, we instituted this *inter partes* review based on Dr. Fuchs's original testimony that "an MPEG stream may require rates of *at least* 1.3 megabits per second." *Id.* at 5 (citing Ex. 1002 ¶ 200; Inst. Dec. 44–45); *see also* Mot. Reply 3–5.

Petitioner responds that Exhibits 1029 and 1030 are proper Reply exhibits because Petitioner cites these exhibits for one simple point—to rebut the suggestion in Patent Owner's Response that ADSL was for residential use only, but not for business use. Opp. 2–3. Petitioner contends

there was no way of knowing that Patent Owner would argue that ADSL is for residential use only, and, given Chen's disclosure of the use of ADSL, Exhibits 1029 and 1030 are not necessary for a *prima facie* case of obviousness. *Id.* at 4. As to Dr. Fuchs's testimony, Petitioner contends that the Petition itself refers to a single client of Wiltshire and also reproduces Wiltshire's Figure 2, which describes steps performed by a single client. *Id.* at 5. Petitioner argues that Dr. Fuchs's opinions in paragraph 79 of Exhibit 1033 are not inconsistent with his opinion in Exhibit 1002 because "Dr. Fuchs did *not* opine or contend that MPEG requires or must always use at least 1.3 Mb/s." *Id.* at 8–9 (citing Ex. 1002 ¶ 88; Ex. 2010, 72:21–73:4, 73:11–17).

We agree with Petitioner. As a threshold matter, Patent Owner's motion is improper as it does not argue admissibility of the challenged evidence. *See* Consolidated Trial Practice Guide 79 (Nov. 2019), https://www.uspto.gov/TrialPracticeGuideConsolidated ("A motion to exclude must explain why the evidence is not admissible (e.g., relevance or hearsay) but may not be used to challenge the sufficiency of the evidence to prove a particular fact. A motion to exclude is not a vehicle . . . [to] address arguments or evidence that a party believes exceeds the proper scope of reply or sur-reply."); Opp. 1–2.

Further, we are not persuaded that Exhibits 1029 and 1030 are improper reply evidence or that the cited portions of Dr. Fuchs's declaration present improper new opinions. As discussed above, we deem Petitioner's reply arguments relating to the disclosures of Wiltshire and Chen in context of the reason to combine the two references to be properly responsive to Patent Owner's arguments. *See supra* § III.G.5. We therefore agree with

Petitioner that responding to Patent Owner's argument with additional evidence and opinions from Dr. Fuchs was indeed proper.

We also do not find Dr. Fuchs's Reply declaration testimony to be inconsistent with his original testimony. Dr. Fuchs did not testify that MPEG always requires the use of *at least* 1.3 Mb/s. *See* Ex. 1002 ¶ 200 ("an MPEG stream *may* require rates of at least 1.3 megabits per second" (emphasis added)). We understand Dr. Fuchs's testimony to show that the bandwidth required for the MPEG stream in one direction is different from that required for transmitting a user input command in the other direction, not to opine on the exact data rates that were being used. *Id.* That is what we cited Dr. Fuchs's testimony for in our Institution Decision. Inst. Dec. 44–45. Dr. Fuchs's testimony in paragraph 79 of his second declaration, that a given client in Wiltshire need not consume the *entire* 1.3 Mbps bandwidth, is therefore not improper Reply evidence under 37 C.F.R. § 42.23(b). Accordingly, Patent Owner's Motion to Exclude Exhibits 1029 and 1030 as well as paragraph 79 of Exhibit 1033 is *denied*.

## V.    CONCLUSION

For the reasons discussed above, Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–12 of the '109 patent are unpatentable.[12]  Our conclusions regarding the Challenged Claims are summarized below:

| Claims Challenged | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 3–12 | 103(a) | Wiltshire, Saha | 1, 3–12 | |
| 2 | 103(a) | Wiltshire, Saha, Chen | 2 | |
| 6, 11, 12 | 103(a) | Wiltshire, Saha, PC Magazine | 6, 11, 12 | |
| **Overall Outcome** | | | 1–12 | |

## VI.    ORDER

It is, therefore,

ORDERED that claims 1–12 of U.S. Patent No. 10,681,109 B2 are determined to be unpatentable;

---

[12] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding.  See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

FURTHER ORDERED that Patent Owner's motion to exclude (Paper 31) is *granted in part* and *denied in part*; and

FURTHER ORDERED that, because this a Final Written Decision, parties to this proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2021-00237
Patent 10,681,109 B2

FOR PETITIONER:

Joseph Haag
Daniel Williams
James M. Dowd
S. Dennis Wang
WILMER CUTLER PICKERING HALE & DORR LLP
joseph.haag@wilmerhale.com
daniel.williams@wilmerhale.com
james.dowd@wilmerhale.com
dennis.wang@wilmerhale.com


FOR PATENT OWNER:

Douglas R. Wilson
Michelle E. Armond
Josepher Li
Patrick Maloney
ARMOND WILSON LLP
doug.wilson@armondwilson.com
michelle.armond@armondwilson.com
josepher.li@armondwilson.com
patrick.maloney@armondwilson.com



US010681109B2

## (12) United States Patent
### Kent et al.

(10) **Patent No.:** **US 10,681,109 B2**
(45) **Date of Patent:** **\*Jun. 9, 2020**

---

(54) **IMAGE DISPLAY SYSTEM WITH VISUAL SERVER**

(71) Applicant: **Intellectual Pixels Limited**, Surrey (GB)

(72) Inventors: **Osman Kent**, Surrey (GB); **David R. Baldwin**, Surrey (GB); **Nicholas J. N. Murphy**, Surrey (GB)

(73) Assignee: **INTELLECTUAL PIXELS LIMITED**, Chertsey, Surrey (GB)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/638,020**

(22) Filed: **Jun. 29, 2017**

(65) **Prior Publication Data**

US 2017/0366599 A1 Dec. 21, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 14/192,789, filed on Feb. 27, 2014, now Pat. No. 9,699,238, which is a
(Continued)

(51) **Int. Cl.**
*G06F 15/16* (2006.01)
*H04L 29/08* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .............. *H04L 67/00* (2013.01); *A63F 13/12* (2013.01); *A63F 13/25* (2014.09); *G06T 9/00* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ........................ H04L 65/607; H04N 21/23412
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,550,962 A | 8/1996 | Nakamura et al. |
| 5,742,289 A | 4/1998 | Naylor et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 10-015245 A | 1/1998 |
| JP | 200042247 A | 2/2000 |
| WO | 0077739 A1 | 12/2000 |

OTHER PUBLICATIONS

"U.S. Appl. No. 10/037,688, Advisory Action dated May 10, 2007", 3 pgs.

