**No. 2024-2174**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

INTELLECTUAL PIXELS LIMITED,

*Appellant*,

*v.*

SONY INTERACTIVE ENTERTAINMENT LLC,

*Appellee.*

On Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2021-00237.

**BRIEF FOR APPELLEE SONY INTERACTIVE ENTERTAINMENT LLC**

THOMAS G. SAUNDERS
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000

JOSEPH F. HAAG
S. DENNIS WANG
WILMER CUTLER PICKERING
HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
(650) 858-6000

JAMES M. DOWD
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, CA 90071
(213) 443-5300

*Attorneys for Appellee Sony Interactive Entertainment LLC*

February 5, 2025

## PATENT CLAIMS AT ISSUE

This appeal relates to claims 1-12 of United States Patent No. 10,681,109.

Claims 1 and 8 are representative:

1. A method of hosting an interactive software application comprising:

running at a server the interactive software application;

receiving at the server user input signals from a client device, wherein the user input signals are used to control updating the state of the interactive software application;

generating at least one updated image at the server in response to updating the state of the interactive software application; and

compressing the at least one updated image and transmitting the compressed updated image to the client device, wherein the server transmits the updated image as a compressed frame that can be decompressed and displayed as an updated image at the client device.

8. An image display system, comprising:

a server having a processor and memory configured to execute an interactive software application and further configured for:

receiving at the server user input signals from a client device, wherein the user input signals are used to control updating the state of the interactive software application;

generating at least one updated image at the server in response to updating the state of the interactive software application running on the server by the user input signals; and

compressing the at least one updated image and transmitting the compressed updated image to the client device, wherein the server transmits the updated image as a frame and wherein the client device is configured for decompressing of the compressed updated image and displaying the updated image on a display coupled to the client device.

# CERTIFICATE OF INTEREST

Counsel for Appellee Sony Interactive Entertainment LLC certifies the following:

**1. Represented Entities**. Fed. Cir. R. 47.4(a)(1). Provide the full names of all entities represented by undersigned counsel in this case.

Sony Interactive Entertainment LLC

**2. Real Party in Interest**. Fed. Cir. R. 47.4(a)(2). Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

Sony Group Corporation
Sony Corporation of America

**3. Parent Corporations and Stockholders**. Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

Sony Group Corporation
Sony Corporation of America

**4. Legal Representatives**. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

WILMER CUTLER PICKERING HALE AND DORR LLP: Daniel V. Williams

**5. Related Cases**. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

[X] Yes (file separate notice; see below) [ ] No [ ] N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). Please do not duplicate information. This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

Already filed.

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None.

Dated: February 5, 2025

/s/ James M. Dowd
JAMES M. DOWD
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, CA 90071
(213) 443-5300

# TABLE OF CONTENTS

Page

PATENT CLAIMS AT ISSUE

CERTIFICATE OF INTEREST .......... i

TABLE OF AUTHORITIES .......... vi

STATEMENT OF RELATED CASES .......... 1

INTRODUCTION .......... 2

STATEMENT OF ISSUES ON APPEAL .......... 4

STATEMENT OF THE CASE .......... 5

I. THE PARTIES .......... 5

II. TECHNOLOGY BACKGROUND AND PRIOR ART .......... 5

A. Server-Client Computer Architecture .......... 5

B. Real-Time Compression And Decompression .......... 6

C. Wiltshire .......... 7

D. Saha .......... 14

III. THE '109 PATENT .......... 14

IV. PROCEDURAL HISTORY .......... 18

A. Sony's Petition And Initial Proceedings .......... 18

B. The Board's First Decision Was Limited To The "Generating" Limitation .......... 21

C. The First Appeal .......... 23

D. This Court Vacates The Entire Final Written Decision And Remands .......... 24

E. Board's Remand Proceedings ....................25

F. The Board's Final Written Decision On Remand Followed The Court's Mandate ....................27

SUMMARY OF THE ARGUMENT ....................30

ARGUMENT ....................31

I. THE BOARD COMPLIED WITH THE MANDATE RULE ....................31

A. The Court's Mandate Did Not Foreclose Consideration Of The "Compressing" Limitation ....................32

B. The "Compressing" Limitation Was Not Part Of The Scope Of The Judgment Appealed From ....................33

1. The Board's First Decision Was Limited To The "Generating" Limitation ....................34

2. IPL's Misplaced Reliance On Two Prior Statements Related To The "Generating" Limitation ....................36

a. The Board's prior statement that Wiltshire is "silent as to the content or origin of that 'compressed video MPEG stream'" ....................36

b. The Board's prior statement that a skilled artisan would not have "understood Wiltshire's system could possibly have supported [Doom] in the manner proposed by Petitioner" ....................40

3. The Case Law Supports Sony, Not IPL ....................42

C. The Board Correctly Followed the Court's Mandate ....................51

II. THE BOARD'S FACTUAL FINDINGS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE ....................53

A. Substantial Evidence Supports The Board's Finding That Wiltshire And Saha Render Obvious The "Compressing" Limitation ....................54

B. IPL's Arguments To The Contrary Should Be Rejected ....................57

CONCLUSION ....................66

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Amado Corp. v. Microsoft*,
517 F.3d 1353 (Fed. Cir. 2008) ............................................................27, 46, 47

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) ..........................................................................62

*Atlanta Gas Light Co. v. Bennett Regulator Guards, Inc.*,
33 F.4th 1348 (Fed. Cir. 2022) ...........................................................................51

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
576 F.3d 1348 (Fed. Cir. 2009) ..........................................................................49

*Doe v. United States*,
463 F.3d 1314 (Fed. Cir. 2006) ....................................................................44, 45

*Droplets, Inc. v. E*TRADE Bank*,
887 F.3d 1309 (Fed. Cir. 2018) ..........................................................................49

*eBay, Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006)..............................................................................................46

*Engel Industries, Inc. v. Lockformer Co.*,
166 F.3d 1379 (Fed. Cir. 1999) ......................................................31, 33, 35, 47

*Exxon Chemical Patents, Inc. v. Lubrizol Corp.*,
137 F.3d 1475 (Fed. Cir. 1998) ............................................................35, 42, 43

*Hayward Industries, Inc. v. Pentair Water Pool & Spa, Inc.*,
814 F. App'x 592 (Fed. Cir. 2020) (nonprecedential).................................49, 50

*HPI/GSA 3C, LLC v. Perry*,
364 F.3d 1327 (Fed. Cir. 2004) ..........................................................................49

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012) ..........................................................................64

*Integrated Technology Corp. v. Rudolph Technologies, Inc.*,
629 F. App'x 972 (Fed. Cir. 2015) (nonprecedential).................................27, 38

*Laitram Corp. v. NEC Corp.*,
115 F.3d 947 (Fed. Cir. 1997) ........................................................*passim*

*Medtronic, Inc. v. Teleflex Life Sciences Ltd.*,
No. 2022-1605, 2024 WL 1208642 (Fed. Cir. Mar. 21, 2024)
(nonprecedential) ..............................................................................63

*PalTalk Holdings, Inc. v. Riot Games, Inc.*,
810 F. App'x 904 (Fed. Cir. 2020) (nonprecedential)........................................57

*Polygroup Ltd. MCO v. Willis Electric Co.*,
No. 2021-1401, 2022 WL 1183332 (Fed. Cir. Apr. 20, 2022)
(nonprecedential) ..............................................................................50

*Retractable Technologies, Inc. v. Becton Dickinson & Co.*,
757 F.3d 1366 (Fed. Cir. 2014) .........................................................46

*Robotic Vision Systems, Inc. v. View Engineering, Inc.*,
112 F.3d 1163 (Fed. Cir. 1997) .........................................................48

*Robotic Vision Systems, Inc. v. View Engineering, Inc.*,
249 F.3d 1307 (Fed. Cir. 2001) .........................................................48

*Sony Interactive Entertainment v. Intellectual Pixels Ltd.*,
No. 2022-2118, 2023 WL 6773879 (Fed. Cir. Oct. 13, 2023) .......................2, 33

*United States v. Husband*,
226 F.3d 626 (7th Cir. 2000) ............................................................45

*United States v. Husband*,
312 F.3d 247 (7th Cir. 2002) ............................................................45

*Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*,
810 F.2d 243 (D.C. Cir. 1987)...........................................................48

## STATEMENT OF RELATED CASES

A prior appeal from the same *inter partes* review was previously before this Court in *Sony Interactive Entertainment LLC v. Intellectual Pixels Ltd.*, No. 2022-2118, 2023 WL 6773879 (Fed. Cir. Oct. 13, 2023) (Dyk, J., joined by Prost & Stoll, JJ.). No other appeal from this *inter partes* review was previously before any other appellate court.

The Court's decision in this appeal may directly affect or be directly affected by the following pending cases: *Intellectual Pixels Limited v. Sony Interactive Entertainment LLC*, No. 8:20-cv-01422-JVS-KES (C.D. Cal.), consolidated with *Intellectual Pixels Limited v. Sony Interactive Entertainment LLC*, No. 8:19-cv-01432-JVS-KES (C.D. Cal.). Intellectual Pixels Limited ("IPL") asserted United States Patent No. 10,681,109 ("the '109 patent") in Case No. 8:20-cv-01422 (C.D. Cal.). By stipulation, both cases are stayed pending the resolution of all IPRs, including any appeals therefrom.

## INTRODUCTION

On remand from this Court's decision in *Sony Interactive Entertainment v. Intellectual Pixels Ltd.*, No. 2022-2118, 2023 WL 6773879 (Fed. Cir. Oct. 13, 2023) (nonprecedential), the Patent Trial and Appeal Board issued a comprehensive 93-page Final Written Decision, which carefully applied the Court's rulings and concluded that the prior art rendered the challenged claims of the '109 patent obvious. IPL now advances two flawed arguments on appeal: first, that the Board exceeded the scope of the mandate by considering the "compressing" limitation, which the Board never previously addressed in its original decision; and second, that the Board's decision regarding the "compressing" limitation—based on express teachings and corroborated expert testimony—was unsupported by substantial evidence. Both arguments should be rejected.

Every step of IPL's mandate rule argument rests on an erroneous premise. First, IPL is wrong about the scope of the mandate. The Court did not limit the scope of proceedings on remand in any way that foreclosed the Board's ruling on the "compressing" limitation. Rather, the Court vacated the Board's original decision in its entirety and issued a broadly worded mandate remanding "for further proceedings consistent with this opinion." Appx45. The Board did just that.

Second, IPL is wrong about the scope of the original Board decision. IPL contends that the mandate precluded the Board from ruling against it on the "compressing" limitation because Sony allegedly did not appeal the Board's rulings on that limitation. But the Board's original decision was expressly limited to a different limitation—the "generating" limitation—and did not reach the "compressing" limitation or any other limitation. Thus, there was no ruling on the "compressing" limitation for Sony to appeal.