(Continued)

*Primary Examiner* — Yves Dalencourt
(74) *Attorney, Agent, or Firm* — Kwan & Olynick LLP

(57) **ABSTRACT**

An image display system with one or more client computers in selective communication with a visual server having image processing capabilities. The client computer generates image-modifying data corresponding to a generated image, and transmits the data to the visual server. The visual server receives the image-modifying data, generates a modified image based upon the image-modifying data, and transmits the modified image as compressed data to the client. The client decompresses the modified image data and displays the modified image. In the system, the visual server and client can provide a sequential display of modified frames on client to support animation with complex 3-dimensional graphics.

**18 Claims, 4 Drawing Sheets**



SONY 1001

## Related U.S. Application Data

continuation of application No. 13/296,776, filed on Nov. 15, 2011, now Pat. No. 8,667,093, which is a continuation of application No. 12/538,347, filed on Aug. 10, 2009, now Pat. No. 8,131,826, which is a continuation of application No. 10/037,688, filed on Jan. 4, 2002, now Pat. No. 7,587,520.

(60) Provisional application No. 60/263,854, filed on Jan. 24, 2001.

(51) **Int. Cl.**

| | |
|---|---|
| *H04L 29/06* | (2006.01) |
| *A63F 13/25* | (2014.01) |
| *G06T 9/00* | (2006.01) |
| *G06T 15/00* | (2011.01) |
| *A63F 13/30* | (2014.01) |

(52) **U.S. Cl.**
CPC .......... *G06T 15/005* (2013.01); *H04L 65/607* (2013.01); *G06T 2200/16* (2013.01)

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,790,792 A | 8/1998 | Dudgeon et al. | |
| 5,801,711 A | 9/1998 | Koss et al. | |
| 6,055,229 A | 4/2000 | Dorenbosch et al. | |
| 6,057,852 A | 5/2000 | Krech, Jr. | |
| 6,094,453 A | 7/2000 | Gosselin et al. | |
| 6,205,582 B1 | 3/2001 | Hoarty | |
| 6,330,281 B1 | 12/2001 | Mann et al. | |
| 6,344,852 B1 | 2/2002 | Zhu | |
| 6,377,257 B1 | 4/2002 | Borrel et al. | |
| 6,384,821 B1 | 5/2002 | Borrel et al. | |
| 6,438,575 B1 | 8/2002 | Khan et al. | |
| 6,603,470 B1 | 8/2003 | Deering | |
| 6,628,282 B1 | 9/2003 | Hertzmann et al. | |
| 6,658,167 B1 | 12/2003 | Lee et al. | |
| 6,929,549 B1 * | 8/2005 | Yamada ................... | A63F 13/12 |
| | | | 463/42 |
| 7,274,368 B1 | 9/2007 | Keslin | |
| 7,587,520 B1 | 9/2009 | Ken et al. | |
| 8,131,826 B2 | 3/2012 | Kent et al. | |
| 8,560,643 B2 | 10/2013 | Kent et al. | |
| 8,667,093 B2 | 3/2014 | Kent et al. | |
| 9,106,605 B2 | 8/2015 | Kent et al. | |
| 9,699,238 B2 * | 7/2017 | Kent ......................... | G06T 9/00 |
| 2002/0082082 A1 | 6/2002 | Stamper et al. | |
| 2010/0201696 A1 | 8/2010 | Kent et al. | |
| 2012/0100913 A1 | 4/2012 | Kent et al. | |
| 2012/0142426 A1 | 6/2012 | Kent et al. | |
| 2014/0040358 A1 | 2/2014 | Kent | |
| 2014/0179433 A1 | 6/2014 | Kent et al. | |

### OTHER PUBLICATIONS

"U.S. Appl. No. 10/037,688, Examiner Interview Summary dated Nov. 28, 2007", 3 pgs.
"U.S. Appl. No. 10/037,688, Final Office Action dated Jan. 19, 2007", 9 pgs.
"U.S. Appl. No. 10/037,688, Non Final Office Action dated Apr. 21, 2005", 12 pgs.
"U.S. Appl. No. 10/037,688, Non Final Office Action dated May 9, 2006", 9 pgs.
"U.S. Appl. No. 10/037,688, Non Final Office Action dated Aug. 10, 2007", 8 pgs.
"U.S. Appl. No. 10/037,688, Non Final Office Action dated Oct. 5, 2005", 9 pgs.
"U.S. Appl. No. 10/037,688, Notice of Allowance dated Mar. 23, 2009", 11 pgs.
"U.S. Appl. No. 10/037,688, Restriction Requirement dated Jul. 25, 2008", 6 pgs.