Third, IPL is wrong that Sony did not challenge the Board's erroneous reading of the Wiltshire reference that IPL relies on in connection with the "compressing" limitation. The two statements that IPL identifies were part of the Board's original decision on the "generating" limitation. Sony challenged both as part of its first appeal on the "generating" limitation, and this Court reversed the basis for those statements in its decision. IPL turns the mandate rule on its head by arguing that the Board should have disregarded that intervening guidance from this Court. Indeed, the Board would have ***violated*** the mandate if it did what IPL wants and adhered to erroneous prior determinations that this Court refuted in the first appeal.

IPL's substantial evidence challenge fares no better than its mandate rule argument. The Board's decision on "compressing" is amply supported by substantial evidence, including express disclosures in the prior art and detailed

expert testimony. For example, Wiltshire taught transmitting "an encoded audio/video stream such as a ***compressed*** video MPEG stream." Appx1355(7:13-18).[1] The Saha reference provided more detail on MPEG compression. The '109 patent admits that MPEG was "an industry standard image compression protocol." Appx152(9:32-33). And the Board credited expert testimony, supported by yet more evidence and this Court's guidance, that it would have been obvious to compress newly generated images, such as those generated when playing interactive video games like Doom. IPL's challenge, which fails under any standard, comes nowhere close to showing that the Board's decision was not supported by substantial evidence.

## STATEMENT OF ISSUES ON APPEAL

1. Whether the Board complied with this Court's mandate where (1) the Board's original decision was based solely on the "generating" limitation and not the "compressing" limitation; (2) this Court held that the Board's "generating" ruling was erroneous, vacated the Board's original decision in its entirety, and remanded with instructions to conduct further proceedings consistent with the Court's opinion; and (3) on remand the Board addressed all remaining issues, including the "compressing" limitation, in a manner consistent with this Court's guidance from the first appeal.

---

[1] Emphasis in quotations added unless otherwise indicated.

2. Whether substantial evidence supports the Board's finding that the prior art renders obvious the "compressing the at least one updated image" limitation.

## STATEMENT OF THE CASE

### I. THE PARTIES

Appellee Sony Interactive Entertainment LLC ("Sony") is a wholly-owned subsidiary of Sony Corporation of America, which is a corporate entity of Sony Group Corporation. Sony is involved in the distribution of PlayStation video game consoles. Sony also works with affiliated video game studios to develop and distribute video games that are played on PlayStation video game consoles.

Appellant IPL was incorporated in the United Kingdom in February 2019, shortly before suing Sony in the Central District of California. IPL does not develop, manufacture, or sell any products.

### II. TECHNOLOGY BACKGROUND AND PRIOR ART

#### A. Server-Client Computer Architecture

The '109 patent generally relates to server-client computer architecture for running graphical software applications. Appx148(1:29-33). A remote server running a software program, such as a video game, generates images, compresses the images, and transmits the images to a client computer over a network. At the client computer, the transmitted images are received, decompressed, and displayed

to the player. The player interacts with the game at the client computer by using a mouse, keyboard, or joystick to generate commands. These commands are transmitted from the client computer to the remote server, where the game running on the server updates its game state. The server may then respond by generating updated images to be transmitted to the client computer. For example, if the command from the client is to move the game character forward, the game program may generate updated images that make objects on the display appear to move closer to the player.

### B. Real-Time Compression And Decompression

It was known to use standard compression techniques to reduce the size of the images at the server before transmitting them to the client. *See* Appx1025(¶27); Appx1649 ("Recent advances in realtime image compression and decompression hardware make it possible for the high-performance machine [e.g., a remote server] to operate as a rendering server for the low-end machines [e.g., a client computer]. This can be accomplished straightforwardly by rendering on the server, then compressing and transmitting an image stream to the client.").

For example, years before the '109 patent, an industry standards group called "Moving Pictures Experts Group" (MPEG) had published multiple compression standards for compression and decompression of full motion video, which could be used to provide real-time compression and decompression.

Appx1366(2:5-14); Appx1026-1027(¶¶29-30). The ’109 patent itself recognizes that “real-time image compression” was already known in the prior art, and that “industry standard” MPEG could be used for that very purpose. Appx148(1:58-61); Appx150(6:55-60); Appx152(9:32-38).

### C. Wiltshire

The server-client computer architecture described above was disclosed in the prior art well before the ’109 patent. For example, Wiltshire is a U.S. patent filed more than two years before the priority date of the ’109 patent. Wiltshire taught a computer gaming system in which a server executing a game program communicates with one or more remote client computers via a network (e.g., the Internet), where the client includes a display and input controls, such as a mouse, keyboard, or joystick. Appx1352-1353(1:26-43, 3:61-4:29). Wiltshire’s Figure 1D showed the server computer 110 connected to multiple remote client computers 120 via communication pathways 130:




Fig. 1D

Appx1335(Fig. 1D).

Wiltshire's server-client system could run a wide variety of games, including a video game called "Doom." Appx1352(1:26-43). Doom is a real-time, first-person perspective video game first released in 1993 where the player's perspective changes dynamically based on the user's actions in real time. Appx1017-1018(¶7); Appx2319-2322(¶¶42-43). For example, the following images show a sequence of images generated by the Doom video game program as the player moves up a set of stairs in real time:







Appx2319-2321(¶42). As depicted above, Doom responds to a player command to move up the stairs by generating a stream of updated images that make objects on the display appear to move closer to other objects on the display—in this example, giving the appearance that the player's character walks up stairs and into a room. *Id.*

Wiltshire's Figure 2 depicted the operation of its system:




Fig. 2

Appx1336(Fig. 2); Appx1353(3:15-16) ("Fig. 2 is a flow diagram of the operation of [the] computer gaming system of Fig. 1."). In Figure 2, operations performed by a "Server/Host Computer" are above the central dashed line, and operations performed by a "Client/Terminal Computer" are below the dashed line. The server and client computers are connected via a "Network Communication Pathway." Appx1336(Fig. 2).

The first step of Figure 2 ("Initialize System") depicted that when a game is first booted, the system was initialized (e.g., started) and the game program began executing on the server at step 210. Appx1355(7:7-9) ("Initially, game program 112 is executed on server/host computer 110 in stage 210"). For example, in accordance with Wiltshire's disclosures, the game program 112 could be Doom. Appx1352(1:26-44).

Next, Wiltshire's system entered an operational loop in which the server running the game (e.g., Doom) generated images for display on a client computer. Step 220 "determines whether an image is to be displayed on the screen of client/terminal computer 120." Appx1355(7:9-11). If the answer is "yes," "[t]he image is generated by game computer program 112" (7:18-19) and the generated image "is sent from server/host computer 110 to client/terminal computer 120" in step 230 (7:13-15). For example, Doom generated images at the server to reflect the current state of the game.

As shown in Figure 2 step 230, the generated images from step 220 were transmitted as a "video stream" over the communication pathways.




Appx1336 (excerpt of Fig. 2 showing step 230); Appx1355(7:13-18) ("In stage 230, an image is sent from server/host computer 110 to client/terminal computer 120. The image may include any type of graphical information including … an encoded audio/***video stream*** … ."). A video stream is a sequence of frames (or pictures). Appx1059(¶89). For example, as shown above, Doom could generate a sequence of images (e.g., moving up the stairs), which would make up the video stream transmitted to the client.

Wiltshire disclosed that the generated "video stream" may be transmitted as a "***compressed*** video MPEG stream." Appx1355(7:15-18) ("The image may include any type of graphical information including … an encoded audio/video stream ***such as a compressed video MPEG stream***."). Wiltshire explained that information sent between the server and client (e.g., the video stream of step 230)

takes up "communication network bandwidth," but "[t]his bandwidth requirement can be further reduced using data ***compression*** techniques to about 100 KB/sec." *Id.* (7:57-64). For example, in accordance with this disclosure, Doom's generated video stream could be compressed into an MPEG stream in real time and transmitted to the client over communication pathways 130. As discussed, Wiltshire's express disclosures of transmitting the "compressed video MPEG stream" and using "data compression" on the transmissions from the server were well understood by skilled artisans, as MPEG and real-time compression had already been used in server-client systems to provide real-time compression "straightforwardly" prior to Wiltshire. Appx1025-1027(¶¶27, 29-30); Appx1366(2:5-14); Appx1649; *see supra* § II.B.

Next, the client in Wiltshire Figure 2 received the compressed video MPEG stream and "cause[d] the image[s] to be displayed on a screen of client/terminal computer 120" (step 240). Appx1355(7:26-27). The user could then enter at the client an "input command" shown in Figure 2 as step 250, such as a command to step forward in Doom. Appx1355(7:28-29). That command was then "transmitted back to server/host computer" (step 260). Appx1355(7:35-36). The game program on the server "processes the input command" (step 270), executes the game program based on the input command (step 210), and decides if it needs to "update[]" the image (step 220) in response to the changed game state resulting

from the received input command. Appx1355(7:41-45); Appx1336(Fig. 2). Wiltshire's system operation then looped, with the server generating updated images and transmitting those images each time it receives user input commands that change the game state, for the duration of game play. Appx1355(7:30-45).

### D. Saha

Saha is a U.S. patent filed over two years before the priority date of the '109 patent. Saha describes the "two predominant MPEG standards" in 1997, referred to as "MPEG-1" and "MPEG-2." Appx185; Appx1366(2:5-14). As explained in Saha, these MPEG standards included "compression and decompression of full motion video images." Appx185; Appx195-197; Appx1366(1:64-2:1). Saha provided the details of the MPEG stream described in Wiltshire, including transmitting compressed frames and the remote decoding of those compressed frames. Appx196-197; Appx1367(4:9-13).

## III. THE '109 PATENT

The '109 patent claims priority to Provisional Application No. 60/263,854 filed on January 24, 2001. Appx140-141. It is undisputed that Wiltshire and Saha are prior art to the challenged claims. Appx54.

Like Wiltshire, the '109 patent purports to relate "to computer graphics and a graphical image display system" in which a "server" is used to "generate and transmit images to a client." Appx148. Also, like Wiltshire, Figure 1 of the '109

patent depicts this relationship, with server 12 connected to clients 16, 18, and 20 via a network or the internet 14:




Fig. 1

Appx144. The '109 patent states that server 12 can "run standard software application[s], such as games, that are the same as versions running on standard personal computers, with the visual server 12 providing the computing power of the PC to the data generated at the client … for purposes of image modification." Appx151-152(7:19-24, 9:18-20). Like Wiltshire, the updated images may be compressed using a standard compression format "such as MPEG" and transmitted to the client, including as one of various standard media file formats, such as

".ASF," ".RM," and ".MOV." Appx150(6:55-60); *see also* Appx149-152(3:51-57, 5:2-5, 6:29-38, 9:32-24).