"U.S. Appl. No. 12/538,347, Examiner Interview Summary dated May 11, 2011", 2 pgs.
"U.S. Appl. No. 12/538,347, Non Final Office Action dated Jul. 21, 2011", 6 pgs.
"U.S. Appl. No. 12/538,347, Non Final Office Action dated Sep. 1, 2010", 10 pgs.
"U.S. Appl. No. 12/538,347, Notice of Allowance dated Oct. 26, 2011", 5 pgs.
"U.S. Appl. No. 13/282,200, Non Final Office Action dated Dec. 26, 2012", 13 pgs.
"U.S. Appl. No. 13/282,200, Notice of Allowance dated Jun. 13, 2013", 10 pgs.
"U.S. Appl. No. 13/296,776, Examiner Interview Summary dated Sep. 18, 2013", 3 pgs.
"U.S. Appl. No. 13/296,776, Non Final Office Action dated May 15, 2013", 11 pgs.
"U.S. Appl. No. 13/296,776, Non Final Office Action dated Dec. 19, 2012", 10 pgs.
"U.S. Appl. No. 13/296,776, Notice of Allowance dated Oct. 30, 2013", 7 pgs.
"U.S. Appl. No. 13/296,776, Restriction Requirement dated Apr. 24, 2012", 6 pgs.
"U.S. Appl. No. 14/052,659, Non Final Office Action dated Dec. 2, 2014", 6 pgs.
"U.S. Appl. No. 14/052,659, Notice of Allowance dated Jun. 23, 2015", 5 pgs.
"U.S. Appl. No. 14/192,789, Advisory Action dated Dec. 1, 2016", 4 pages.
"U.S. Appl. No. 14/192,789, Examiner Interview Summary dated May 24, 2016", 3 pages.
"U.S. Appl. No. 14/192,789, Examiner Interview Summary dated Dec. 1, 2016", 1 page.
"U.S. Appl. No. 14/192,789, Final Office Action dated Aug. 4, 2016", 11 pages.
"U.S. Appl. No. 14/192,789, Non Final Office Action dated Jan. 29, 2016", 13 pgs.
"U.S. Appl. No. 14/192,789, Non Final Office Action dated Dec. 30, 2016", 4 pages.
"U.S. Appl. No. 14/192,789, Notice of Allowance dated Apr. 12, 2017", 5 pgs.
"The G-cluster Game Portfolio", G-Cluster Ltd., Printouts from WorldWide Web. gcluster.com, 2002, 23 pgs.
Agrawala, Maneesh et al., "Model-Based Motion Estimation for Synthetic Animations", AMC Multimedia 95—Electronic Proceedings; Nov. 5-9, WorldWide Web-Graphics.Stanford.edu/papers/modelbased, 1995, 1-18.
Bharadvaj, Harini et al., "An Active Transcoding Proxy to Support Mobile Web Access", Department of Computer Engineering & Computer Science. University of Missouri-Columbia, Oct. 1998, 20-23.
Guenter, Brian K. et al., "Motion Compensated Compression of Computer Animation Frames", 7 pgs.
Wallach, Dan S. et al., "Accelerated MPEG Compression of Dynamic Polygonal Scenes", Computer Graphics (Poc. Siggraph 1994), 3 pgs.
Engel, Klaus et al., "Remote 3D Visualization Using Image-Streaming Techniques", Proceedings of the 11th International Conference on Systems Research, Informatic and Cybernetics, Baden-Baden, International Institute for Advanced Studies in Systems Research and Cybernetics, Aug. 1999, pp. 91-96, Germany.
Engel, Klaus et al., "A Framework for Interactive Hardware Accelerated Remote 3D-Visualization", Data Visualization 2000, Proceedings of the Joint EUROGRAPHICS and IEEE TCVG Symposium on Visualization, Springer-Verlag/Wein, May 29-31, 2000, p. 167-178, Amsterdam, Netherland.
Richardson, Tristan et al., "The RFB Protocol", Olivetti Research Laboratory, Jan. 1998, Version 33, Rev. Jul. 16, 1998, Cambridge.
Richardson, Tristan et al., "Virtual Network Computing", The Olivetti & Oracle Research Laboratory, IEEE Internet Computing, p. 33-38, vol. 2, No. 1, Feb. 1998.

(56) **References Cited**

OTHER PUBLICATIONS

Schmidt, Brian et al., "The Interactive Performance of SLIM: A Stateless, Thin-Client Architecture", 17th ACM Symposium on Operating Systems Principles, Dec. 1999, p. 32-47, Kiawah Island, SC.

Segal, Mark et al., "The Open GL Graphics System: A Specification", Version 1.0, Jul. 1994.

Ma, Kwan-Liu et al., "High Performance Visualization of Time-Varying Volume Data Over a Wide-Area Network", Proceedings of the IEEE/ACM SC2000 Conference, 2000.

Levoy, Marc, "Polygon-Assisted JPEG and MPEG Compression of Synthetic Images", Computer Graphics Proceedings, Annual Conference Series, Aug. 6-11, 1995, pp. 21-29, Los Angeles, USA.

Lamothe, Andre, "Tricks of the Windows, Game Programming Gurus", Fundamentals of 2D and 3D Game Programming, 1999, Indianapolis, USA.

Ciminiera, Luigi et al., "Industrial IEEE 802.3 Networks with Short Delivery Time for Urgent Messages", IEEE Transactions on Industrial Electronics, vol. 35, No. 1, Feb. 1988, pp. 18-25.

Fowler, James E., "Evaluation of SGI Vizserver", Technical Report, Mar. 31, 2000, Mississippi, USA.

"SGI Brings Advanced Visualization to the Desktop", HPC Wire, https://www.hpcwire.com/1999/11/17/sgi-brings-advanced-visualization-to-the-desktop/, Nov. 17, 1999.

Hartwig, Stephan et al., "Mobile Multimedia—Challenges and Opportunities Invited Paper", IEEE Transactions on Consumer Electronics, Nov. 2000, pp. 1167-1178, vol. 46, No. 4.

Carney, Dan, "Gateway 2000 Unveils Destination Presentation System at FOSE", FCW, Mar. 31, 1996.

"Gateway Debuts $1,999 PC-TV", CNET, http://www.cnet.com/news/gateway-debuts-1999-pc-tv/, Aug. 26, 1998.

"Gateway Eyes New Destination with a Hybrid PC/TV System", PC Week, Apr. 1, 1996, p. 39.

"The Living-Room PC", PC Computing, Aug. 1996, p. 76.

"Computer-TV Hybrids", Nation's Business, Dec. 1996, pp. 23-28.

Haddon, Leslie, "The Development of Interactive Games", The Media Reader: Continuity and Transformation, 1999, pp. 305-327.

Curtiss, Aaron, "Sony's PlayStation Joins the Rich Video Game Party", Los Angeles Times, Dec. 6, 1995, p. F11.

Ham, Tom, "Fight to the Finish", The Washington Post, Oct. 25, 1995, pp. 7-11.

Singhal, Sandeep et al. "Network Virtual Environments: Design and Implementation", ACM Press, 1999, pp. 2-5, 34-49, 251-269, New York, USA.