The '109 patent describes the operation of its system in nearly identical terms to Wiltshire, using a substantially similar flow diagram depicting steps performed at a server (Figures 2B and 2D below) and at a client (Figures 2A and 2C below):




Fig. 2A Fig. 2B




Fig. 2C




Fig. 2D

Appx145-146(Figs. 2A-2D). Following initialization (steps 50, 52), the system of the ’109 patent enters an operational loop in which server 12 executes a game program that generates images to be transmitted and displayed on a client computer, and receives and responds to “image modifying data” sent from the client computer. Appx145(Figs. 2A-2B).

Like Wiltshire, the ’109 patent explains how the updated images are “compress[ed]” using “an industry standard image compression protocol such as MPEG” (step 66; Appx152(9:32-33)) and transmitted “from the visual server 12 to the client.” Appx151(8:9-17); *see also* Appx149-152(3:51-57, 5:2-5, 6:29-38, 6:55-60, 9:32-24). The client then “displays the decompressed image on the client image display” (step 74). Appx151(8:20-22). The ’109 patent’s system iterates through Figures 2A-2D in a loop, with the server generating updated images each

time it receives image-modifying data from the client, for the duration of game play. Appx145-146(Figs. 2A-2D).

Despite IPL's contention that real-time compression for interactive games at the time was "hardly trivial" (IPL Br. 13), the '109 patent says otherwise. For example, the '109 patent admits that "methods of client-server graphics that employ image transmission" and use "real-time image compression and decompression" were known in the prior art. Appx148(1:58-61). Moreover, the '109 patent did not provide any details of how to perform MPEG compression or decompression for real-time games, because such knowledge was already well within the skill in the art. Indeed, the '109 patent admits compression is performed by "***industry standard*** image compression protocol[s] such as MPEG." Appx152(9:32-34). And just like Wiltshire, the '109 patent states that the system could be implemented using then-existing commercially available hardware and software. *Compare* Appx152(9:4-34) ('109 patent disclosure) *with* Appx1352-1353(2:45-3:3) (Wiltshire disclosure).

## IV. PROCEDURAL HISTORY

### A. Sony's Petition And Initial Proceedings

Sony petitioned for *inter partes* review of claims 1-18 of the '109 patent, challenging independent claims 1 and 8 based on the combination of Wiltshire and Saha. Appx168. In response, IPL disclaimed claims 13-18, leaving only claims 1-

12 remaining for review with claims 1 and 8 as the only remaining independent claims. Appx2426. Each of these remaining claims is directed to a server-client system that generates updated images at a server, compresses those updated images, and transmits the compressed updated images to a client for display. The challenged independent claims (claims 1 and 8) both recite two limitations relevant to IPL's appeal:

(1) "***generating*** at least one updated image at the server in response to updating the state of the interactive software application" (the "generating limitation") and

(2) "***compressing*** the at least one updated image and transmitting the compressed updated image to the client device, wherein the server transmits the updated image as a compressed frame that can be decompressed and displayed as an updated image at the client device" (the "compressing limitation").

*See* Appx152(9:62-10:2, 10:35-45).

Sony's Petition demonstrated the obviousness of claims 1 and 8 based on Wiltshire in combination with Saha. Appx186-225. In particular, the Petition demonstrated how Wiltshire disclosed generating updated images at server 110 and compression of these generated images as "an encoded audio/video stream such as a compressed video MPEG stream," which reduces the bandwidth requirements. Appx194-195; Appx1355(7:15-18, 7:62-63). The Petition also demonstrated how

Saha provides further details of "a compressed video MPEG stream" referenced in Wiltshire, including compressed frames and remote decompression of the compressed frames. Appx195-197.

IPL's Patent Owner Response argued that Wiltshire's system was limited to simple casino games that used pre-existing images and pre-existing MPEG video clips—not real-time compression—and thus Wiltshire did not teach the "compressing" limitation. Appx436-437; Appx440. IPL further argued that Wiltshire did not describe how MPEG could apply to live, real-time interactive games, even in view of Saha. Appx440.

Sony's Reply demonstrated why IPL was wrong on those points. Sony discussed Wiltshire's express disclosure that the system shown in Figure 2 runs non-casino video games like Doom, which undisputedly generated dynamic images in real time. Appx505. IPL's contention that Wiltshire was limited to pre-existing MPEG video clips would not make sense in the context of real-time games, such as when Doom is applied to Figure 2. *Id.*; Appx508; Appx2319-2328(¶¶42-50). Sony's expert, Dr. Fuchs, also explained why Wiltshire did not need to expressly include the details of real-time compression because such knowledge was already well within possession of persons of ordinary skill in the art, as demonstrated by the fact that the '109 patent lacks any such disclosure and

the prior art's recognition that real-time compression was already known and "straightforward[]." Appx2328-2329(¶¶51-53); Appx1649.

IPL's Sur-Reply doubled down on its position that Wiltshire was limited to casino games and that "Wiltshire never applies 'Doom' to Figure 2." Appx555. IPL did not (and still does not) dispute that persons of ordinary skill in the art at the time understood that real-time compression was "straightforward[]." Appx1649.

### B. The Board's First Decision Was Limited To The "Generating" Limitation

The Board's first decision found claims 1-12 non-obvious based on a single limitation: "'generating at least one updated image at the server.'" Appx19. The Board did not reach any other limitation of the '109 patent. *See* Appx48 ("[O]ur Final Written Decision addressed only one of the arguments raised by Patent Owner—whether Petitioner established that the combination of Wiltshire and Saha teaches or suggests the 'generating at least one updated image' limitation of independent claim 1 and 8 of the '109 patent ('the 'generating' limitation').").

The Board's original determination that Wiltshire did not disclose the "generating" limitation was based upon multiple findings that have now been overturned by this Court. For example, the Board originally found that Wiltshire's system was limited to the specific casino game embodiments and that Wiltshire at most disclosed the use of pre-existing images and pre-existing MPEG files and thus did not "generate" them. Appx29-30. To reach this conclusion, the Board

misinterpreted Wiltshire to exclude the game Doom from the system disclosed in Figure 2. Appx26-27. While acknowledging unrebutted testimony that Doom operated by generating new images in real time, the Board found that "Wiltshire does not teach using the operation disclosed in Figure 2 with Doom," Appx26-27, even though Figure 2 referred to executing a "game," Appx1355(7:7-9), and Wiltshire specifically defined "game" to include "video based games such as Doom," Appx1352(1:26-38).

By excluding Doom from Wiltshire and by limiting Wiltshire to the casino game embodiments, the Board concluded—as part of its analysis of the "generating" limitation—that the images in Wiltshire "could have simply been pre-existing images and would not necessarily need to be generated in real time. We therefore agree with Patent Owner that Wiltshire's disclosure [is] completely silent as to the content or origin of that compressed video MPEG stream and that Petitioner imparts to Wiltshire something Wiltshire never discloses." Appx30 (internal quotation marks and citation omitted). In other words, because the Board assumed (incorrectly) that Doom did not apply to Wiltshire Figure 2, it found that Wiltshire was silent as to the "origin" of the compressed MPEG stream, and thus found no disclosure of the "generating" limitation.

The Board made clear that it was addressing the "generating" limitation. The next sentence referred to "Petitioner's contentions as to the 'generating' claim

limitation." Appx30. The Board stated: "Patent Owner's argument is that Wiltshire's disclosure is silent as to the content or origin of that MPEG stream, and therefore, Wiltshire fails to teach the 'generating' limitation." Appx31. And the Board finished the section by concluding that Sony had not met its "burden as to the 'generating' limitation of claims 1 and 8 of the '109 patent." Appx32.

Having found that the "generating" limitation of the independent claims was not rendered obvious, the Board did not reach any other limitation of the challenged '109 patent claims. *See* Appx32 ("Because we conclude … Petitioner has not met its burden to show by a preponderance of the evidence that a person of ordinary skill in the art would have understood the combination of Wiltshire and Saha as teaching 'generating at least one updated image at the server in response to updating the state of the interactive software application,' as claimed, Petitioner has not shown the subject matter of claims 1 and 8 of the '109 patent would have been obvious over Wiltshire and Saha at the time of the invention.").

### C. The First Appeal

On appeal, Sony challenged the basis for the Board's non-obviousness determination—the Board's finding that Wiltshire and Saha did not disclose the "generating" limitation. Appx3514-3516.

Sony argued, *inter alia,* that the Board's findings, such as its finding that Figure 2 does not work with Doom, were not supported by substantial evidence.

Appx3517-3523; Appx3530-3535; Appx3680-3682. In view of these errors, Sony requested that "[t]he FWD should be vacated and remanded so that the Board can consider these statements that teach a person of ordinary skill in the art that Wiltshire's Figure 2 works with games like Doom." Appx3682; *see also* Appx3535.

During oral argument, Judge Prost asked: "There are still other issues for the Board to consider even if we reject the Board's theory on generating, right? There's compressing, there are other limitations. So, this case wouldn't be over, it would just … go back to the Board to deal with the other limitations." Oral Argument Recording, No. 22-2218, at 2:13-30. Sony's counsel agreed. *Id.* at 2:31-32. Similarly, when Judge Dyk asked about ruling in Sony's favor on the generating limitation, Sony's counsel acknowledged "there is still a compressing issue, so that would still result in a remand." *Id*. at 5:02-19. IPL never argued in its brief or in its rebuttal at argument that the Board would lack authority to rule in Sony's favor on the "compressing" limitation.

### D. This Court Vacates The Entire Final Written Decision And Remands

The Court vacated the Board's decision and remanded. The Court held that "Wiltshire discloses generation of a new image, contrary to the Board's conclusion." Appx42. The Court explained that "Wiltshire explicitly discloses that Figure 2 is to be applied to games like Doom," and "[t]he Board erred when it

narrowed the disclosure of Wiltshire to exclude Doom and only focused on the more detailed examples." Appx44. The Court held that "[a] reference must be considered for everything that it teaches, not simply the described invention or a preferred embodiment. Therefore, the Board erred by not crediting Wiltshire's disclosure of applying its system to video games like Doom, which require 'generating' new images under the Board's construction." Appx44-45 (internal citations omitted). The Court further noted that "[t]he parties agree that executing Doom requires generating new images." Appx40-41.