Graf, Rudolf F., "Modern Dictionary of Electronics", 7th Ed., 1999, pp. 470 & 739.

"Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, filed Jan. 27, 2020, 251 pgs.

"[Exhibit A-1: Remote 3D Visualization Using Image-Streaming Techniques ("Engel 1999")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 64 pgs.

"[Exhibit A-2: A Framework for Interactive Hardware Accelerated Remote 3D-Visualization ("Engel 2000") Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 75 pgs.

"[Exhibit A-3: U.S. Pat. No. 7,274,368 ("Keslin")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 77 pgs.

"[Exhibit A-4: U.S. Pat. No. 6,330,281 ("Mann")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 116 pgs.

"[Exhibit A-5: Japanese Patent Application Publication No. JP 2000-42247A ("Moriguchi")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 88 pgs.

"[Exhibit A-6: Richardson and Wood, The RFB Protocol ("Richardson")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 54 pgs.

"[Exhibit A-7: Schmidt et al., The Interactive Performance of SLIM: A Stateless, Thin-Client Architecture ("Schmidt")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 44 pgs.

"[Exhibit A-8: Richardson et al., Virtual Network Computing ("Richardson IEEE")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 27 pgs.

"[Exhibit A-9: Additional Prior Art References] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 28 pgs.

"[Exhibit B-1: Remote 3D Visualization Using Image-Streaming Techniques ("Engel 1999")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 64 pgs.

"[Exhibit B-2: A Framework for Interactive Hardware Accelerated Remote 3D-Visualization ("Engel 2000")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 66 pgs.

"[Exhibit B-3: U.S. Pat. No. 7,274,368 ("Keslin")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 70 pgs.

"[Exhibit B-4: U.S. Pat. No. 6,330,281 ("Mann")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 86 pgs.

"[Exhibit B-5: Japanese Patent Application Publication No. JP 2000-42247A ("Moriguchi")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 70 pgs.

"[Exhibit B-6: Richardson and Wood, The RFB Protocol ("Richardson")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 63 pgs.

"[Exhibit B-7: Schmidt et al., The Interactive Performance of SLIM: A Stateless, Thin-Client Architecture ("Schmidt")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 39 pgs.

"[Exhibit B-8: Richardson et al., Virtual Network Computing ("Richardson IEEE"] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 25 pgs.

"[Exhibit B-9: Additional Prior Art References] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 23 pgs.

"[Exhibit C-1: Remote 3D Visualization Using Image-Streaming Techniques ("Engel 1999")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 55 pgs.

"[Exhibit C-2: A Framework for Interactive Hardware Accelerated Remote 3D-Visualization ("Engel 2000")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 62 pgs.

"[Exhibit C-3: U.S. Pat. No. 7,274,368 ("Keslin")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 61 pgs.

"[Exhibit C-4: U.S. Pat. No. 6,330,281 ("Mann")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 61 pgs.

(56)　　　　　**References Cited**

OTHER PUBLICATIONS

"[Exhibit C-5: Japanese Patent Application Publication No. JP 2000-42247A ("Moriguchi")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 70 pgs.

"[Exhibit C-6: Richardson and Wood, The RFB Protocol ("Richardson")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 39 pgs.

"[Exhibit C-7: Schmidt et al., The Interactive Performance of SLIM: A Stateless, Thin-Client Architecture ("Schmidt")] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 26 pgs.

"[Exhibit C-8: Richardson et al., Virtual Network Computing ("Richardson IEEE"] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 20 pgs.

"[Exhibit C-9] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 32 pgs.

"[Exhibit D-1] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 98 pgs.

"[Exhibit D-2] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 132 pgs.

"[Exhibit D-3] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 76 pgs.

"[Exhibit D-4] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 72 pgs.

"[Exhibit D-5] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 95 pgs.

"[Exhibit D-6] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 82 pgs.

"[Exhibit D-7] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 63 pgs.

"[Exhibit D-8] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 53 pgs.

"[Exhibit D-9] Sony Interactive Entertainment LLC's Invalidity Contentions Pursuant to Patent Local Rule 3-3", Case No. 8:19-cv-01432-JVS-KES, (Jan. 27, 2020), 56 pgs.

* cited by examiner



Fig. 1



Fig. 2A

Fig. 2B



Fig. 2C          Fig. 2D



Fig. 3

# IMAGE DISPLAY SYSTEM WITH VISUAL SERVER

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. application Ser. No. 14/192,789, filed Feb. 27, 2014, and titled "IMAGE DISPLAY SYSTEM WITH VISUAL SERVER", which is a continuation of U.S. application Ser. No. 13/296,776, filed Nov. 15, 2011, and titled "IMAGE DISPLAY SYSTEM WITH VISUAL SERVER", now issued as U.S. Pat. No. 8,667,093, which is a continuation of U.S. application Ser. No. 12/538,347, filed Aug. 10, 2009, and titled "IMAGE DISPLAY SYSTEM WITH VISUAL SERVER", now issued as U.S. Pat. No. 8,131,826, which is a continuation of U.S. application Ser. No. 10/037,688, filed Jan. 4, 2002, and titled "IMAGE DISPLAY SYSTEM WITH VISUAL SERVER", now issued as U.S. Pat. No. 7,587,520, which claims priority to U.S. Provisional Application No. 60/263,854, filed Jan. 24, 2001 and titled "VISUAL SERVER", all of which are incorporated by this reference in their entireties for all purposes.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention generally relates to computer systems. More particularly, the present invention relates to computer graphics and a graphical image display system that use a visual server to generate and transmit images to a client.

### 2. Description of the Related Art

Computer generated images are created in a series of several steps: modeling, or describing the objects in mathematical terms; animation, or describing how the objects move over time; and rendering, or determined which of the images defined by the modeling and animation programs are visible on the screen for every frame, assigning color to those images, and drawing them. Of these, rendering is the most difficult as it is the most processing intensive action. Because the generation of images is both processing and memory intensive, a client computer often relies upon other processors and memories, such as a server, to assist in generating the data to render new images. In the existing network model, storage and caching of content and applications can occur on a centralized server, but the actual software applications execute on a system in the client user space. The network thus allows the server to supply image processing resources beyond the constraints of a remote terminal, while taking advantage of client resources for certain tasks. Several existing systems utilize the client-server model to process and render images at a client display with the assistance of server resources.