Because the Court found that the Board's finding of no "generating" was "central" to the Board's original decision, the Court vacated the Board's decision in its entirety and remanded. Appx45 ("Because the Board's finding was not supported by substantial evidence and was central to its non-obviousness determination, we vacate the Board's final written decision, and remand for further proceedings consistent with this opinion."). The Court's mandate did not say anything about precluding consideration of the "compressing" limitation (or any other limitation that the Board never previously decided).

**E. Board's Remand Proceedings**

On remand, the parties exchanged simultaneous opening and response briefs. In its remand brief, Sony explained how the Court's holdings confirm that the prior art discloses "generating" as well as the rest of the limitations not previously

considered in the first decision. Appx873-889. On the "compressing" limitation, Sony explained how IPL's argument in the IPR that "Wiltshire never applies 'Doom' to Figure 2" was rejected under the Court's opinion. Sony explained that per the Court's opinion, Wiltshire is not limited to "pre-existing" MPEG videos as the Board previously found and that, by applying Doom to Figure 2, Wiltshire expressly discloses generating a "compressed video MPEG stream" as explained in the Petition. Appx879-880.

IPL argued that the Board's first decision had found that "Wiltshire's disclosure [is] completely silent as to the content or origin of that 'compressed video MPEG stream'" and that finding was "not rejected or contradicted by the Federal Circuit." Appx865-866. IPL further argued that this finding was now "binding" under the "mandate rule" because Sony purportedly never appealed this finding. *Id.*

In its response brief on remand, Sony explained that the Board's prior finding that Wiltshire is "completely silent as to the content or origin of that 'compressed video MPEG stream'" was rejected and contrary to the Court's opinion. Appx895-896. As Sony explained, the Court held that "Wiltshire discloses generation of a new image" and thus provided both the "content" and "origin" of the compressed video MPEG stream—i.e., the content and origin are

the generated images from the game program running on the server (such as Doom). *Id.*

Sony also explained that the mandate rule did not preclude the Board from re-considering the "content or origin" finding. The mandate rule provides that a party can only waive issues that are "within the scope of the judgment appealed from." *Amado Corp. v. Microsoft*, 517 F.3d 1353, 1360 (Fed. Cir. 2008). However, the judgment appealed from did not reach the "compressing" limitation, and thus no arguments regarding the "compressing" limitation were waived. *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 954-955 (Fed. Cir. 1997) (holding that issues not reached by district court and not raised in first appeal were not waived); Appx895-896. Further, Sony pointed out that the Court's mandate vacated the Final Written Decision in its entirety, and the Board thus could make new findings consistent with the Court's opinion on remand. *Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 629 F. App'x 972, 976 (Fed. Cir. 2015) (nonprecedential) (holding that after vacatur, district court "had to consider anew" the facts on remand); Appx896.

### F. The Board's Final Written Decision On Remand Followed The Court's Mandate

On remand, the Board duly considered the complete record and the Court's opinion and issued a comprehensive 93-page decision finding all challenged claims unpatentable.

First, the Board made clear that its prior decision "addressed only one of the arguments raised by Patent Owner—whether Petitioner established that the combination of Wiltshire and Saha teaches or suggests the 'generating at least one updated image' limitation of independent claims 1 and 8 of the '109 patent ("the 'generating' limitation")." Appx48. Thus, the Board's Final Written Decision on remand correctly recognized the need to evaluate the other limitations that it had not previously reached, including the "compressing" limitation.

Next, the Board acknowledged that "[t]he Federal Circuit found that we erred by interpreting Wiltshire's disclosure narrowly as only disclosing selecting an already available image to display on the client, rather than creating a new image." Appx73. In particular, the Board acknowledged that it had ignored the portion of Wiltshire explaining that "[t]he *image is generated* by" the program on the server, and the rest of Figure 2 and corresponding descriptions demonstrate that "Wiltshire discloses generation of a new image." *Id.* (emphasis in original). The Board also acknowledged that the Court "found that we also incorrectly ignored other examples in Wiltshire, such as the playing of the game Doom, where new images are created." Appx74.

The Board found that "[b]ased on our review of the complete record, and in view of the Federal Circuit's guidance as to Wiltshire's disclosure, we are persuaded that Petitioner has shown that the combination of Wiltshire and Saha

teaches [the compressing] limitation." Appx82. In particular, the Board found that "[s]tage 230 of Wiltshire's Figure 2 shows that an updated image is sent from server to the client device and Wiltshire teaches that to reduce bandwidth requirements, the server may compress the updated images in the form of 'a compressed video MPEG stream.'" Appx91. The Board also found credible Dr. Fuchs' corroborated testimony that "real-time image compression (including by using MPEG) was also well known at the time of the invention, as evidenced by the Levoy article." *Id.*

The Board disagreed with IPL's argument that its prior finding regarding the "content" of the MPEG stream was undisturbed by the Court's opinion. Appx92-93. The Board explained that the "logical conclusion from the Federal Circuit's reasoning is that our finding that Wiltshire is silent as to the content of that compressed MPEG stream has now been rejected." *Id.* In particular, the Board explained how its prior finding was based on focusing exclusively on Wiltshire embodiments where the images are pre-loaded, which the Court concluded was improper. *Id.* The Board also recognized that under the Court's opinion, it was incorrect to exclude Doom from Figure 2. *Id.* Per the Court's opinion, the Board explained it had to "credit[] Wiltshire's disclosure of applying its system to video games like Doom, which require 'generating' new images." *Id.* After properly

applying Doom and other disclosures that it previously ignored, the Board recognized that its prior finding was inconsistent with the Court's opinion. *Id.*

## SUMMARY OF THE ARGUMENT

Contrary to IPL's arguments on appeal, the Board's Final Written Decision on remand complied with the mandate rule and was supported by substantial evidence.

1. IPL's arguments regarding the mandate rule rely on a series of erroneous premises and should be rejected. The Court's mandate from the first appeal vacated the first Board decision in its entirety and did not limit the scope of remand in any way that would have foreclosed the Board from considering the "compressing" limitation for the first time. Contrary to IPL's arguments, the "compressing" limitation was ***not*** part of the original Board decision, and thus did not become part of the mandate. Nor were the two prior statements that IPL now relies on left "undisturbed" by the first appeal. Both statements related to the Board's determination on the "generating" limitation, Sony challenged the basis for both, and the Court's ruling held that the Board had misread Wiltshire. The Board correctly followed the Court's mandate when it carefully considered the "compressing" limitation on remand in light of the complete record and this Court's guidance.

2. Substantial evidence supports the Board's factual findings on the "compressing" limitation. Wiltshire taught transmitting "a ***compressed*** video MPEG stream," the Saha reference provided more detail on MPEG compression, and the Board credited detailed expert testimony regarding a skilled artisan's knowledge of compression techniques and how a skilled artisan would read the prior art. IPL's attempt to reargue the facts comes nowhere close to showing a lack of substantial evidence.

## ARGUMENT

### I. THE BOARD COMPLIED WITH THE MANDATE RULE

IPL's primary argument on appeal is that the "mandate rule" foreclosed the Board from ruling for Sony on the "compressing" limitation, even though the Board had never reached that limitation in the first decision. IPL Br. 26-46. This argument misconstrues both the mandate rule and the record.

Under the mandate rule, "[o]nly the issues actually decided … are foreclosed from further consideration." *Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999). The "issues actually decided" include "those within the scope of the judgment appealed from, minus those explicitly reserved or remanded by the court." *Id.* For any other issues, the Board "may act on matters left open by the mandate." *Laitram*, 115 F.3d at 951.

Here, the Court's mandate from the first appeal did not foreclose consideration of the "compressing" limitation. Nor was "compressing" within the scope of the judgment appealed from. Rather, the Board properly acted on matters left open by the mandate, which included deciding the "compressing" limitation and other claim limitations never reached in the first decision.

### A. The Court's Mandate Did Not Foreclose Consideration Of The "Compressing" Limitation

The Court's mandate from the first appeal left ample room for the Board to proceed as it did on remand. This is not a case in which the Court remanded on a narrow set of issues or provided specific instructions limiting the scope of the remand. Nor is it a case in which the Court only vacated-in-part or only addressed a tangential issue while leaving prior findings from the first Final Written Decision intact. Rather, the Court's mandate from the first appeal vacated the first Final Written Decision in its entirety and remanded:

> The Board's determination that Wiltshire does not disclose the "generating" limitation under the Board's construction is not supported by substantial evidence. We need not reach the issues of whether the Board's construction is correct or whether the Board committed an Administrative Procedure Act violation here in adopting a new claim construction without providing an opportunity to respond.
>
> Because the Board's finding was not supported by substantial evidence and was central to its non-obviousness determination, we vacate the Board's final written decision, and remand for further proceedings consistent with this opinion.
>
> VACATED AND REMANDED

*Sony*, 2023 WL 6773879, at *4-5.

Because the Board's error was "central" to the non-obviousness determination, the Court vacated the ***entire*** Final Written Decision and ordered further proceedings "consistent with this opinion"—without narrowing the scope of remand in any way. Indeed, IPL does not argue that the words of the mandate foreclose consideration of the "compressing" limitation. IPL also does not argue that the Court "actually decided" the "compressing" limitation in its opinion from the first appeal. *Engel*, 166 F.3d at 1383.

Rather, IPL's mandate argument rests on a chain of incorrect assertions: that a ruling on the "compressing" limitation was part of the first judgment appealed from; Sony tactically chose not to appeal that ruling; and the purported "compressing" ruling thus became part of the mandate, precluding further consideration on remand. IPL Br. 28-29. As discussed below, each of these assertions is incorrect.

### B. The "Compressing" Limitation Was Not Part Of The Scope Of The Judgment Appealed From

IPL's mandate argument fails at the outset because the Board never reached the "compressing" limitation in the first decision, so "compressing" could not be part of the judgment appealed from. The Board's first decision was expressly limited to the "generating" limitation and never decided the "compressing"

limitation, and IPL's attempt to characterize two prior statements about "generating" as allegedly undisturbed "compressing" findings is incorrect.

**1. The Board's First Decision Was Limited To The "Generating" Limitation**

The Board's original decision did not reach the question of whether the prior art disclosed the "compressing" limitation (or any other limitation besides "generating"). The "compressing" limitation thus was not part of the judgment appealed from.