In methods of client-server graphics that employ image transmission, the server unit requires a relatively high bandwidth connection even if real-time image compression and decompression is employed. Even in geometric replication methods, such as VRML, which generally have a lower bandwidth requirement, the image processing does not decrease the storage or processing requirements of the client. In these systems, the client must be capable of 30 rendering the complete replicated database in real time, and the server does not provide true image generation services. Rather, the server functions primarily as a database server. For example, in a client-server method based on a hybrid image transmission and geometry transmission approach, the server unit maintains a low level-of-detail database and a high level of detail database. For each frame of a real-time image stream, images are generated from both the low level-of-detail and high level-of-detail database. The difference between the two images is computed using known methods of image processing. The client unit contains only a low level-of-detail geometric database and renders this database for each frame, and the difference image computed on the sever is compressed and transmitted to the client in real-time which decompresses and composites it together with the image generated by the client from the low level-of-detail database. The result is a high level-of-detail, high quality image that requires a relatively low transmission bandwidth to transmit the relatively low information difference image. Such method also requires relatively limited client storage and processing capabilities. While this method can decrease the computational load of the client and reduce the communication costs, it requires both real-time image compression and decompression and further requires that special image compositing be added to the pipeline. In addition, the entire low level-of-detail database must be stored and processed by the client.

Another known method of client-server image processing is transmitting a transformed and compressed low level-of-detail representation of the geometric database in screen-space representation from the client to the server. The low level-of-detail geometric primitives are transmitted for every frame, and such action increases the required connection bandwidth. Only the primitives that are actually visible for each frame need to be transmitted in this approach. Moreover, since primitives visible in a current frame are likely to be visible in a subsequent frame, the repeated transmission of primitives that have been transformed to image-space representation is an inefficient use of available bandwidth. Any processing to identify repetitive primitives requires further client resources, which hampers the image displaying process.

A further approach to distributed client-server image generation is based on demand-driven geometry transmission to the client. In this method, the server determines and periodically updates a list of potentially visible primitives for each client using a spherical clipping volume around a viewpoint. The result is then compared to a list of primitives previously transmitted to the corresponding client and only those potentially visible primitives that have not been previously transmitted are sent to the client. However, this method reduces communication cost by limiting transmission to those primitives that have become potentially visible. The client replaces primitives in the client display list when they are no longer included in the spherical clipping volume, and thus, the storage and computing requirements of the client are limited to only those primitives in the potentially visible set. However, as this method uses a limited inclusion volume, a major disadvantage is that distant primitives can be arbitrarily excluded from the potentially visible data set. Further, the use of a spherical inclusion volume results in the inclusion and transmission of a large number of geometric primitives that are not visible in the current frame and are unlikely to be visible in upcoming frames, an example being primitives in the inclusion sphere behind the viewpoint. As a result, the demand-driven geometry transmission makes inefficient use of available transmission bandwidth and available client storage and computing resources, and the client resources are taxed because the client must compute

**3**

removal of primitives by clipping to the inclusion volume, and implement display list replacement and compaction protocols.

Client graphic image display processing capabilities are even further taxed in the display of 3-dimensional images. In existing clients, the implementation of a system delivering 3D graphics requires graphics hardware at the client, which presents several problems. The additional hardware increases the cost of the client hardware as the graphics hardware must be incorporated and integrated therewith. Further, the software and hardware used to generate 3D images is in constant flux, and the system must be continually upgraded, creating an additional expense and a logistical burden for the client. Moreover, the remote hardware impedes the central maintenance and coordination of configurations of client software, which is an important capability and critical to the product viability of many applications.

Some clients use separate 3D hardware component to assist in processing the images, but with the constant change of graphics languages and protocols, the hardware becomes obsolete rather quickly, which adversely impacts the value of the client. Furthermore, the use of programmable graphics hardware within the client system is difficult because the client resources are inherently static and limited.

Therefore, for reasons of cost, size, and power consumption, sophisticated three dimensional graphics are not available on common consumer client devices such as personal digital assistants (PDAs) mobile telephones and set-top boxes used to decode cable and satellite television signals. Consequently, it would be advantageous to display complex three dimensional graphics, such as those used by games, on these consumer client devices.

Accordingly, it is to the provision of such an improved system and method of displaying images on a client consumer device utilizing the resources of a visual server that the present invention is primarily directed.

## SUMMARY OF THE INVENTION

The present invention is an image display system and method of displaying images on a client through the use of the resources of a remote visual server. The Visual Server runs standard software, such as games, that are the same as versions running on standard personal computers. The Visual Server has certain support software modified to enable control of the application from the client and the delivery of the result of 3D drawing to the client. One or more clients can access the visual server, or an array of servers, wherein each of the clients includes an image display. The system includes a visual server having image data processing capabilities wherein the server selectively receives image-modifying data from one or more clients corresponding to a generated image, and the server generates a modified image based on the image-modifying data, and then transmits the modified image as compressed data back to the client.

The clients are in selective communication with the visual server, and each client selectively generates image-modifying data corresponding to the image resident on the image display of that specific client. The client selectively transmits the image-modifying data to the visual server, and the client then receives, as compressed data from the visual server, an image, or data representing an image, which is a modification of the previous image on the client altered in accord with the previously transmitted image-modifying data. The client includes the processing ability to uncom-

**4**

press the compressed image data from the visual server, and display the image defined by the decompressed data on the client image display.

The visual server and the one or more clients are in selective digital or analog communication preferably across a network, such as an Ethernet, WAN, LAN, or the Internet. Alternately, the visual server and one or more clients are in selective wireless communication, either point-to-point or relayed.

In generating the image-modifying data at the client and processing the image-modifying data at the visual server, the typical data processing segment is a frame. Alternately, the image-modifying data can be generated and transmitted from the client, and the modified image data sent from the visual server to the client after predetermined duration has elapsed.