The original decision only determined non-obviousness based on a single limitation of the '109 patent: the "generating" limitation. Appx32 ("Because we conclude … that Petitioner has not met its burden to show by a preponderance of the evidence that a person of ordinary skill in the art would have understood the combination of Wiltshire and Saha as teaching 'generating at least one updated image at the server in response to updating the state of the interactive software application,' as claimed, Petitioner has not shown that the subject matter of claims 1 and 8 of the '109 patent would have been obvious over Wiltshire and Saha at the time of the invention."). The Board's finding that the prior art did not teach "generating" mooted the remaining issues in the IPR, and thus the Board did not reach any other limitation, including the "compressing" limitation. *Id.*

On appeal, this Court recognized that the Board's decision had been based on the "generating" limitation. Appx39. The Court explained: "Because all of

Sony's prior art combinations relied on Wiltshire to disclose the 'generating' limitation, the Board concluded that claims 1-12 were not shown to have been obvious." *Id.*

The Board's Final Written Decision on remand confirmed that its prior decision had been limited to the "generating" limitation. The Board explained that its "Final Written Decision ***addressed only one of the arguments*** raised by Patent Owner—whether Petitioner established that the combination of Wiltshire and Saha teaches or suggests the '***generating at least one updated image***' limitation of independent claims 1 and 8 of the '109 patent ('the "generating" limitation')." Appx48.

Because the "compressing" limitation was plainly not part of the judgment appealed from, the Board was free to consider that limitation on remand. *Engel*, 166 F.3d at 1383; *Exxon Chem. Pats., Inc. v. Lubrizol Corp.*, 137 F.3d 1475, 1482-1483 (Fed. Cir. 1998) (holding that mandate rule did not preclude consideration of doctrine of equivalents because the scope of the judgment appealed from was limited to literal infringement); *Laitram*, 115 F.3d at 952 (holding mandate allowed for consideration of issues that were never decided by the district court and unripe for appellate review).

### 2. IPL's Misplaced Reliance On Two Prior Statements Related To The "Generating" Limitation

Unable to credibly dispute that the Board's first decision did not decide the "compressing" limitation, IPL focuses instead on two prior statements from the first decision that the Board made in connection with the "generating" limitation. But neither statement was left undisturbed on appeal or precluded the Board from ruling for Sony on the "compressing" limitation.

#### *a. The Board's prior statement that Wiltshire is "silent as to the content or origin of that 'compressed video MPEG stream'"*

IPL first relies on the Board's prior statement that "Wiltshire's disclosure [is] completely silent as to the content or origin of that 'compressed video MPEG stream.'" IPL Br. 28 (quoting Appx30). IPL makes three incorrect assumptions with respect to this statement: (i) that it relates to the "compressing" limitation; (ii) that Sony never appealed the Board's reading of Wiltshire and thus forfeited any challenge to it; and (iii) that the Court left this statement "undisturbed." IPL is wrong on all three counts.

***First***, this prior statement was part of the Board's decision on the "generating" limitation—not the "compressing" limitation. The Board's statement about the ***content or origin*** of Wiltshire's MPEG stream related to the images that form the MPEG stream and whether they are generated—i.e., whether the images

that form the MPEG stream are pre-existing images (as IPL contended) or generated images (as Sony contended). The Board said:

> Wiltshire's example screens in Figures 4A–9D suggest that these could have simply been ***pre-existing images*** and would ***not necessarily need to be generated in real time***. We ***therefore*** agree with Patent Owner that 'Wiltshire's disclosure [is] completely silent as to the ***content or origin*** of that 'compressed video MPEG stream.'

Appx30. The Board was not making a finding regarding "compressing."

***Second***, Sony did in fact appeal the Board's statement as part of the "generating" appeal. The Board incorrectly thought Wiltshire was "silent" as to the "content or origin" of Wiltshire's MPEG stream because it incorrectly interpreted Wiltshire not to disclose generation of new images and Wiltshire's Fig. 2 not to include the game Doom (which undisputedly generated new images). Appx26-30. Sony's opening brief in the first appeal specifically challenged the Board's erroneous finding that Wiltshire did not generate images at the server and that Doom was not part of Figure 2. *See, e.g.*, Appx3530-3541. For example, Sony disputed the Board's "erroneous conclusion that Wiltshire is limited to selecting pre-existing images." Appx3539; *see also* Appx3540. Sony also specifically addressed the content or origin of the MPEG stream in Wiltshire, which was the "output" of the various games running on the server, such as Doom. Appx3541 ("As Dr. Fuchs testified, to display the ***output*** of the various video games contemplated by Wiltshire ***such as the Doom video game***, a person or

ordinary skill would understand that ***the video MPEG streams in Wiltshire are dynamically generated in real time in response to user inputs***."); *see also* Appx3502 (explaining how Wiltshire discloses compressing the updated images); Appx3511 (same); Appx3518-3520 (same); Appx3680-3682 (explaining in reply how Doom should be applied to Figure 2).

Sony's appeal thus challenged the "content or origin" finding by identifying the content and origin of the compressed video MPEG streams that the Board erroneously believed were missing. IPL's argument that Sony never appealed the Board's statement regarding Wiltshire's silence is demonstrably incorrect.

Further, although the "compressing" limitation was not at issue on appeal, Sony's brief did make clear that the generated images were compressed. Appx3487; Appx3501-3502; Appx3509; Appx3511; Appx3520. In fact, IPL acknowledged that Sony was connecting the newly generated images in Doom to the MPEG stream. Appx3649 (discussing "[a]dding Doom to the MPEG stream, ***as Appellant attempts to do on appeal***").

***Third***, IPL is wrong that the Court left the Board's statement "undisturbed." As an initial matter, the Court vacated the entire decision, so it is incorrect to argue that any finding in the first decision was "undisturbed." *Integrated Tech. Corp.*, 629 F. App'x at 976 (holding that after vacatur, district court "had to consider anew" the facts on remand).

Further, the Court's opinion rejected the Board's statement. The Court held that Wiltshire expressly discloses that images are generated at the server and that Figure 2 applies to Doom. Appx41-42; Appx44. In other words, the Court agreed with Sony and identified the "content or origin" of the MPEG stream that the Board erroneously found was missing from Wiltshire: the "content or origin" could be the server generating new images when running a video game, such as Doom. Appx42 ("Wiltshire discloses generation of a new image, contrary to the Board's conclusions"); Appx44 ("Wiltshire explicitly discloses that Figure 2 is to be applied to games like Doom").

On remand, the Board correctly recognized that the Court's opinion overturned its prior statement. In view of the Court's ruling that Doom is part of Figure 2 and that Wiltshire in fact generates new images, the Board correctly concluded that Wiltshire was not "silent" as to the "content or origin" of the disclosed MPEG stream because the content or origin is the game program, such as Doom, running on the server. Appx93 ("Contrary to Patent Owner's assertion, the logical conclusion from the Federal Circuit's reasoning is that our finding that Wiltshire is silent as to the content of that compressed MPEG stream has now been rejected.").

In sum, the Board's prior "content or origin" statement—made in connection with the "generating" limitation—was appealed to and rejected by this Court, and

thus did not preclude the Board from considering the "compressing" limitation on remand.

#### *b. The Board's prior statement that a skilled artisan would not have "understood Wiltshire's system could possibly have supported [Doom] in the manner proposed by Petitioner"*

IPL similarly errs in relying on the Board's prior statement there was "nothing in Wiltshire to suggest that a person of ordinary skill in the art would have understood that Wiltshire's system could possibly have supported [Doom] in the manner proposed by Petitioner." IPL Br. 28-29 (quoting Appx27). Again, IPL incorrectly asserts (i) that this statement was about the "compressing" limitation, (ii) that Sony never appealed this statement, and (iii) that the Court left this statement undisturbed. Again, IPL is wrong on all three points.

***First***, this statement relates to the "generating" limitation, not the "compressing" limitation. Appx26-27 (discussing this finding in context of the generating limitation). Specifically, the Board made this statement in response to Sony's argument that "preloaded images" would not make sense for interactive games like Doom, which are real-time games. Appx26. The Board disagreed, finding that "Wiltshire does not teach using the operation disclosed in Figure 2 with Doom." Appx26-27. Thus, this statement had nothing to do with the "compressing" limitation, which the Board never reached in the first decision.

***Second***, Sony challenged this statement in the first appeal. In its opening brief, Sony argued that the Board's failure to apply Doom to Figure 2 was not supported by substantial evidence. Appx3490-3491. Sony also explained how the evidence demonstrated that a person of ordinary skill understood how to generate images in real time when running a game like Doom, citing corroborated testimony from Dr. Fuchs. Appx3515-3516; Appx3531-3535; Appx2319-2322(¶¶42-43); Appx2326-2328(¶¶49-50). Sony also disputed this statement in its Reply brief. Appx3663; Appx3680-3682 (citing evidence for how Sony "explained with expert testimony how [] Doom or any video game would work in connection with Wiltshire's Figure 2"). Thus, IPL's contention that Sony waived this issue is incorrect.

***Third***, the Court did not leave this statement undisturbed. As explained above, the Court vacated the entire decision. Further, the Court expressly found the Board ***erred*** in making this statement. Appx43-44 (referencing statement and stating that "[t]he Board erred in its interpretation of Wiltshire"). The Court also explained that to the extent the Board's statement was about lack of enablement, that was also error because "a prior art reference asserted under [35 U.S.C. §] 103 does not necessarily have to enable its own disclosure" and "[e]ven if a reference discloses an inoperative device, it is prior art for all that it teaches." Appx44. Thus, even if the Court had adopted this statement (which it did not), it would not

have precluded the Board from finding that the prior art rendered obvious the "compressing" limitation.

In sum, both prior Board statements made in connection with the "generating" limitation were challenged on appeal and both were rejected by this Court. Thus, those prior statement did not preclude the Board from considering the "compressing" limitation on remand—a limitation it never reached in the first decision. As such, IPL's repeated contention that Sony "waved off" or discouraged appellate review of "compressing" is without merit, as "compressing" was never part of the original decision to begin with. IPL Br. 4, 5, 35.[2]

### 3. The Case Law Supports Sony, Not IPL

The Court's opinions in *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 137 F.3d 1475 (Fed. Cir. 1998) and *Laitram Corp. v. NEC Corp.*, 115 F.3d 947 (Fed. Cir. 1997) are instructive and show why the Court's mandate in this case did not preclude the Board from considering the "compressing" limitation on remand.

In *Exxon*, the jury had entered an infringement verdict for the plaintiff, which "addressed only ***literal*** infringement." 137 F.3d at 1477. On appeal, the

---

[2] IPL points to Sony's arguments in the first appeal challenging the Board's findings regarding the "generating" limitation in part because the Board had improperly relied on IPL's expert testimony relating to the "compressing" limitation. IPL Br. 35. But that does constitute "waving off" or "discouraging" appellate review of any decision regarding the "compressing" limitation, or whether the prior art disclosed that limitation, which was never part of the first decision.