The present invention further includes a method of displaying an image on a client in selective communication with a visual server wherein the method includes the steps of generating image-modifying data at the client wherein the image-modifying data corresponds to a generated image, transmitting the image-modifying data from the client to the visual server, receiving at the visual server image-modifying data from the client, generating at the visual server a modified image based upon the image-modifying data received from the client, transmitting the modified image from the visual server to the client as compressed data, receiving at the client as compressed data from the visual server an image modified by the transmitted image-modifying data, uncompressing the compressed image data at the client, and displaying the decompressed image on the client image display. The method alternately further includes the step of transmitting a link or other flag to the visual server from the client prior to the step of transmitting the image-modifying data from the client to the visual server in order to notify the visual server that image-modifying data is about to be transmitted from the client.

In the preferred embodiment, the steps of transmitting the image-modifying data from the client to the visual server and transmitting the modified image from the visual server to the client as compressed data are performed across a network, such as the Internet or other WAN, LAN, or Ethernet. Alternately, the steps of transmitting the image-modifying data from the client to the visual server and transmitting the modified image from the visual server to the client as compressed data are performed through wireless communication.

In one embodiment of the system, the step of transmitting the modified image from the visual server to the client as compressed data is transmitting the modified image from the visual server to the client as a compressed data comprising a frame, and accordingly, the step of transmitting the image-modifying data from the client to the visual server is transmitting the image-modifying data from the client to the visual server as data sufficient to generate an image frame. In another embodiment, the step of transmitting the modified image from the visual server to the client as compressed data is transmitting the modified image to the client after predetermined duration of generating an image based upon the transmitted image-modifying data has occurred, and accordingly, the step of transmitting the image-modifying data from the client to the visual server is transmitting the image-modifying data from the client to the visual server after a predetermined duration of generating image-modifying data.

The present invention therefore provides a commercial advantage in that the client can interactively generate com-

plex graphical images to a user without the need for significant client resources. The system can be implemented with existing networking and communication technology between the client and the visual server, and the image data can be transmitted with known data compression protocols. Further, the visual server and its associated components are readily updateable and maintainable without having to directly access the individual client applications utilizing the image generating capabilities of the visual server.

Other objects, features, and advantages of the present invention will become apparent after review of the hereinafter set forth Brief Description of the Drawings, Detailed Description of the Invention, and the Claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a representational diagram of the image display system with a visual server and associated components in selective communication with a plurality of clients across a network.

FIG. 2A is a flowchart illustrating the preferred process executed on the client in selective communication with the visual server to facilitate image generation.

FIG. 2B is a flowchart illustrating the preferred process executed on the visual server in receiving image-modifying data from the client, and then generating and transmitting a modified image to the client.

FIG. 2C is a continuation of the flowchart of FIG. 2A.

FIG. 2D is a continuation of the flowchart of FIG. 2B.

FIG. 3 shows a schematic of data and procedural flow in an inventive embodiment.

## DETAILED DESCRIPTION OF THE INVENTION

With reference to the figures in which like numerals represent like elements throughout, FIG. 1 is representational diagram of the image display system 10 with a visual server 12 and associated components in selective communication with a plurality of clients across a network 14, such as the Internet. The client components are shown as a television 16 having a set-top box 22 in communication with the network 14, and the set-top box 22 can selectively provide image data to the display 24 of the television 16. Set-top box 22 is similar to the type of boxes generally extant, except that the set-top box 22 in the present system must be able to receive and decompress compressed image data from the visual server 12. The same capability must be present in any client device in order to have the advantages of using the present system 10 for image data processing. Another exemplary clients are PDA 18, such as a Palm Pilot or a Handspring Visor, which has a display screen 26, and cellular telephone 20, which includes a display screen 28. The PDA 18 and cellular telephone 20 are shown here as communicating with the network 14 via a wireless connection, such as an infrared, radio frequency, or microwave transmission. However, PDA 18 and cellular telephone 20 can be in direct wireless communication with the visual server 12 solely though wireless communication.

The visual server 12 is shown here as a cluster of devices, including a server 32, which are in communication through an Ethernet 34, and a hub 36 links the Ethernet 34 to the Internet or other network 14. Thus, while the present inventive system 10 can be implemented with only a server, such as server 32, in communication with the network 14, the visual server 12 here includes additional components that can facilitate the image processing at the visual server 12.

An additional server 38 can support the visual server, as well as a database 40 for storing the image related information such as the specific graphical application programming interface that the client 16,18,20 requires for the modified image, such as Open GL or Direct3D. Additional computers, such as computer 42, can be connected to the server 32 or to the Ethernet 34 to support the image processing, and provide server maintenance and upgrades. Accordingly, the visual server 12 configuration is readily scalable as would be apparent to one of skill in the art.

The communication between the visual server 12 and client preferably occur over a high bandwidth connection such that 1 Mbps or greater data can be sent across the network. However, the client bandwidth can be asymmetric, with the high-bandwidth reserved for visual server 12 to client 16,18,20 communication, an example being a DSL. With the use of an asymmetric connection, the lesser volume of image-modifying data can be transmitted on the lower bandwidth link from the client 16,18,20 to the visual server 12, and the more significant compressed image data can travel across the high bandwidth portion of the connection from the visual server 12 to the client 16,18,20 for decompression and display. Through the use of adequate bandwidth, substantial image data can be transmitted from the visual server 12 to the client 16,18,20, approaching real-time speeds which can allow multimedia applications to be displayed on the clients 16,18,20, such as games and other graphic-intensive applications.

In operation of the image display system 10, the visual server 12 selectively receives image-modifying data from the client 16,18,20 corresponding to a generated image, such as that generated by a game being played on the client, or a multimedia application being executed on the client. The visual server 12 then generates a modified image based upon the image-modifying data, compresses the image or image data with a specific "codec" (compression/decompression) algorithm, and transmits the modified image as compressed data back to the client 16, 18,20. The visual server 12 can either generate a full image modified with the image-modifying data from the client and then compress the generated image, or the visual server 12 can solely generate the data in a specified format for the modified image and have that 30 data compressed and transmitted. Thus, in the system 10, the visual server 12 can generate only the data necessary to render an image at the client, and does not need to fully produce an image at the visual server prior to compression.