Court reversed the finding of literal infringement. *Id.* at 1477-1478. Back in the district court, the plaintiff sought a new trial on a different infringement ground—the doctrine of equivalents. The district court denied this motion, believing it lacked authority to do so. On appeal, the Court disagreed and held that the mandate did ***not*** preclude consideration of the doctrine of equivalents because the original judgment of the district court was limited to literal infringement. *Id.* The Court noted that "it would be incorrect to conclude that the court's mandate encompassed an issue that was not presented to the court." *Id.*

The situation here is analogous because the Board's original decision was limited only to the "generating" limitation and not the "compressing" limitation. It would be incorrect to conclude that "compressing" was part of the mandate, just like it was incorrect to conclude that "doctrine of equivalents" was part of the mandate in *Exxon*.

In *Laitram*, the Court similarly held that the mandate rule could not preclude consideration of issues that were never previously decided by the district court. In that case, Laitram won a jury verdict of infringement. In response, NEC filed motions for JMOL on three issues: non-infringement, no willfulness, and claim identicality. *Laitram*, 119 F.3d at 949. The district court granted JMOL only on the first motion relating to non-infringement, but did not reach the remaining two because they were mooted by the grant of the non-infringement JMOL. On appeal,

the Court reversed the JMOL of non-infringement and remanded "with instructions to reinstate the jury's verdict." *Id*. at 949. On remand, the district court found that NEC's other two JMOL motions were precluded from consideration under the mandate rule. On appeal, the Court disagreed, finding the mandate from the first appeal was limited to infringement, and thus the district court was free to consider the other two JMOLs on remand. The Court held that "[i]t is incorrect to conclude that we decided issues not only undecided on the merits by the trial court because they were moot, and thus on appeal unripe, but also neither presented to us nor discussed in our opinion, nor necessary to our disposition of the appeal. The scope of our review, and our power to review, was limited to the sole order that was appealed. That order was limited to infringement." *Id.* at 952.

Just as in *Laitram*, the first decision on appeal here did not decide the compressing limitation because it was "moot" due to the generating limitation, and "thus on appeal unripe" and "neither presented … nor discussed … nor necessary to … disposition of the appeal." 115 F.3d at 952.

In contrast, all of IPL's cited cases are distinguishable. IPL Br. 29-30, 35. ***First***, unlike here, most of IPL's cases involved situations in which the party could have—but did not—appeal issues actually decided by the lower tribunal.

In *Doe v. United States*, 463 F.3d 1314 (Fed. Cir. 2006), the plaintiffs sued the government on two separate counts: one for holiday pay and one for overtime

pay. *Id.* at 1315. The plaintiffs subsequently filed a motion for summary judgment on liability that "explicitly bound the two claims together" and the district court granted summary judgment on ***both*** claims. *Id.* at 1327. On appeal from summary judgment, the plaintiffs never argued that the holiday pay claim was distinct from the overtime pay claim, and only raised the distinction between claims for the first time after completion of the appeal, which reversed the judgment on liability. On those facts, the Court held that the plaintiffs "should have raised the issue of the distinction between their holiday pay claim and their overtime pay claim before" but did not, and as such, the claim for holiday pay was waived. *Id.*

In *United States v. Husband*, 312 F.3d 247 (7th Cir. 2002), the Seventh Circuit found waiver because the defendant could have but did not raise issues in the first appeal. 312 F.3d at 251. There, the defendant moved to suppress evidence in a drug possession case based on multiple Fourth Amendment claims challenging the method of the search, as well as the stop, arrest, and validity of the warrant. *Id.* at 250. At the district court, defendant's motion was denied on "all of the defendant's claims." *United States v. Husband*, 226 F.3d 626, 629 (7th Cir. 2000) (*Husband I*). Defendant appealed only the method of the search, but did not raise the other rejected claims. 312 F.3d at 250. The Seventh Circuit held that because defendant did not raise the issues relating to the stop, the arrest, and validity of the warrant, those issues were waived. *Id.* at 251.

In *Retractable Technologies, Inc. v. Becton Dickinson & Co.*, 757 F.3d 1366 (Fed. Cir. 2014), the jury issued a verdict including both a finding of patent infringement and a damages award. *Id.* at 1368-1369. Defendant appealed infringement and validity, but did not appeal the damages award. *Id.* at 1369. The Court reversed infringement as to one of the products but affirmed as to the other. On remand, defendant sought to modify the damages award in view of the Court's reversal on one of the products. However, the district court found that the mandate rule precluded revisiting the damages issue because the damages award was within the scope of the original judgment but not appealed. *Id.* On a second appeal, the Court agreed, holding that the damages award "could have and should have been raised in the previous appeal" because the "damages award was within the scope of the appealed judgment[.]" *Id.* at 1370-1371.

In *Amado v. Microsoft Corp.*, 517 F.3d 1353 (Fed. Cir. 2008), the Court found that Microsoft had a reasonable opportunity to raise an issue during the appeal but "expressly declined that opportunity." 517 F.3d at 1360. After the jury returned a verdict of patent infringement against Microsoft, the district court granted plaintiff's request for permanent injunction and entered final judgment. 517 F.3d at 1356. After appeal briefing had concluded but before oral argument, the Supreme Court issued its decision in *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006), which overturned the then-controlling law regarding permanent

injunctions. However, Microsoft did not raise the issue of *eBay's* impact or reserve the right to seek relief from the injunction on remand, even when questioned at oral argument. *Amado*, 517 F.3d at 1360. In a subsequent appeal, the Court found that "there can be no question that the grant of the permanent injunction was within the scope of the [] mandate" and that "Microsoft had a reasonable opportunity to raise" the *eBay* issue but "expressly declined that opportunity." *Id.* On these facts, the Court held that the mandate rule foreclosed reconsideration of the initial issuance of the injunction. *Id.*

In *Engel Industries, Inc. v. Lockformer Co.*, 166 F.3d 1379 (Fed. Cir. 1999), the Court found waiver of a claim relating to a license agreement because the claim was "plainly within the scope of the judgment appealed from" but Engel made the "choice ***not*** to present its claim." 166 F.3d at 1383. Engel had appealed from a judgment "that its product infringed [] *and* that Engel 'must continue to make royalty payments' under the terms of the license agreement." 166 F.3d at 1383 (emphasis in original). The Court found that "liability under the license agreement was plainly within the scope of the judgment appealed from." *Id.* On appeal, Engel chose not to present its claim that it was entitled to a refund of payments under the license. *Id.* Thus, the Court held that the license claim was part of the mandate and the district court could not revisit that issue on remand. *Id.* at 1384.

In *Robotic Vision Systems, Inc. v. View Engineering, Inc.*, 249 F.3d 1307 (Fed. Cir. 2001), the district court granted summary judgment of invalidity based on the on-sale bar because (1) the inventor agreed to sell the invention for profit before the critical date, and (2) the invention was sufficiently complete. On appeal, the Court determined that there was a dispute of fact on the latter point and remanded. *Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 112 F.3d 1163, 1167 (Fed. Cir. 1997). This left the district court's finding on the first prong, which was an integral part of the district court's original ruling, "undisturbed." 249 F.3d at 1310. The Court never mentioned the mandate rule, and there was no indication that the patent owner had disputed the relevant finding on remand.

In *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243 (D.C. Cir. 1987), the district court had ordered plaintiffs to pay back-rent. On appeal, plaintiffs "attacked some portions of the damages award but did not challenge the back-rent decision." 810 F.2d at 250. On those facts, the D.C. Circuit held that the law of the case doctrine precluded subsequent challenges relating to the back-rent decision. *Id.* at 250-251.

Unlike the cited cases, Sony could not have appealed a ruling on the "compressing" limitation because the Board made no ruling on that limitation in its prior decision. The "compressing" limitation was thus not within the scope of the judgment appealed from, leaving the Board free to consider "compressing" on

remand. As to the two prior statements within the Board's "generating" discussion that IPL identifies, Sony could not have challenged them as "compressing" rulings given that the Board ruled against Sony solely on the "generating" limitation. *Cf. Droplets, Inc. v. E*TRADE Bank*, 887 F.3d 1309, 1321 (Fed. Cir. 2018) ("we review judgments, not opinions"). In any event, Sony ***did*** challenge both prior findings as part of its "generating" appeal, and the Court agreed with Sony and overturned them. *Supra* pp. 37-39.

***Second***, unlike here, IPL relies on cases that used restrictive wording when remanding. In *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 576 F.3d 1348 (Fed. Cir. 2009), the district court could not consider anticipation on remand where the mandate had expressly "reinstate[d] the jury verdict of validity, and remand[ed] for a new trial on infringement and reassessment of damages." 576 F.3d at 1353; *see also id*. at 1355-1356.

In *HPI/GSA 3C, LLC v. Perry*, 364 F.3d 1327 (Fed. Cir. 2004), the Court vacated-in-part, and only with respect to a particular issue on which the Board of Contract Appeals "did not clearly state its reasoning." *Id*. at 1337. The opinion expressly stated that a different determination that "neither party disputed" would remain "undisturbed on remand." *Id*. at 1334.

In *Hayward Industries, Inc. v. Pentair Water Pool & Spa, Inc.*, 814 F. App'x 592 (Fed. Cir. 2020) (nonprecedential), the Board originally found certain patent

claims to be patentable because it found that the prior art reference did not teach the "interrelated master/slave relationship" limitation. *Id.* at 594. On appeal, the Court reversed this finding and remanded for the specific purpose of considering a different limitation—the "optimize energy consumption" limitation—which the Board did not previously reach. *Id.* at 595. Nonetheless, on remand, the Board went beyond addressing the "optimize energy consumption" limitation to make findings relating to the "master/slave" limitation, which had already been addressed by the Court. *Id.* On appeal, the Court found that the Board exceeded the express scope of its mandate by improperly revisiting the "master/slave" issues that the Court already decided in the first appeal. *Id.* at 597-598.

In *Polygroup Ltd. MCO v. Willis Electric Co.*, No. 2021-1401, 2022 WL 1183332 (Fed. Cir. Apr. 20, 2022) (nonprecedential), the Court had expressly limited the scope of the remand, instructing the Board to consider petitioner's "arguments based on Miller … alone." 2022 WL 1183332 at *2. On remand, the Board also considered whether Miller in combination with another reference Lessner rendered obvious one of the challenged claims. *Id.* at *3. The Court held that this was "outside the scope of our mandate" which was limited to considering Miller alone. *Id.*

Unlike in these cases, the Court's remand here did not narrow the scope of remand to any particular issue, much less foreclose consideration of the limitation

the Board never previously reached. The Court simply remanded "for further proceedings consistent with this opinion." Appx45.