The client 16,18,20 selectively generates image-modifying data and transmits the image-modifying data to the visual server 12 and awaits the image data from the visual server 12 for the next requested image. Once the client receives the modified image as compressed data from the visual server 12, the client 16,18,20 then decompresses the compressed image data and displays the decompressed image on the client image display 24,26,28. The modified image data can be compressed at the visual server 12 in any compression standard, such as MPEG, JPEG, H.261, or other industry standard codecs, and streaming formats such as Windows Media .ASF standard, Real .RM standard, Apple .MOV standard. The client 16,18,20 includes the requisite hardware and software to decompress the modified image.

If the system 10 is displaying a series of images on the client 16, 18,20, such as in multimedia animation, the visual server 12 transmits the modified image to the client 16,18,20 as a frame, and preferably but not necessarily, the client 16,18,20 transmits the image-modifying data to the visual

server **12** as data sufficient to generate an image frame. Otherwise, the visual server **12** can transmit the modified image to the client **16,18,20** in an arbitrary predetermined manner, such as after predetermined duration of generating an image based upon the transmitted image-modifying data has occurred, or after a predetermined amount of data has been received from the client **16, 18,20**. The client **16,18,20** can likewise transmits the image-modifying data to the visual server **12** in an arbitrary manner, such as after a predetermined duration of generating image-modifying data has occurred, or a specific amount of image-modifying data is ready to be sent.

In the art currently, when the client **16,18,20** is active, the client **16,18,20** is in communication with networks and can be supported by a one or more servers. Consequently, the visual server **12** is able to utilize existing architectures with the higher bandwidth, asymmetric or other, to handle complex visual processing for the client **16, 18,2**, or the ultimate recipient of the processed data. The visual server **12** can also run standard software application, such as games, that are the same as versions running on standard personal computers, with the visual server **12** providing the computing power of the PC to the data generated at the client **16,18,20** for purposes of image modification.

It can be seen that the visual server **12** has, either in software or hardware, an image processor that selectively receives image-modifying data corresponding to a generated image from the client **16,18,20**, and the image processor generates a modified image based upon the image-modifying data and then transmits the modified image as compressed data to the client **16,18,20**. Further, each client **16,18,20** can have, either embodied in hardware or software, in additional to the image display **24,26,28** for displaying an image to a user of the client **16, 18,20**, an image-modifying data generator that generates image-modifying data, and image-modifying data transmitter for transmitting the image-modifying data to the visual server **12**, and a modified image data receiver for receiving as compressed data from the visual server **12** an image modified based the transmitted image-modifying data from the client **16,18,20**, and the modified image data receiver decompresses the compressed image data.

FIGS. **2A-2D** illustrate the process thread of the image display system **10**, with FIGS. **2A** and **2C** representing the client platform, and FIGS. **2B** and **2D** representing the visual server **12** platform. The thread preferably begins with the step of sending a link to the visual server, step **50**, which indicates that the client **16,18,20** is about to send image-modifying data to the visual server. The link can be a flag at the beginning of a frame or packet, or can be separate from the frame or packet. The visual server **12** receives the link from the client, as shown at step **52**, and then can make any necessary resource allocations for use in the image-modification process. The step of sending a link is not necessary if the visual server **12** is able to have sufficient turn around processing on frames and packets send without advanced warning from the client **16,18,20**. Then the client **16,18,20** generates image-modifying data, as shown at step **54**, and transmits the image-modifying data to the visual server **12**, as shown at step **56**.

The thread then continues at the visual server **12** which receives the image-modifying data from the client **16, 18,20**, as shown at step **58**, where the image-modifying data corresponds to an image in a graphics API recognizable to the visual server **12**. Thus, if a link was sent to the visual server **12** from the client **16,18,20** (steps **50** and **52**), the visual server can determine the appropriate graphics API in

anticipation of receipt of the image-modifying data. The visual server **12** otherwise determines the graphic API, as shown at step **60**, based upon the image-modifying data receiving, and then generates the corresponding modified image based upon the image-modifying data received from the client **16, 18,20**, as shown at step **62**. If the image data requires aggregation to complete the image, then the visual server **12** aggregates the data, as shown at step **64**, and if not, once the modified image, or data comprising the modified image is generated, the visual server **12** compresses the image data in a predetermined format, such as MPEG, as shown at step **66**, and then transmits the modified image from the visual server **12** to the client **16,18,20** as compressed data, as shown at step **68**.

The thread then continues at the client **16,18,20**, with the client receiving the compressed data from the visual server **12**, as shown at step **70**, where the compressed data is an image modified based the transmitted image-modifying data, and the client **16,18,20** decompresses the compressed image data, as shown at step **72**. The client **16,18,20** then displays the decompressed image on the client image display, such as displays **24,26,28**. The client then ends the particular display routine of the thread, as shown at step **76**, and can begin to generate new image modifying data. The client **16,18,20** alternately process new image-modifying tying data while the current image is being displayed. Further, as embodied here, the client **16,18,20** transmits an end routine flag to the visual server, as shown at step **78**, to indicate that the client successfully received and displayed the frame. The visual server **12** then receives the end routine flag, as shown at step **80**, which allows the visual server **12** to deallocate the resources set aside for the specific image processing requested initially by the client **16,18,20** at step **50**. The step of transmitting an end routing flag from the client (step **78**) and the receipt of the flag at the visual server **12** (step **80**) are not required, but do assist in the visual server **12** management of resources. Other methods of client-server interaction through packet and frame-relay networks as would be known to those of skill in the art can be used to control interaction between the clients **16,18,20** and visual server **12** in the present system **10**.

If the client **16,18,20** and visual server **12** data transfers occur through the use of frames, the step of transmitting the modified image from the visual server **12** to the client **16,18,20** as compressed data is transmitting the modified image from the visual server **12** to the client **16,18,20** as a compressed data comprising a frame. Likewise, the step of transmitting the image-modifying data from the client **16,18, 20** to the visual server **12** is preferably transmitting the image-modifying data from the client **16, 18,20** to the visual server **12** as data sufficient to generate an image frame. Alternately, if the client and visual server **12** transfer data based upon an arbitrary method such as elapse of a predetermined duration, then the step of transmitting the modified image from the visual server **12** to the client **16,18,20** as compressed data is transmitting the modified image to the client **16,18,20** after predetermined duration of generating an image based upon the transmitted image-modifying data has occurred at the visual server **12**. In such embodiment, the step of transmitting the image-modifying data from the client **16,18,20** to the visual server **12** is transmitting the image-modifying data from the client **16,18,20** to the visual server **12** after a predetermined duration of the client generating image-modifying data.