***Finally***, *Atlanta Gas Light Co. v. Bennett Regulator Guards, Inc.*, 33 F.4th 1348, 1355 (Fed. Cir. 2022) undermines IPL's mandate rule argument. In *Atlanta Gas*, the Court held that the Board did ***not*** violate the mandate by considering a time bar issue on remand, which the Court had "said nothing" about. 33 F.4th at 1355. The Court also noted that the Board did not "analyze, criticize, or alter the unpatentability issues" actually decided on appeal. *Id.* This case supports Sony, not IPL. Here, similar to *Atlanta Gas*, the Court's opinion in the first appeal was about the "generating" limitation and "said nothing" about whether the prior art disclosed the "compressing" limitation. The Board on remand did not "analyze, criticize, or alter the unpatentability issues" actually decided regarding the "generating" limitation, and was free to consider the "compressing" limitation which was never previously decided.

In sum, the record and relevant case law demonstrate that the Board was not foreclosed from considering "compressing" on remand.

### C. The Board Correctly Followed the Court's Mandate

When the mandate is properly construed, there can be no dispute the Board properly followed the Court's mandate. As set forth in the Final Written Decision on remand, the Board analyzed the "compressing" limitation (as well as the other

limitations not previously considered in the first decision) and reached a determination that expressly adhered to the Court's opinion. *See* Appx73-75 (summarizing the Court's findings that the Board had to follow on remand).

Regarding the "compressing" limitation, the Board found that "[b]ased on our review of the complete record, and in view of the Federal Circuit's guidance as to Wiltshire's disclosure, we are persuaded that Petitioner has shown that the combination of Wiltshire and Saha teaches this limitation." Appx82.

The Board also disagreed with IPL's argument that its prior statement regarding the "content" of the MPEG stream was left undisturbed by the Court's opinion—which is the same argument IPL presents on appeal. Appx92-93. The Board explained how the "logical conclusion from the Federal Circuit's reasoning is that our finding that Wiltshire is silent as to the content of that compressed MPEG stream ***has now been rejected***." *Id.* In particular, the Board explained how its prior statement was based on focusing on Wiltshire embodiments where the images are pre-loaded, which the Court concluded was improper. Appx93. The Board recognized that under the Court's opinion, it was incorrect to exclude Doom from Figure 2. *Id.* Per the Court's opinion, the Board explained it had to "credit[] Wiltshire's disclosure of applying its system to video games like Doom, which require 'generating' new images." *Id.* After properly applying Doom and other disclosures that it previously ignored, the Board correctly recognized that its prior

statement was inconsistent with the Court's opinion. *Id.* IPL notably never takes issue with the Board's logical reasoning summarized above; rather, IPL only contends (incorrectly) that the Board was foreclosed due to the mandate rule. But if anything would have violated the mandate, it was IPL's position that the Board should have continued applying an understanding of Wiltshire that had been rejected on appeal.

* * *

In sum, because the Board duly followed the Court's mandate, IPL's primary argument on appeal should be rejected and the Board's Final Written Decision on remand should be affirmed.

## II. THE BOARD'S FACTUAL FINDINGS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

The Board's comprehensive 93-page decision on remand devoted 20 pages to the "compressing" limitation.[3] Substantial evidence—indeed, overwhelming evidence—supports the Board's decision.

---

[3] IPL suggests some impropriety because the Final Written Decision on remand "mushroomed" to 93 pages. IPL Br. 5. However, the additional length is entirely reasonable given that the Board's first decision only considered a single limitation. On remand, the Board had to consider all the limitations of the challenged claims, including those it never reached in the first decision, such as the "compressing" limitation.

### A. Substantial Evidence Supports The Board's Finding That Wiltshire And Saha Render Obvious The "Compressing" Limitation

On remand, the Board found that Wiltshire and Saha taught "compressing the at least one updated image and transmitting the compressed updated image to the client device, wherein the server transmits the updated image as a compressed frame that can be decompressed and displayed as an updated image at the client device" (the "compressing" limitation). Appx76-96.

The Board's findings regarding the "compressing" limitation were supported by substantial evidence and directly followed from the Court's holdings in the first appeal. The Board relied on the express teaching from Wiltshire showing the images on the server may be compressed before transmission. Specifically, the Board relied on Figure 2 of Wiltshire, which disclosed sending a "video stream to client" at stage 230. Appx1336(Fig. 2); Appx91. The Board also relied on Wiltshire's explanation that "[i]n stage 230, an image is sent from server/host computer 110 to client/terminal computer 120. The image may include any type of graphical information including … ***an encoded audio/video stream such as a compressed video MPEG stream***." Appx1355(7:13-18); Appx91. Taken together, Wiltshire discloses that images sent in step 230 may be various "type[s]," including "an encoded audio/video stream such as a ***compressed*** video MPEG stream." Appx1336(Fig. 2); Appx1355(7:13-18); Appx91. The Board further

relied on Wiltshire's express disclosure that the "bandwidth requirement can be further reduced using data ***compression*** techniques to about 100 KB/sec." Appx1355(7:62-64); Appx91.

The Board considered and rejected IPL's argument that "Wiltshire does not disclose on-the-fly creation and compression of an MPEG stream, but instead could have used a pre-existing MPEG stream." Appx92. The Board explained that under the Court's opinion, it "must 'credit[] Wiltshire's disclosure of applying its system to video games like Doom, which require 'generating' new images." Appx93; *see also* Appx40-41. When applying Doom to Figure 2, the Board found the "compressed MPEG stream" of Wiltshire would be dynamically generated. Appx93. The Board further relied on testimony from Dr. Fuchs providing "details about how a person of ordinary skill in the art would have understood Wiltshire's disclosure, as applied to Doom," crediting his testimony "that the 'compressed video MPEG stream' disclosed in Wiltshire 'must be dynamically generated because [the] Wiltshire system must be capable of playing real-time interactive games like Doom.'" Appx95; Appx2323-2324(¶46); Appx2326-2328(¶¶49-50); Appx506-508.

The Board also found credible and persuasive Dr. Fuchs' testimony that "real-time image compression (including by using MPEG) was also well known at the time of the invention, as evidenced by the Levoy article." Appx91-92;

Appx1025-1026(¶27) (Dr. Fuchs testifying that "it was known prior to the '109 patent that graphics can be generated on a server computer, and the generated image can then be compressed and transmitted to a client computer that will decompress that image and display the image on a monitor attached to the computer" citing the Levoy article and Wiltshire); Appx2329(¶53) (testifying that details of real-time MPEG compression was already in the knowledge of a person of ordinary skill in the art in 2001, citing earlier declaration and the Levoy article); Appx1649 (authors of Levoy article stating that "[r]ecent advances in ***realtime image compression and decompression*** hardware make it possible for the high performance machine to operate as a rendering server for the low-end machines This can be accomplished ***straightforwardly*** by rendering on the server, then ***compressing*** and transmitting an image stream to the client.").

The Board also relied on substantial evidence to find that the combination of Wiltshire and Saha disclosed transmitting the updated images as a "compressed frame." Appx83-88. The Board relied on multiple pages of testimony from Dr. Fuchs and concluded that "Dr. Fuchs ***testifies in detail*** regarding how the application of Doom to Figure 2 of Wiltshire teaches the claim limitation." Appx88 (citing Fuchs testimony at Appx2319-2333(¶¶42-59)); Appx1366(1:64-2:1) (Saha teaching that "[MPEG] is a set of methods for compression and decompression of full motion video images which uses the interframe and

intraframe compression techniques… .”); *id.* (2:5-14) (describing “predominant MPEG standards”); *id.* (2:19-35) (teaching use of “frames” in MPEG).

In sum, the Board relied upon substantial evidence, including express disclosures and expert testimony, and the Court’s guidance to conclude that the combination of Wiltshire and Saha disclosed the “compressing” limitation, and thus the Board’s Final Written Decision on remand should be affirmed. *PalTalk Holdings, Inc. v. Riot Games, Inc.*, 810 F. App’x 904, 905 (Fed. Cir. 2020) (nonprecedential) (in affirming obviousness, there was substantial evidence where the Board relied on “expert testimony and express disclosures in the prior art”).

### B. IPL’s Arguments To The Contrary Should Be Rejected

As explained above, the Board’s findings regarding the “compressing” limitation were supported by substantial evidence, and none of IPL’s arguments shows otherwise.

***First***, far from showing lack of substantial evidence, IPL merely re-argues that Wiltshire’s disclosure of a “compressed video MPEG stream” does not disclose real-time compression. IPL Br. 47-49. However, the Board considered these very arguments and rejected them after considering Sony’s evidence and the Court’s holdings. Appx72; Appx80; Appx82-95.

As the Board recognized, IPL’s argument that there is no real-time compression is contrary to the Court’s holding that Wiltshire teaches generating

"new" images, including when running Doom. Appx41-42. As Dr. Fuchs testified, when running Doom, it would make no sense to transmit pre-existing compressed video MPEG streams because Doom generates "new" images dynamically. Appx505; Appx508; Appx2319-2328(¶¶42-50).

Further, IPL's argument that Wiltshire uses pre-existing MPEG files is based on a made-up example of displaying a short pre-existing compressed video that is, as IPL admits, nowhere in Wiltshire. Appx3044(¶64); Appx437 (admitting "Wiltshire does not disclose this example"). It is not surprising that the Board credited Dr. Fuchs' testimony, which is rooted in Wiltshire's express disclosures, over IPL's, which was based on conjecture.

***Second***, unable to point to any actual example of a pre-existing compressed MPEG file in Wiltshire, IPL grasps at Wiltshire's alleged use of the "past-tense" term "encoded" in the phrase "encoded audio/video stream" to suggest that the audio/video stream is pre-stored or pre-encoded. IPL Br. 48. IPL's argument should be rejected. Wiltshire states that the "encoded audio/video stream" is a type of "image" at the server and that the "image ***is generated*** by game computer program 112." Appx1355(7:7-19). As this Court already held, Wiltshire's disclosure that an image is generated means "generation of a ***new*** image[.]" Appx42. It follows that the "encoded audio/video stream" (a type of image) is "generated at the game computer program 112" and not pre-existing. Finding

otherwise would run counter to the Court's holding that Wiltshire discloses newly generated images. Appx41-42. Further, "encoded" is used as an adjective rather than a past-tense verb, but even using the past tense would not mean it is a pre-existing file. The '109 patent uses the term "compressed" dozens of times, so under IPL's logic, the '109 patent would fail to disclose real-time compression as well. *See, e.g.*, Appx149(4:40-46); Appx150(6:37-38); Appx151(8:44-47).