While there has been shown a preferred and alternate embodiments of the present invention, it is to be understood that certain changes may be made in the forms and arrange-

9

ment of the elements and steps of the method without departing from the underlying spirit and scope of the invention as is set forth in the claims.

For reasons of cost, size, and power consumption, sophisticated three dimensional graphics are not available on devices such as mobile telephones and the set-top boxes used to decode cable and satellite television signals. There is, however, a need to display complex three dimensional graphics, specifically those used by games, on these devices.

We have solved this problem by recognizing that another common element of these devices is connectivity; when the device is active it is connected to a service provider and hence already follows the model of a client device supported by a server device. Extending this analogy we have developed the concept of a Visual Server that handles all complex visual processing, and a client (the telephone or set-top box) that receives the processed data.

The Visual Server runs standard software, such as games, that are the same as versions running on standard personal computers. The Visual Server has certain support software modified to enable control of the application from the client and the delivery of the result of 3D drawing to the client.

The application running on the Visual Server sends drawing commands to one of the industry standard application programming interfaces such as Direct3D or OpenGL. When the drawing is complete the resulting image is compressed and transmitted to the client using a protocol such as MPEG4. The transmission of the compressed image usually occurs on completion of a frame; in the event that there is no distinct end to a frame the transmission occurs after a specified elapsed time.

The use of an industry standard image compression protocol such as MPEG allows us to make use of facilities that are already present in most clients. Set-top boxes already need to decode MPEG data in order to display digital television; mobile telephones will soon need to support MPEG protocols for video conferencing or television display.

The main advantages of this invention are:
1. The ability to display complex 3D graphics on a device lacking necessary hardware.
2. The avoidance of costly components in the client device and taking advantage of necessary functions already present in it.
3. The ability to provide access to industry standard software on a device which is unable to execute that software.
4. The ability to upgrade performance and features needed by applications at the server without modifying the more numerous clients.
5. The avoidance of installing numerous applications on each client with the consequential support problems; the client software can be installed when shipped from the factory.

The invention claimed is:
1. A method of hosting an interactive software application comprising:
    running at a server the interactive software application;
    receiving at the server user input signals from a client device, wherein the user input signals are used to control updating of the state of the interactive software application;
    generating at least one updated image at the server in response to updating the state of the interactive software application; and
    compressing the at least one updated image and transmitting the compressed updated image to the client device, wherein the server transmits the updated image as a

10

    compressed frame that can be decompressed and displayed as an updated image at the client device.
2. The method as recited in claim 1 wherein a first bandwidth for transmitting the user input data between the client device and the server and a second bandwidth for transmitting the compressed updated image from the server to the client device are asymmetric.
3. The method as recited in claim 1 wherein the server is configured for bidirectional communications with a plurality of client devices, the bidirectional communication including receiving at the server user input signals and transmitting the compressed updated image.
4. The method as recited in claim 1 wherein the server is configured to receive user input data and transmit compressed updated images with a plurality of client devices.
5. The method as recited in claim 1 wherein at least two of the plurality of client devices include different device platforms.
6. The method as recited in claim 1 wherein the client device is a mobile device.
7. The method as recited in claim 1 wherein the interactive software application is an interactive game that is configured to run at the server, which is in bidirectional communication with a plurality of client devices, and wherein said updating the state of the software application includes updating the game state of the interactive game.
8. An image display system, comprising:
    a server having a processor and memory configured to execute an interactive software application and further configured for:
    receiving at the server user input signals from a client device, wherein the user input signals are used to control updating the state of the interactive software application;
    generating at least one updated image at the server in response to updating the state of the interactive software application running on the server by the user input signals; and
    compressing the at least one updated image and transmitting the compressed updated image to the client device, wherein the server transmits the updated image as a frame and wherein the client device is configured for decompressing of the compressed updated image and displaying the updated image on a display coupled to the client device.
9. The image display system of claim 8, wherein the user input signals are generated at the client device to update the state of the interactive software application from the state that initiated the current image displayed on the display coupled to the client device.
10. The image display system of claim 8 wherein the server is configured to exchange user input data and compressed updated images with a plurality of client devices.
11. The image display system of claim 8 wherein the interactive software application is a game and wherein the client device is a mobile device.
12. The image display system of claim 10 wherein the interactive software application is a game and wherein at least one of the plurality of client devices is a mobile device.
13. A method of displaying interactive video, comprising:
    receiving at a server user input control signals from a client device, wherein the user input control signals are used to control at least one image in a sequence of images generated from the running of a software gaming application on the server;
    generating a modified image at the server in response to the user input control signals; and

transmitting the modified image to the client device for display as compressed data, wherein the transmitting step comprises compressing the at least one modified image and sending the compressed modified image to the client device once the modified image is generated, and wherein the client device is configured for decompressing of the compressed modified image and displaying the modified image on a display coupled to the client device.

14. The method as recited in claim 13 wherein a first bandwidth available for receiving user input control signals at the server and a second bandwidth available for transmitting the modified image to the client device is asymmetric with the second bandwidth available for transmitting the modified image from the server being greater than the first bandwidth.

15. The method as recited in claim 13 wherein the server is configured to exchange user input data and compressed modified images with a plurality of client devices.

16. The method as recited in claim 15 wherein at least two of the plurality of client devices include different platforms.

17. The method as recited in claim 1 wherein the interactive software application is a game running on the server and wherein updating of the state of the interactive software application includes changing the game state.

18. The method as recited in claim 13 wherein the user input control signals are used to control a plurality of images in the sequence of images generated from the running of a software gaming application on the server.

* * * * *

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Federal Circuit Rule 32(b).  This brief contains 10,879 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This Brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

ARMOND WILSON LLP

Dated:  November 25, 2024

By: _/s/ *Douglas R. Wilson*_____
     Douglas R. Wilson

*Attorney for Appellant*
*Intellectual Pixels Limited*