***Third***, IPL incorrectly asserts that it was "undisputed" that a skilled artisan would have understood Wiltshire's reference to a "compressed video MPEG stream" to be a pre-stored MPEG file. IPL Br. 48. Dr. Fuchs' testimony directly refutes this contention, explaining how a skilled artisan would understand Wiltshire's Figure 2 and accompanying descriptions to mean that the updated images are sent as a compressed MPEG stream. Appx2323-2325(¶¶45-47). Dr. Fuchs also directly disputed IPL's contention that "transmitting a 'compressed video MPEG stream' actually means sending a *pre*-compressed MPEG file." Appx2326(¶49) (emphasis in original). Dr. Fuchs explained why the video stream must be dynamically generated because Wiltshire's system must be capable of playing real-time games like Doom. *Id.* The Board found Dr. Fuchs' testimony persuasive and followed the Court's opinion regarding the application of Doom. Appx91.

***Fourth***, IPL incorrectly argues that Wiltshire's express "data compression" disclosure at column 7, lines 62-64 (teaching that "[t]his bandwidth requirement can be further reduced using data compression techniques") does not disclose "what is being compressed or when." IPL Br. 49-50. Contrary to IPL's argument, Wiltshire clearly discloses that "data compression" refers to the images being generated at the server and transmitted to the client. The "bandwidth requirement" refers to transmissions over "communications pathways 130 between server/host computer 110 and client/terminal computers 120." Appx1355(7:57-59). The generated images are transmitted by the server to the client over that pathway 130, as shown in step 230 of Figure 2 and column 7:20-21 ("In turn, the image is transferred over communication pathways 130"). The Board's conclusion that Wiltshire's teaching of "data compression" applies to the transferred images is thus supported by substantial evidence. *See* Appx1055-1056(¶81), Appx1063-1064(¶96), Appx2319-2321(¶42), Appx2322-2323(¶44), Appx2324-2325(¶47).

***Fifth***, IPL's argument that the Board improperly changed course by relying on "repudiated" testimony from Dr. Fuchs is without merit. IPL Br. 50. The Board properly credited Dr. Fuchs' testimony regarding Wiltshire's compression, which was never addressed, much less repudiated, in the first decision. Appx91-93 (crediting Dr. Fuchs' testimony that a person of ordinary skill in the art "would have understood that MPEG was well known and widely used to compress and

decompress image or video data years before the ’109 patent” and that real-time image compression (including by using MPEG) was also well known at the time of the invention, as evidenced by the Levoy article.”). It was proper for the Board to disagree with Dr. Hart’s testimony limiting Wiltshire to pre-existing images in view of, among other things, the Court’s holding that Wiltshire was not limited to pre-existing images. Appx92-93.

***Sixth***, IPL incorrectly argues that Dr. Fuchs “never explained why the Doom video stream was also a ***compressed*** video MPEG stream.” IPL Br. 52. IPL appears to be relying on the fact that Dr. Fuchs’ testimony stating that “[t]he video stream must be dynamically generated” does not say a “***compressed*** video stream must be dynamically generated.” *Id.* IPL’s argument misstates the testimony by excerpting a single sentence while omitting the immediately prior two sentences which expressly reference a “***compressed*** video stream.” Appx2326(¶49) (“Patent Owner also argues that Wiltshire’s disclosure of transmitting a ‘***compressed video MPEG stream’*** actually means sending a *pre*-compressed MPEG file … . As explained above, Figure 2 and the accompanying descriptions teach dynamically generating updated images based on game states that are in turn affected by user inputs, and sending those images to the client as a ***compressed*** video stream. ***The*** video stream must be dynamically generated because Wiltshire system must be capable of playing real-time interactive games like Doom.”) (second emphasis in

original). Indeed, the only type of "video stream" mentioned in Wiltshire is a "compressed" video stream. Appx1355(7:15-18).

***Seventh***, IPL incorrectly argues that the Board's reliance on Dr. Fuchs' testimony regarding Saha and Levoy is improper. IPL Br. 52. Saha is part of the obviousness ground that Sony argued for the "compressing" limitation. Appx194 ("The combination of Wiltshire and Saha discloses [the compressing] limitation."). The Board properly acknowledged how Saha "details MPEG standards and describes how MPEG compression 'encode[s] or compress[es] frames in the sequence." Appx91. The Board also properly relied on Levoy for knowledge of a person of ordinary skill in the art. As this Court held in *Ariosa Diagnostics v. Verinata Health, Inc.*, "[a]rt can legitimately serve to document the knowledge that skilled artisans would bring to bear in reading the prior art identified as producing obviousness" even if that art was not "identified at the petition stage as one of the pieces of prior art defining a combination for obviousness." 805 F.3d 1359, 1365 (Fed. Cir. 2015). Here, Levoy was cited in Sony's opening expert declaration to explain the knowledge of a person of ordinary skill in the art prior to the '109 patent, and again in his supplemental declaration to rebut Dr. Hart's contention that real-time compression was not possible at the time of Wiltshire. Appx1025-1026(¶27); Appx2329(¶53). Thus, Dr. Fuchs presented Levoy as evidence of the background knowledge of a person of ordinary skill in the art when reading

Wiltshire and Saha to understand the ease of real-time compression, in rebuttal to Dr. Hart's testimony that real-time compression was not possible for a live stream prior to the '109 patent. Appx1025-1026(¶27); Appx2329(¶53).

*Medtronic, Inc. v. Teleflex Life Sciences Ltd.*, cited by IPL, does not say otherwise. No. 2022-1605, 2024 WL 1208642 (Fed. Cir. Mar. 21, 2024) (nonprecedential). In *Medtronic*, the Court held that the Board did not need to consider the petitioner's argument that a skilled artisan would have modified the teachings of a reference based on the reference alone and a skilled artisan's knowledge because that argument was not in the petition. *Id.* at *8. Here, unlike *Medtronic*, the Board did not rely on Levoy to ***modify*** Wiltshire to arrive at the compressing limitation. Appx91-92. The Board relied on Wiltshire's express disclosures without modification by Levoy. Appx91 (citing Appx1355(7:13-18; 7:62-64)). The Board relied on Levoy for knowledge of a person of ordinary skill in the art to understand the ease of implementing real-time compression, which is proper, as this Court held in *Ariosa Diagnostics*.

In any event, the express disclosures from Wiltshire provide more than substantial evidence to support the Board's obviousness finding. Appx91 (citing Appx1355(7:13-18; 7:62-64)).

***Eighth***, IPL's argument that there is no evidence that Doom's images "***require*** compression" misses the point. IPL Br. 44-45 (arguing that "[a]lthough

Doom generates images, there is no evidence that its images ***require*** compression"). Wiltshire did not need to teach that MPEG compression is the only embodiment or "required" in order to disclose the compressing limitation. As the Court explained in the first appeal, "a reference must be considered for everything that it teaches, not simply the described invention or a preferred embodiment." Appx44-45 (quoting *In re Applied Materials, Inc.*, 692 F.3d 1289, 1298 (Fed. Cir. 2012)). Wiltshire expressly taught the option to use MPEG compression to reduce bandwidth. Appx1355(7:15-18, 7:57-61). When Doom is applied to Figure 2, there is no dispute that the images are dynamically generated. Appx41. Thus, to make use of Wiltshire's compression teachings with the dynamically-generated images from Doom, it follows that the MPEG stream is dynamically generated. Appx2319-2333(¶¶42-59).

***Finally***, the Court should reject IPL's argument that the Board's reliance on Dr. Fuchs' expert testimony in paragraphs 46, 47, and 49 of his supplemental declaration is not substantial evidence. IPL Br. 53-54. IPL first complains that the Board's excerpts from paragraphs 46 and 49 of Dr. Fuchs' testimony do not explicitly refer to "compressing." IPL Br. 53 (citing Appx93). But IPL ignores the full context of these paragraphs and the Board's reliance upon them. The Board cited Dr. Fuchs' paragraph 46 as evidence that Doom generates a live, real-time video stream (which remains undisputed). Appx93. The Board cited paragraph 49

as evidence for why that real-time video stream would be compressed—also in real time—when used in Wiltshire's system. *Id.* As explained above, the quote from paragraph 49 referencing "[t]he video stream" is clearly referring to a "compressed" video stream when read in context of the entire paragraph. Appx2326-2327(¶49); *supra* pp. 61-62.

IPL also incorrectly argues that Dr. Fuchs' paragraph 49 is conclusory. IPL Br. 53-54. Paragraph 49 explicitly refers to earlier paragraphs, which describe in detail why Wiltshire discloses real-time video streams. For example, paragraph 47 explains why Wiltshire step 230 discloses compressing a real-time video stream. Appx2324-2325(¶47). IPL acknowledges this much, but then incorrectly characterizes Dr. Fuchs' paragraph 47 as a "transparent attempt to redraft Wiltshire's disclosure" and "blatantly masking the actual disclosure of Wiltshire." IPL Br. 54. These accusations are unwarranted. Dr. Fuchs thoroughly explained why a skilled artisan would conclude that Wiltshire discloses the limitation, and the Board agreed. As Dr. Fuchs explained, step 230 of Figure 2 shows sending a "video stream," and column 7 explains that in step 230, "an image is sent." Appx1355(7:13-15). Thus, Wiltshire plainly disclosed that a video stream is sent. In the very next sentence, Wiltshire explained that the transmitted image at step 230 includes various types, including "an encoded audio/video stream such as a compressed video MPEG stream." Appx1355(7:15-17). Again, this is consistent

with Figure 2 step 230, which shows one of these types listed at 7:15-16—a video stream. And the only type of video stream described in column 7 was a "compressed video MPEG stream." Thus, as Dr. Fuchs testified, a person of ordinary skill would understand that Wiltshire disclosed sending a compressed video MPEG stream. Appx2324-2325(¶47).

Contrary to IPL's arguments, Dr. Fuchs' testimony follows from the express disclosures of Wiltshire and provides substantial evidence for the Board's conclusion. On the other hand, IPL's myopic reading of Wiltshire's Figure 2 and column 7 cannot diminish the substantial evidence that the Board relied upon for the "compressing" limitation.

## CONCLUSION

Because the Board correctly followed the Court's mandate and because its conclusions regarding the "compressing" limitation are supported by substantial evidence, the Board's Final Written Decision should be affirmed.

Respectfully submitted,

/s/ James M. Dowd

JAMES M. DOWD
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, CA 90071
(213) 443-5300

*Attorneys for Appellee Sony Interactive Entertainment LLC*

THOMAS G. SAUNDERS
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000

JOSEPH F. HAAG
S. DENNIS WANG
WILMER CUTLER PICKERING
HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
(650) 858-6000

February 5, 2025

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoinwg filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1. The filing has been prepared using a proportionally-spaced typeface and includes 13,361 words.

2. The filing has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ James M. Dowd
JAMES M. DOWD
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, CA 90071
(213) 443-5300

February 5, 2025